**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GREGORY STENSTROM; NICK MANGANARO;
and HARRY R. HAURY, Plaintiffs, individually pro se,
v.
AL SCHMIDT, in his official capacity as Secretary of the
Commonwealth of Pennsylvania, Defendant.

Civil Action No. ___________________

**PLAINTIFFS' EMERGENCY MOTION ON NOTICE FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1. Plaintiffs request a prompt noticed hearing on the machine-compliance evidence and withheld registration records. Under Rules 65, 26(d)(1) and 16, Manganaro seeks preservation, focused production, examination and a conditional seven-day pause in Schmidt's own remaining PA-5 certification, submission and attestation acts. Stenstrom and Haury seek preliminary enforcement of their personal statewide NVRA inspection demands. No relief is requested without notice. The defined terms in Complaint paragraph 2 apply.

**A. Pause certification for seven days**

2. Prevent finalization under the allegedly deficient process. Manganaro seeks a restraint solely on Schmidt's own remaining PA-5 certification and filing under 25 P.S. § 3159 and submission and attestation under § 3163. The threatened harm is State certification of Manganaro's election under the allegedly deficient process before the documented software-check dispute receives meaningful examination. He alleges that the machines outside the precinct sample counted his race without the prescribed software check and separately disputes compliance within the sample. Preservation and production alone do not prevent the challenged finalization during examination. The requested restraint applies only to uncompleted acts upon findings of the requisite federal violation, imminence and irreparable injury. It lasts seven calendar days,

expiring at 5:00 p.m. Eastern Time on the seventh day after entry unless dissolved earlier or extended by a further supported order. Complaint ¶¶ 25–37, 45, 56–61; Exs. A–D, F, Q.

3. Receipt of county returns, computation, canvassing, lawful audit work and preservation may continue. The restraint would not invalidate votes, undo completed acts or restrain another contest. It reaches only Schmidt's own remaining acts; it does not bind the Governor or direct the United States House of Representatives.

**B. Identify the certification timetable and hold a hearing**

4. Plaintiffs request a hearing within two business days; a sworn statement within one business day identifying completed and remaining PA-5 finalization acts and their expected dates; and preservation of the existing records described in the proposed order. Plaintiffs also request at least 48 hours' written notice before the planned PA-5 certification while this preliminary-injunction motion remains pending. The notice does not automatically extend the seven-day restraint.

**C. Produce the testing and reconciliation records**

5. For good cause under Rule 26(d)(1), Plaintiffs request production within two business days of existing November 2026 L&A completion certifications for Delaware County's Hart Verity 2.7 equipment received by the Department; accompanying or responsive Department communications; and corresponding certified reference manifests supplied by the Department to Delaware County for Hart Verity 2.7, their source, and existing transmittal or authentication records, including EAC Field Services communications, together with validation outputs and comparison records already in Schmidt's possession, custody or control. This request concerns existing records and does not authorize entry into county equipment. Any request to expand equipment coverage will be supported separately. To the extent already held by the Department

and concerning the Delaware County machines or affected returns, production also includes November audit submissions bearing on the same records: the ballot manifest, relevant contest totals by batch, and audit results with reported anomalies. Ex. R, GEX-R-003–005. This does not assume that the PA-5 contest was selected for audit.

5(a). The request expressly includes any executed Voting System Implementation Attestation using Attachment C referenced in Condition J, or an equivalent existing attestation, including its attachments and related submission or response communications. Ex. A, GEX-A-005; Ex. C, GEX-C-006.

5(b). Plaintiffs request instructions, guidance and communications implementing the Department practice alleged in Complaint paragraphs 36(a)–(c), within the same production deadline.

5(c). At the preliminary-injunction stage, Plaintiffs request a focused county report through Schmidt's § 2621(e) authority upon findings establishing a federal violation and the necessity of that remedy. The requested subjects are the November Hart equipment, operation performed, dates, coverage and custodians. The initial temporary order requires only existing Department-held records and identification of known custodians; new reporting awaits a further supported order.

5(d). Plaintiffs request existing Department-held precinct comparisons and discrepancy resolutions for Delaware County returns in PA-5 under 25 P.S. § 3154(b) and (d)(4)–(5), and identification of known custodians for records not held. Any additional county reporting concerning those comparisons, discrepancies and dispositions is reserved for the preliminary-injunction stage. Complaint ¶¶ 24(a), 69(d).

**D. Open the covered registration records**

6. At the preliminary-injunction hearing, Stenstrom and Haury request identification of the NVRA inspection custodian and responsive categories within two business days, inspection beginning within five business days, and prompt rolling access to remaining covered records. The request concerns the existing records specified in their August 18 notice and September 18 renewed demand, with statutory exclusions and protection of confidential identifiers. They request coordination with No. 2:26-cv-07467-JS. They seek one coordinated inspection schedule with the pending U4F action, with credit for production there. The identified NVRA analysis concerns 2,555,665 distinct registration identifiers and 2,865,011 flagged conditions. The records are requested to determine which conditions are resolved and which require lawful correction, to support accurate registration and eligible participation. Ex. H, GEX-H-003, 007; Complaint ¶¶ 47–52, 63–66. The existing records must be available to test the explanations offered for them.

**The evidence submitted with this motion**

7. The factual grounds are stated in Complaint paragraphs 11–46, 47–52 and 53–54 and the accompanying memorandum. Exhibits A–U, filed with the Complaint in an indexed compilation, are expressly adopted as evidence supporting this motion at the cited pages. Plaintiffs submit those identified exhibits in support of this motion and will reattach the same exhibit PDFs if required by the assigned judge’s filing procedures. The motion and memorandum also state the essential facts supporting relief.

8. The record includes the approval conditions, vendor method, verified County explanation, sworn testimony, signed observer declarations, timely examination requests and orders, and the mandatory county testing-certification requirement. Exs. A–F, L–M, Q. The November practice is alleged on the specific basis in Complaint paragraph 31. Manganaro’s own federal

congressional contest and requested PA-5 relief are developed in Complaint paragraphs 14–15 and 60. The separate related appeals are disclosed in paragraphs 53–55 and Exhibits O–P and S. The requested hearing will address the implemented practice, Schmidt's own conduct and the particular federal injury, with the injunction factors addressed in the memorandum and its record-specific table. The October 30 signed notice in the machine case expressly includes Manganaro among all six appellants from the October 29 dismissal with prejudice. Ex. S, GEX-S-004–010. Manganaro also joined the November 23 written compliance request mailed to the Department's Office of Chief Counsel. The letter, enclosures, postal receipt and addressed envelope are Exhibit T. Complaint ¶ 46. Exhibit U supplies the contemporaneous official PA-5 public display labeling the returns unofficial, without treating that label as confirmation of each statutory act's status.

**Separate rulings on the claims and requested relief**

9. Plaintiffs request findings and conclusions under Rule 52(a)(2), a security determination under Rule 65(c), and entry of the self-contained proposed order. Manganaro requests nominal security of $100, subject to the Court's determination based on the evidence. The separate proposed status-conference order accompanying the Complaint may be superseded by this emergency schedule. If the Court defers a question concerning Condition J pending State appellate review, Plaintiffs request prompt determination of the separately supported preservation and existing-record production requests, and Count II's inspection claim, on their own applicable grounds. Plaintiffs request separate rulings on candidate standing, Count I, Count II and each form of preliminary relief so the legal and factual grounds are clear. They welcome Department of Justice review and lawful participation as stated in Complaint paragraph 71; that invitation does not delay the requested hearing. The federal questions are expressly stated in Complaint

paragraphs 6(a)–(d) and the memorandum; Plaintiffs request resolution of those necessary to decide this motion, with any threshold ground separately identified.

WHEREFORE, Plaintiffs request the temporary restraint, preservation, focused production and expedited hearing specified above; preliminary inspection relief on the NVRA claim upon the required findings; and such narrower or additional relief as the established federal violation warrants.

**Emergency submission and preservation of merits proceedings**

Plaintiffs request prompt determination of emergency relief on the written submissions, subject to any necessary hearing. This request does not waive requested oral argument on dispositive motions or adjudication of the underlying claims on a developed merits record.

Respectfully submitted,

Gregory Stenstrom, individually pro se
1541 Farmers Lane, Glen Mills, PA 19342
856-264-5495; gregorystenstrom@gmail.com

Nick Manganaro, individually pro se
429 Montgomery Avenue, Apt. C403
Haverford, PA 19041
610-662-9291; n.manganaro@comcast.net

Harry R. Haury, individually pro se
167 Lamp & Lantern Village, Suite 194
Chesterfield, MO 63017
314-498-2569; harryhaury@protonmail.com

Dated: November 23, 2026

**Certificate of notice and service**

I certify that on ____________________, at ___________ Eastern Time, I provided Defendant or his identified counsel with the emergency motion, supporting memorandum, proposed order and access to the Complaint and Exhibits A–U by the following means:

Recipient and contact information: ______________________________________

Method and time of actual notice: _______________________________________

Defendant's stated position, if obtained: _________________________________

Status of original-process service under Rule 4: ___________________________

________________________________________
Signature and printed name

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GREGORY STENSTROM; NICK MANGANARO;
and HARRY R. HAURY, Plaintiffs, individually pro se,
v.
AL SCHMIDT, in his official capacity as Secretary of the
Commonwealth of Pennsylvania, Defendant.

Civil Action No. ___________________

## MEMORANDUM SUPPORTING EMERGENCY MOTION ON NOTICE

### I. What happened and what Plaintiffs ask the Court to do

Manganaro asks the Court to preserve the records, obtain the compliance evidence and hear his request before Schmidt completes any remaining State finalization acts for PA-5. He alleges a combined deprivation: an adopted substitute for the prescribed software check, blocked timely examination and finalization under that practice. He seeks a conditional seven-day pause in Schmidt's own acts. The approval report, vendor instructions, verified County explanations, sworn testimony and observer declarations support the allegations. Stenstrom and Haury separately seek covered statewide NVRA inspection. Exs. A–F, L–M, Q.

Allen admitted that his described hash procedure was "absolutely not" run on every machine. The County relied on powering on and booting for the rest. Plaintiffs allege continuation of that practice in November and dispute compliance within the sample. The inquiry is specific: what procedure was performed, on which machines, against which approved reference? **A machine's ability to boot does not establish that it is running the approved software.** Complaint ¶¶ 28–32, 36(a)–(c). Paragraph 2 defines the terms used here.

County counsel argued for access and challenges after counting. County certification then overtook the interim requests. Ex. N, GEX-N-007–010; Ex. F, GEX-F-008–009. **Officials cannot answer a demand for verification by withholding the verification records and then**

**insist that a candidate identify the very errors those records would reveal.** Plaintiffs seek records and adjudication before the remaining State acts occur.

The proposed temporary order seeks existing Department-held records within two business days, a sworn status statement within one business day, preservation, advance notice and the conditional seven-day restraint. Additional county reporting awaits the preliminary-injunction stage and a further supported order. Receipt, computation and lawful audits may continue. Stenstrom's and Haury's covered NVRA inspection request is presented separately.

Count I invokes the Fourteenth Amendment through § 1983; Count II invokes §§ 20507(i) and 20510(b). Complaint ¶¶ 56–66. If the Court declines the restraint, Plaintiffs request separate consideration of preservation, focused production and inspection on their applicable grounds. Ancillary production depends on a viable claim; NVRA inspection has its own statutory basis. Plaintiffs seek a ruling identifying the ground for each disposition.

The requested records will permit examination of the operation performed, its equipment coverage and the approved comparison reference. The Court can then assess further relief on the evidence and the governing federal standard.

## II. The evidence identifies the missing check and Schmidt's responsibility

Condition J requires trusted-build validation during election preparation and the post-election canvass using vendor-supplied methods. Hart document 6670-015 specifies selecting Validate, exporting calculated identifiers and comparing the output with certified manifests. Ex. A, GEX-A-005; Ex. B, GEX-B-003–004. Read with Condition J, the device-specific instructions require the software check on every covered machine. One device's comparison cannot verify another device's installed software. Step 6 addresses manifests from each device/workstation type; the preceding instructions identify serial-numbered export folders and repetition for

additional devices. Ex. B, GEX-B-003–005. Those instructions establish the distinction the Court must decide: startup versus affirmative comparison with the approved reference.

**The procedure its coverage and the approved reference are distinct**

Operation. Hart's method calls for selecting Validate, exporting identifiers and comparing them with the approved reference. Powering on and booting alone does not establish that this comparison occurred. Coverage. The County describes a 2% precinct sample; its 2025 verified Answer describes a separate 5% sample. Allen identified powering on and verifying version 2.7 as the universal operation and admitted that his described hash procedure was not run on every machine. N.T. 118–120; Ex. D, GEX-D-004–006. Reference. Plaintiffs seek the actual Department-supplied manifests, their source and the records connecting each output to the reference used. They do not concede compliance on sampled machines. Allen's separate project report had no signature, serial number or production date; he assumed its authorship and offered an email Stenstrom states was not supplied. N.T. 73–81; Ex. D, GEX-D-008–016. That report and the comparison manifests are distinct records. Their authentication is an issue for examination; the absence of provenance does not itself establish altered software. Complaint ¶¶ 29–32.

The County's March 11 memorandum expressly equates vendor-method validation with boot-up and treats hash testing as additional. Ex. Q, GEX-Q-003–005. The Secretary's RLA directive separately requires county manifests, contest totals by batch and results with anomalies reported before county certification. Ex. R, GEX-R-003–005. The records distinguish software identity, counting accuracy and outcome audits, and identify what the Department received.

The signed September declarations describe sampling and limits on observing identifiers and comparison details. The October 27 machine application requested an observed demonstration on

two court-selected devices and inventory-wide completion records. Manganaro and Stenstrom signed that application. Ex. L, GEX-L-002–011. Their separately documented records requests preceded certification; the November 18 orders denied interim relief as moot because County certification had occurred that morning. Those orders permitted additional requests for relief. Ex. F, GEX-F-002–009.

The October 20 Manganaro hearing also documents the request for records and matching links before the challenge deadline and pre-canvassing. County counsel opposed access at that stage and asserted that post-counting examination and challenges could provide a remedy. Ex. N, GEX-N-003–010 (N.T. 6–13). The October 27 order denied preliminary relief on the stated direct-demand ground. Ex. F, GEX-F-002–004. That history supports the alleged loss of timely examination; the § 1983 claim seeks prospective relief concerning Schmidt's own implementation of the challenged process.

**The Secretary receives the required testing reports**

Schmidt's own functions are central: 25 P.S. § 2621(b) assigns system approval, § 2621(e) authorizes receipt and demand of county reports, and §§ 3158–3159 assign his tabulation acts. The L&A directive requires county completion certifications to his Department at least fifteen days before the election. Ex. M, GEX-M-003, 007–008. Directives 2 and 3 govern preparation and technical access. Ex. J. Complaint paragraphs 36(a)–(c) attributes acceptance of startup-and-sampling to the Department on information and belief, supported by the County procedure, verified Answer, Department-supplied references and Allen's qualified statement about statewide practice. Ex. C, GEX-C-002, 008–010; Ex. D, GEX-D-006. Production of Department instructions and acceptance records will directly test that attribution.

The focused production includes any executed Attachment C implementation attestation or equivalent, its attachments and submission communications, together with the distinct L&A certification and existing validation evidence. Ex. A, GEX-A-005; Ex. C, GEX-C-006. Comparing these records can establish what was represented as completed and what operation was performed, without immediate entry into equipment.

Manganaro's November 23 written request expressly joins the compliance inquiry concerning his congressional race. The letter and six enclosures are reproduced in Exhibit T, together with the postal receipt and addressed Priority Mail envelope. The receipt records 3:52 p.m. at Bryn Mawr and tracking no. 9510 8145 2594 6327 9605 23. Complaint ¶ 46; Ex. T, GEX-T-002–011. These materials document the request and reported mailing; the requested Department communications and status statement will establish receipt and any response. The letter does not replace Stenstrom's and Haury's August and September NVRA notices.

**III. Federal jurisdiction and each plaintiff's injury**

The motion arises in the action under 28 U.S.C. §§ 1331 and 1343(a)(3). Count I invokes the Fourteenth Amendment and 42 U.S.C. § 1983; Count II invokes 52 U.S.C. §§ 20507(i) and 20510(b). Prospective relief is requested against the officer who performs the challenged acts. *Ex parte Young*, 209 U.S. 123, 159–60 (1908).

Manganaro challenges the count in his own congressional race. The Delaware County machines counted votes in that contest. Complaint ¶¶ 12–15, 38–42, 60. *Bost v. Ill. State Bd. of Elections*, No. 24-568, slip op. at 3–10 (U.S. Jan. 14, 2026), supports a candidate's concrete interest in counting rules for his own election. He requests PA-5 records, examination, prospective correction and a conditional pause in Schmidt's remaining acts. The § 3159

certification and filing and § 3163 submission and attestation are Schmidt's acts. The proposed order does not bind the Governor or direct the United States House of Representatives.

Stenstrom and Haury personally requested NVRA inspection and describe the particular records work the denial prevents: testing official explanations against historical transactions, identifying verified errors and presenting supported correction requests. Ex. H, GEX-H-003–005, 007–009. Their asserted informational injury concerns those ongoing uses of the requested records. See *Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.*, 136 F.4th 456 (3d Cir. 2025), cert. denied, No. 25-379 (Mar. 2, 2026).

**This action challenges independent conduct, not the State judgments**

The operative sequence is specific: the October 29 machine order preceded the November 3 election; the November 18 interim orders concerned county certification; and the November 23 letter Manganaro joined requested the Department's own validation position and compliance records. Exs. F, S–T; Complaint ¶¶ 40, 44–46, 54–54(a). This action seeks relief against Schmidt's own remaining State PA-5 acts and the alleged continuing denial of covered inspection. It requests no reversal, vacatur or modification of a State judgment. A related legal question in earlier litigation does not turn an independent federal claim into appellate review. *Skinner v. Switzer*, 562 U.S. 521, 532 (2011). *Rooker–Feldman* requires, among other elements, an injury caused by the State judgment and a request to review and reject it. *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166–67 (3d Cir. 2010). Plaintiffs identify official conduct, rather than the judgments themselves, as the source of the pleaded injury.

Pennsylvania judgments receive the effect required by 28 U.S.C. § 1738; preclusion remains distinct from *Rooker–Feldman*. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292–93 (2005). Claim preclusion concerns a final merits judgment between the same parties or

their privies on the same cause of action, including claims that could have been raised. Issue preclusion requires an identical issue necessary to the earlier merits judgment and a full and fair opportunity for the affected party or privy to litigate it. *Balent v. City of Wilkes-Barre*, 669 A.2d 309, 313 (Pa. 1995). An appeal does not by itself remove finality. *Shaffer v. Smith*, 673 A.2d 872, 874 (Pa. 1996). The comparison here must account for Manganaro's November 3 race, the later State finalization acts and Schmidt's alleged continuing administration, rather than merely a newly attached label or newly obtained evidence. Complaint ¶¶ 40, 44–46, 53–55; Exs. F, O–P, S–T. The October 29 order's lack of stated grounds calls for examination of the prior pleadings and disposition to identify what was necessarily decided. Stenstrom brings only the personal NVRA inspection claim here. Plaintiffs request application of each preclusion element to the particular claim, parties and conduct at issue, with separate treatment of later acts.

The pending U4F federal action presents a distinct case-management issue. Stenstrom and Haury seek adjudication of their individual inspection injuries and one coordinated inspection remedy, not duplicative production. Complaint ¶¶ 55, 63–66. If Rule 20 does not permit both counts to proceed together, Rule 21 permits severance and states that misjoinder is not a ground for dismissing an action. Plaintiffs request severance or appropriate coordination, with an opportunity to seek joinder or intervention in the pending action where required. They request separate treatment of any genuinely duplicative claim rather than dismissal of Manganaro's independent candidate claim. Coordination does not itself resolve a claim-splitting objection; the Court should identify the overlapping claim and the appropriate procedure.

**Pro se construction and separate procedural standards**

Plaintiffs ask the Court to construe their individual pro se pleadings liberally and to apply the governing law to the facts alleged. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Erickson v.*

*Pardus*, 551 U.S. 89, 94 (2007); Fed. R. Civ. P. 8(e). In any Rule 12(b)(6) review, well-pleaded factual allegations receive the pleading-stage treatment required by that rule; disputed technical compliance is not resolved by choosing between competing factual accounts. The emergency motion separately seeks findings on the evidence under Rule 65. Plaintiffs request a ruling identifying the claim, plaintiff and remedy affected by any threshold disposition, and an opportunity to cure a pleading deficiency before dismissal with prejudice where amendment is permissible. See *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (civil-rights claims); Complaint Prayer F. The independent NVRA claim and separately supported records requests require their own determinations.

## IV. The four requirements for preliminary relief

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176–79 (3d Cir. 2017), requires a sufficient likelihood of success and a likelihood of irreparable injury, followed by consideration of the balance of harms and public interest. Plaintiffs address those requirements separately. For affirmative inspection relief, they also request the findings required for a mandatory injunction. See *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020).

### A. Likelihood of success on the federal claims

Count I enforces the constitutional integrity of the election process through § 1983. *Marks v. Stinson*, 19 F.3d 873, 888–89 (3d Cir. 1994), recognizes patent and fundamental unfairness and considers the adequacy of corrective procedures. Complaint paragraphs 56–61 plead the combined deprivation: deliberate replacement of the software check, blocked timely examination and impending certification. The documents and sworn evidence support those allegations. Plaintiffs request adjudication of that combined process on the pleaded facts and evidence.

Manganaro seeks a limited prospective pause and examination, with no discarded votes or substitute winner. That requested remedy differs from the statewide relief rejected in *Donald J. Trump for President, Inc. v. Sec'y Commonwealth of Pa.*, No. 20-3371, slip op. at 14–20 (3d Cir. Nov. 27, 2020) (nonprecedential). The combined conduct alleged here must still satisfy the constitutional threshold in *Marks* and the separate requirements for preliminary relief.

The federal right and the testing requirement have distinct sources. Count I enforces the Fourteenth Amendment through § 1983; it does not assert that § 1983 independently creates a software-testing right. Section 21081 establishes federal voting-system minimum standards and includes associated identification and testing practices in the system definition. The every-covered-device obligation alleged here derives from Condition J and the vendor method, read with Pennsylvania's approval framework. System approval, installed-software comparison and functional L&A testing are distinct operations. Count II, by contrast, invokes the inspection right in § 20507(i) and Congress's express civil-enforcement provision in § 20510(b). Each count therefore identifies its own enforceable right and route to relief.

**The alleged practice is an adopted method not an isolated malfunction**

*Marks* supplies the controlling circuit standard. The County's written procedure, verified Answer and sworn coverage testimony support an inference of an adopted practice; Complaint ¶¶ 36(a)–(c) identify the separate basis for Department attribution. The denied pre-election access and November 18 dispositions identify the alleged loss of timely corrective examination. Exs. C–D, F, N, Q. Manganaro relies on that combined course of conduct and its effect on his own race, not the seriousness of a technical omission standing alone.

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478–79 (6th Cir. 2008), supplies a persuasive pleading-stage analogy: specific allegations of systemic election failures and severe

burdens on voting supported substantive due-process claims beyond dismissal. Those allegations included denied voting opportunities and machine-related vote switching; the court rejected the separately pleaded procedural due-process claim. Here, the allegation is a different adopted method affecting a candidate's own count, combined with blocked examination and impending State finalization. *Brunner* supports evaluating the specific combined allegations rather than classifying the dispute as an isolated malfunction; *Marks* governs the constitutional threshold in this Circuit.

**The federal claim protects a fair election process**

*Snowden v. Hughes*, 321 U.S. 1, 7–8, 11 (1944), holds that a violation of state election law alone does not establish a federal constitutional violation and requires purposeful discrimination for the equal-protection theory addressed there. Count I asserts the separate election-process injury recognized in *Marks*: an adopted method that dispenses with the software safeguard, blocks timely examination and proceeds to certification. Manganaro seeks a fair count and meaningful examination of how officials administered his own election. He does not ask the Court to award him office. The specific conduct, sources and Secretary-level attribution appear in Complaint paragraphs 25–46 and 56–61. Those allegations supply the constitutional basis for prospective relief; Pennsylvania's approval condition identifies the safeguard officials displaced.

**Prospective relief remedies the federal violation**

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), bars a federal injunction against State officials based on State-law obligations. Plaintiffs instead seek prospective relief for the independently pleaded federal deprivations under *Ex parte Young*. Condition J and the Pennsylvania statutes identify the safeguard, official responsibilities and available reporting mechanisms; they are not standalone federal causes of action. Existing-record discovery rests on

Rule 26(d)(1) and the viable federal claim it serves. Any additional county-reporting requirement must be necessary and appropriately tailored to remedy a supported federal violation, rather than enforcement of § 2621(e) for its own sake. The proposed temporary order accordingly seeks existing records first and reserves additional reporting for further findings.

Count II directly invokes 52 U.S.C. §§ 20507(i) and 20510(b). The August notice, acknowledgment, September renewed demand and declarations identify the requesters, covered records, elapsed cure periods and continuing denial. Exs. G–H; Complaint ¶¶ 63–66. *Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.*, 136 F.4th 456 (3d Cir. 2025), cert. denied, No. 25-379 (Mar. 2, 2026), requires concrete consequences connected to NVRA interests. The declarations describe the record comparisons and supported correction work the denial prevents. The 2,865,011 conditions across 2,555,665 identifiers define the analysis requiring inspection; histories and dispositions determine which conditions were resolved. Plaintiffs do not equate the totals with ineligible voters. Inspection supports accurate registration and eligible participation independently of any PA-5 restraint.

**B. Irreparable injury from certification and continued denial of records**

The threatened harm is State certification of Manganaro's election under the allegedly deficient process before the documented software-check dispute receives meaningful examination. The alleged omission, coverage testimony, Department-practice inference and denied examination are identified in Complaint ¶¶ 25–46, 56–61 and Exhibits A–D, F, L–N, Q. The claim does not depend on declaring Manganaro the winner or proving fraud. Nor does the mere possibility of an erroneous result establish irreparable harm: *Reilly* requires a showing that irreparable injury is more likely than not without relief. 858 F.3d at 179.

Preservation protects the evidence; production enables examination. Neither prevents certification under the challenged process before the Court can assess the requested protection. Certification would give the disputed PA-5 returns official State effect while the candidate's documented compliance objections remain unexamined. Later production could support correction, but it would address an already-finalized State act rather than prevent the alleged injury at that stage. Money cannot compensate for finalization of his election through a process found fundamentally unfair. The November 18 county orders show the practical timing problem: certification overtook the interim requests. Ex. F, GEX-F-008–009. The requested seven days permit existing-record production within two business days and prompt judicial assessment. Manganaro asks the Court to find why later relief would be inadequate on the actual record and timetable, rather than presume that certification eliminates all subsequent judicial review.

The Department's PA-5 public page, captured November 23, 2026, at 11:09:56 p.m. EST, identifies the November 3 returns as unofficial and says official results will be clearly marked after county certification. Ex. U, GEX-U-001, 003; Complaint ¶ 45. That contemporaneous designation supports the pending-status inference; it does not establish which § 3159 or § 3163 act remains uncompleted. Ex. I identifies the county reporting deadline. Plaintiffs request the sworn status statement and 48-hour notice to establish the actual timetable. A restraint requires evidence of an imminent, uncompleted act, the required likelihood of success and inadequacy of later relief; the independent records and NVRA requests remain for separate consideration.

For Stenstrom and Haury, each day of withheld inspection prevents the concrete comparisons and supported correction work described in their declarations. Their established work continues after Election Day. Prompt inspection will enable them to test the Department's

explanations, identify unresolved errors and pursue lawful correction while protecting eligible voters. Ex. H, GEX-H-003–005, 007–009.

**C. The balance of harms and public interest favor a defined inquiry**

The requested seven-day interval is defined and conditional. Receipt of returns, computation, canvassing and lawful audits continue. The inquiry concerns the Delaware County machines and PA-5 returns; the restraint concerns only Schmidt's own remaining acts for that contest. Other contests and completed acts are unaffected. A sworn status statement will identify whether a prospective restraint remains available. Preservation, focused records production and the independent NVRA request require separate consideration on their own grounds.

The public interest favors a lawful count that can be verified. Approval conditions and completion certifications must correspond to operations actually performed. The vendor method, verified startup explanation, sworn coverage testimony and documented examination requests identify the precise inquiry. Exs. A–D, F, L, O–Q. A short pause for existing records and a prompt hearing serves reliable results and timely administration together. Voters deserve an answer supported by evidence, and the requested order provides a defined way to obtain it.

The evidence supporting each requirement for a seven day pause

| Showing | Record and requested finding | Defined limit |
|---|---|---|
| Merits | Condition J, vendor method, startup explanation and coverage testimony support the pleaded combined-process claim. Exs. A–D, Q; *Marks*, 19 F.3d at 888–89. The asserted substitution is an affirmative choice of method and coverage. | Constitutional finding required; inquiry alone is insufficient. |
| Irreparable injury | State finalization of Manganaro's own race under the alleged combined practice before examination; the November 18 County orders document certification overtaking interim review. Complaint ¶¶ 45, 56–61; Ex. F, GEX-F-008–009. | Find an imminent remaining State act and likely injury inadequately remedied later; no presumption from possible error alone. |
| Causation and scope | Schmidt performs the remaining PA-5 certification and filing under § 3159 and submission and attestation under § 3163; identified Hart returns enter that contest's tabulation. | Restrain that act only; no completed acts, other contests or county equipment access. |
| Equities and public interest | Existing-record production and a prompt hearing permit a reasoned compliance decision while counting and audits continue. | Assess actual deadlines and administrative burden; protect lawful votes. |
| Duration and alternatives | Two-business-day production; prompt hearing; seven-day expiration unless further supported order. | Preservation and records relief remain available separately; no automatic extension. |

**V. The proposed order states the acts deadlines and safeguards**

Plaintiffs request notice and an opportunity to respond before any restraint. The initial order would expire on a stated date and time, with a prompt hearing on further preliminary relief. They request findings under Rule 52(a)(2) and explicit terms under Rule 65(d), limited to Schmidt and persons properly bound under Rule 65(d)(2). No county board is made a defendant or independently bound merely by receipt of the order.

Good cause supports the requested expedited discovery under Rule 26(d)(1): the remaining acts may occur promptly, the documents are specifically identified, and existing State-held records can test the disputed practice without immediate entry into equipment. The request includes a statement identifying requested records not held or controlled by the Department and their known custodian. Any equipment examination or expansion of scope requires a further supported order. The production request includes relevant existing audit submissions identified by Exhibit R only to the extent held by the Department and concerning the affected records. No new audit, new technical report or entry into equipment is required by the initial order.

**The Court should require focused reporting and advance notice**

The proposed order separates existing records from new reporting. At the initial stage, Schmidt produces responsive records within his possession, custody or control and identifies known custodians for categories not held. At the preliminary-injunction stage, Plaintiffs request consideration of a focused report under his existing § 2621(e) authority, upon findings of a federal violation and the report's remedial necessity. The requested subjects remain the November equipment inventory, operation performed, dates, coverage, supporting outputs and reconciliation records. No county is directly bound and no new reporting duty takes effect without a further supported order. The distinct 48-hour notice request concerns Schmidt's own remaining PA-5 acts and does not automatically extend the seven-day restraint.

**Reconciliation records answer a separate factual question**

Software validation asks whether installed software matches the approved reference. Reconciliation asks whether returns agree with supporting precinct figures. Section 3154(b) requires specified comparisons and investigation of excesses; subsections (d)(4)–(5) address central and precinct tabulation, respectively. SURE records participation and voting method

under 25 Pa.C.S. § 1222(c)(20). The entry duty appears in 4 Pa. Code § 183.4(b)(2); § 183.7(a)(8) supplies a fourteen-day-from-receipt rule for other registrant-record updates. The requested histories and dated records permit examination of timing. Initial production seeks existing Department-held comparisons and discrepancy resolutions and known custodians; a new county reconciliation report is reserved for the preliminary-injunction stage. Manganaro seeks these records in support of Count I; Count II separately seeks covered list-maintenance records.

Manganaro requests security of $100 under Rule 65(c), subject to the Court's finding as to likely costs and damages from an erroneous seven-day restraint. Plaintiffs request an express security determination and will comply with the amount set before the restraint takes effect. They request coordinated handling of the NVRA issues with No. 2:26-cv-07467-JS and related-case review concerning No. 2:26-cv-02429-MRP. For Count II, Plaintiffs request coordinated adjudication and one inspection schedule with U4F, not parallel inconsistent production obligations. If overlapping inspection claims should proceed there, they request an appropriate coordination order and an opportunity to seek amendment in that action under Rule 15.

Exhibits A–U attached to the Complaint are expressly submitted as the evidentiary attachments supporting this motion at the pages cited above. The motion should be docket-linked to those attachments; the same exhibit PDFs may be reattached without alteration if required by the Court's filing procedures. The order itself states its operative terms in full and does not incorporate another document to define the acts restrained.

**The Court can address records while State interpretation remains pending**

The related proceedings document sustained efforts to obtain review before use and certification. Complaint ¶¶ 40, 53–55; Exs. O–P, S. No. 499 C.D. 2026 remained awaiting consideration on November 23. No. 1661 C.D. 2026 is the records-access appeal from CV-2026-

009462 and was awaiting the original record. In the separate machine case, CV-2026-009865, the October 29 order sustained preliminary objections and dismissed the complaint with prejudice without stating grounds. The signed, October 30 filed notice expressly identifies all six plaintiffs, including Manganaro, as appellants. Ex. S, GEX-S-004–010. Its Commonwealth Court identifier is not supplied. The earlier federal Mancini ruling dismissed for lack of standing without adjudicating testing compliance. This history supports diligence; exhaustion of State administrative remedies is not a § 1983 prerequisite. *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982).

Prompt records relief while preserving the State-law question. *Pullman* abstention requires the identified exceptional circumstances and a discretionary assessment that includes adequate State remedies and the impact of delay. *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 149–50 (3d Cir. 2000). The pending appeal may inform the construction of Condition J; Plaintiffs do not ask this Court to direct that appeal or treat its anticipated decision as already rendered. Their present federal claim also concerns withheld examination evidence, the documented timing of access requests and Schmidt's own remaining act. The separately requested preservation and production of existing State-held certifications, attestations, outputs and comparisons do not require a final ruling on what Condition J demands. Those records establish what was certified and performed under either interpretation. If the Court defers the construction issue, Plaintiffs request that it retain jurisdiction and promptly decide the separately supported records requests and federal NVRA claim on their applicable grounds. An unresolved State-law question should not itself prevent the Court from determining what relevant records exist and whether the independent federal inspection duty has been met. The Court should

preserve jurisdiction and decide the independent federal inspection duty and supported discovery requests promptly.

**DOJ participation and clear rulings are welcome**

Plaintiffs welcome DOJ review, a statement of interest under 28 U.S.C. § 517, and intervention or other participation where authorized. Sections 20510(a) and 21111 of Title 52 separately authorize Attorney General enforcement within their respective scope. Complaint ¶ 71. Plaintiffs request no compelled federal participation or delay. They ask for a reasoned disposition separately addressing standing, the federal constitutional threshold, the NVRA inspection claim and each requested remedy. Rule 52(a)(2) requires findings and conclusions on preliminary injunctions. A denial of a short restraint need not resolve the merits of the underlying claims or the separately supported records requests.

**VI. Federal questions requiring a reasoned decision**

1. The missing software check. Whether election officials violate the Fourteenth Amendment by deliberately using tabulation equipment without performing the binding software check, denying timely examination of compliance, and proceeding toward certification of the affected election. Plaintiffs contend that the combined process alleged in Count I meets the fundamental-unfairness standard of *Marks v. Stinson*, 19 F.3d 873, 888–89 (3d Cir. 1994). Complaint ¶¶ 56–62.

**2. Proof before access to the records.** Whether a candidate alleging that combined deprivation must identify particular miscounted votes to state a claim under 42 U.S.C. § 1983 when officials control the records needed to examine whether the required safeguard was performed. Plaintiffs contend that particular miscounted votes are not an additional pleading prerequisite where the alleged constitutional injury is the combined implemented process. Their specific factual allegations and evidence appear in Complaint ¶¶ 25–46, 57–60 and Exhibits A–F, L–M and O–S.

3. The Secretary’s own responsibility. Whether prospective federal relief is available against the State officer who administers the approval and reporting framework and performs the challenged certification, where county officials operated the equipment and the complaint alleges that his own conduct implements the constitutional deprivation. Plaintiffs seek relief from Schmidt’s own ongoing or impending federal violations under *Ex parte Young*, 209 U.S. 123, 159–60 (1908), with each remedy tied to the affected candidate’s contest. Complaint ¶¶ 8, 14–15, 21, 46, 59 and 62.

**4. Access to registration records.** Whether withholding covered voter-list-maintenance records violates 52 U.S.C. § 20507(i) when identified requesters have satisfied statutory notice requirements and the denial prevents their specifically pleaded registration-comparison and correction activities. Plaintiffs contend that the personal requests, notice and concrete consequences pleaded in Count II establish an enforceable inspection claim under 52 U.S.C. §§ 20507(i) and 20510(b). Complaint ¶¶ 17–20, 47–52 and 63–66; Exs. G–H.

These questions concern the pleaded federal claims. The preceding sections supply the factual foundation and address standing, the constitutional and statutory standards, and each requested remedy. Plaintiffs request decisions on the questions necessary to disposition, including identification of any threshold ground that prevents reaching the merits.

## VII. Requested disposition

Plaintiffs request an immediate noticed hearing, the defined seven-day PA-5 restraint, preservation, the status statement and focused production. At the preliminary-injunction hearing, they request the separately supported NVRA inspection schedule and such further relief as the evidence and federal claims warrant.

**Emergency submission and preservation of merits proceedings**

Plaintiffs request prompt determination of emergency relief on the written submissions, subject to any necessary hearing. This request does not waive requested oral argument on dispositive motions or adjudication of the underlying claims on a developed merits record.

Plaintiffs request oral argument before disposition of any motion seeking dismissal of their claims, particularly on standing, federal jurisdiction and the sufficiency of the pleaded federal claims. This request is subject to Local Civil Rule 7.1(f), Rule 78 and the Court's discretion, and will be renewed in the response to any dispositive motion.

Respectfully submitted,

Gregory Stenstrom, individually pro se
1541 Farmers Lane, Glen Mills, PA 19342
856-264-5495; gregorystenstrom@gmail.com

Nick Manganaro, individually pro se
429 Montgomery Avenue, Apt. C403
Haverford, PA 19041
610-662-9291; n.manganaro@comcast.net

Harry R. Haury, individually pro se
167 Lamp & Lantern Village, Suite 194
Chesterfield, MO 63017
314-498-2569; harryhaury@protonmail.com

Dated: November 23, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GREGORY STENSTROM; NICK MANGANARO;
and HARRY R. HAURY, Plaintiffs, individually pro se,
v.
AL SCHMIDT, in his official capacity as Secretary of the
Commonwealth of Pennsylvania, Defendant.

Civil Action No. ___________________

**[PROPOSED] ORDER GRANTING LIMITED TEMPORARY RELIEF AND SETTING A PRELIMINARY INJUNCTION HEARING**

AND NOW, this ______ day of ___________________, 2026, at ___________ Eastern Time, after notice to Defendant and an opportunity to be heard on Plaintiffs' emergency motion, and for the reasons stated in the Court's accompanying findings and conclusions under Rule 52(a)(2), it is ORDERED:

**A. Findings supporting temporary relief**

For purposes of this limited temporary relief, and on the written submissions and any hearing conducted, the Court finds a sufficient likelihood of success on Manganaro's pleaded Fourteenth Amendment claim under § 1983 concerning the combined validation and examination process in his own election. The approval condition, vendor method, verified County explanation, sworn coverage testimony and dated requests support that provisional finding. The Court further finds that the § 3159 PA-5 certification and filing remains uncompleted and imminent, and that without a short restraint Manganaro will more likely than not suffer the pleaded injury from official finalization of his own election under the preliminarily established unconstitutional process before meaningful examination, for which later relief is inadequate. The accompanying findings identify the evidence establishing that consequence and the timing; unresolved questions alone do not supply these findings. On the evidence presented, the Court provisionally finds that the challenged substitution concerns the operation performed

and its equipment coverage; startup alone does not establish performance of the prescribed identifier comparison. These findings concern the pleaded combined process and this temporary relief, not a final determination that any particular device contained altered software.

The seven-day restraint permits specified existing-record production and a prompt hearing. Receipt of returns, computation, canvassing and lawful audit work continue; no votes or completed acts are invalidated. On the actual schedule established, the limited burden is outweighed by the demonstrated injury, and the public interest in lawful administration, reliable results and timely completion favors this defined interval. The initial inquiry concerns identified Hart equipment whose returns enter the PA-5 tabulation. Preservation and production alone would not prevent the impending finalization while examination proceeds. On the evidence and timetable identified in the accompanying findings, later relief would not adequately remedy the candidate-specific injury from that finalization. This finding does not rest on a mere possibility of error or presume that certification bars all later review. Further restraint requires a further supported order. Existing State-held records bear directly on this inquiry and establish good cause for the expedited production below.

**B. The seven day certification restraint**

1. Upon posting of the security specified in paragraph 8, Al Schmidt, in his official capacity, is temporarily restrained from performing any remaining certification and filing of the PA-5 tabulation under 25 P.S. § 3159 and any remaining submission and attestation acts for that contest under § 3163. This restraint applies only to acts not completed before entry of this Order. It binds only Defendant and persons described in paragraph 7, does not bind the Governor as a nonparty, and does not direct the United States House of Representatives or restrain any other contest.

2. The restraint expires at 5:00 p.m. Eastern Time on __________________, 2026, the seventh calendar day after entry, unless dissolved earlier or extended by a further supported order. Receipt of county returns, computation, canvassing, lawful audit work and record preservation may continue. Certification of other contests is not restrained. No completed act is vacated and no ballot is invalidated by this Order.

**C. Records preservation production and reporting**

3. Until the hearing set below or further order, Defendant shall preserve, within his possession, custody or control:

(a) November 2026 PA-5 returns, tabulations and adjustments;

(b) November 2026 testing completion certifications concerning Delaware County Hart Verity 2.7 equipment and related Department communications;

(c) corresponding software reference manifests, existing device-validation outputs, comparison results and completion records; and

(d) existing Pennsylvania voter-list maintenance records responsive to the August 18 and September 18, 2026 inspection demands of Stenstrom and Haury, including transaction and change histories, confirmation notices and responses, voter-history adjustments, reconciliation records and dispositions. Preservation requires retention of existing records, not creation of missing records. The preserved testing and validation records include any executed Voting System Implementation Attestation using Attachment C referenced in Condition J, or an equivalent existing attestation, including its attachments and related submission or response communications.

4. Within one business day after entry, Defendant shall file a statement under 28 U.S.C. § 1746 identifying PA-5 State finalization acts completed, their dates, the acts remaining and their

expected dates. If an identified act has occurred, the statement shall identify the associated document and its date.

5. Under Rule 26(d)(1), within two business days after entry Defendant shall provide Plaintiffs with existing records in his possession, custody or control consisting of:

(a) November 2026 L&A completion certifications for Delaware County's Hart Verity 2.7 equipment and communications accompanying or responding to those certifications; and

(b) corresponding certified software reference manifests supplied by the Department to Delaware County for Hart Verity 2.7, their source, and existing transmittal or authentication records, including EAC Field Services communications, together with validation outputs and comparison records. To the extent already held and concerning the identified equipment or affected returns, production also includes the November ballot manifest, relevant contest totals by batch, and audit results with reported anomalies submitted under the Secretary's RLA directive. For any category not held or controlled, he shall identify that fact and the known custodian. A claim of privilege or confidentiality shall identify the withheld category and basis; protected material may be submitted for in camera review or a protective order. This paragraph does not authorize entry into equipment or disclosure of voter selections, credentials or protected identifiers. Production also includes any executed Voting System Implementation Attestation using Attachment C referenced in Condition J, or an equivalent existing attestation, including its attachments and related submission or response communications. The request concerns existing records; it does not require a new attestation or prescribe an exclusive form. Production includes existing Department instructions, guidance and communications concerning whether startup satisfies Condition J or the affirmative software comparison is supplemental, as applied to Hart Verity 2.7 equipment in November 2026. Production also includes existing precinct-level comparisons and

discrepancy resolutions held by Defendant concerning the Delaware County returns in the PA-5 contest under 25 P.S. § 3154(b) and (d)(4)–(5).

5(a). Additional county reporting is reserved for the preliminary-injunction hearing and a further supported order. No demand for a new county report is required by this temporary Order. At the hearing, the Court will consider whether findings of a federal violation and remedial necessity warrant requiring Defendant to use his § 2621(e) authority to obtain the November Hart equipment inventory, operation performed, dates, coverage, supporting-record custodians and records of the precinct comparisons under § 3154(b) and (d)(4)–(5), including identified discrepancies and their disposition. Any such order must define its scope and deadlines and bind only the persons properly subject to it.

5(b). Until disposition of the preliminary-injunction motion or further order, Defendant shall give Plaintiffs and the Court at least 48 hours' written notice before any planned remaining PA-5 certification or filing under 25 P.S. § 3159 or submission or attestation under § 3163. Notice shall identify the act and planned date and time. This requirement does not extend the restraint in paragraphs 1–2 beyond its stated expiration. Defendant may seek expedited modification on notice if necessary to meet an identified legal deadline.

**D. The hearing notice and security**

6. A preliminary-injunction hearing is set for ___________________ at __________ Eastern Time, by ___________________. The Court will address continuation or modification of temporary relief, any further examination, and Stenstrom's and Haury's request for inspection of covered voter-list maintenance records. Briefing and evidentiary submission deadlines are: Defendant's response ___________________; Plaintiffs' reply ___________________. No final NVRA inspection or equipment-access injunction is entered by this temporary Order. The

hearing will separately address the candidate's own claims and remedies, including Manganaro's PA-5 request, and the grounds for any grant or denial of further preliminary relief.

7. Plaintiffs shall promptly provide actual notice of this Order to Defendant and identified counsel and file a statement of notice. Original-process service remains governed by Rule 4. This Order binds only Defendant and the persons specified in Rule 65(d)(2) who receive actual notice. It does not independently bind nonparty county election boards.

8. The Court sets security under Rule 65(c) at $100, based on its assessment of likely costs and damages from the limited restraint. Paragraph 1 takes effect only upon posting. Defendant may seek prompt modification or dissolution on notice. Further relief requires a further order and the findings required by the applicable rules.

BY THE COURT:

______________________________
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREGORY STENSTROM; NICK MANGANARO;
and HARRY R. HAURY, Plaintiffs, individually pro se,
v.
AL SCHMIDT, in his official capacity as Secretary of the
Commonwealth of Pennsylvania, Defendant.

Civil Action No. ___________________

**EXHIBIT INDEX**

Separate Exhibits A-U. Page counts include each exhibit's identification sheet. Cite the added page label, for example: Exhibit A, GEX-A-005 (source printed p.28). Original source pagination remains visible.

| Ex. | Document and filing filename | Pages / citation range |
|---|---|---|
| A | Hart Verity Voting 2.7 approval report: selected conditions<br>07_Exhibit_A_Hart_Approval_Conditions.pdf | 6 pages<br>GEX-A-001–006 |
| B | Hart document 6670-015: Hash Testing for Verity Software and Devices<br>08_Exhibit_B_Hart_Vendor_Testing_Method.pdf | 6 pages<br>GEX-B-001–006 |
| C | County hash-testing procedure and verified Answer<br>09_Exhibit_C_County_Procedure_and_Verified_Answer.pdf | 10 pages<br>GEX-C-001–010 |
| D | February 13, 2026 hearing: validation and claimed EAC authority<br>10_Exhibit_D_Validation_Testimony_Excerpts.pdf | 16 pages<br>GEX-D-001–016 |
| E | September 1, 2026 observer attendance and conduct records<br>11_Exhibit_E_September_1_Observation_Records.pdf | 4 pages<br>GEX-E-001–004 |
| F | Records-request and certification chronology<br>12_Exhibit_F_Requests_and_Certification_Orders.pdf | 9 pages<br>GEX-F-001–009 |
| G | NVRA notice, Department response and renewed inspection demand<br>13_Exhibit_G_NVRA_Notice_Response_and_Renewal.pdf | 26 pages<br>GEX-G-001–026 |
| H | Signed declarations of Harry R. Haury and Gregory Stenstrom<br>14_Exhibit_H_Signed_NVRA_Declarations.pdf | 9 pages<br>GEX-H-001–009 |
| I | Department of State 2026 General Election Calendar<br>15_Exhibit_I_Official_Certification_Calendar.pdf | 2 pages<br>GEX-I-001–002 |
| J | Secretary of the Commonwealth Directives 2 and 3 of 2026<br>16_Exhibit_J_Secretary_Directives_2_and_3.pdf | 13 pages<br>GEX-J-001–013 |

| Ex. | Document and filing filename | Pages / citation range |
|---|---|---|
| K | October 28 records motion excerpts, verification and source comparisons<br>17_Exhibit_K_October_28_Verified_Comparisons.pdf | 10 pages<br>GEX-K-001–010 |
| L | October 27 machine application excerpts and signed observer declarations<br>18_Exhibit_L_Machine_Application_and_Observer_Declarations.pdf | 11 pages<br>GEX-L-001–011 |
| M | Logic and accuracy directive excerpts and complete certification form<br>19_Exhibit_M_Testing_Certification_Requirement.pdf | 8 pages<br>GEX-M-001–008 |
| N | October 20 Manganaro hearing on records and pre-canvassing access<br>20_Exhibit_N_Manganaro_Precanvass_Access_Transcript.pdf | 11 pages<br>GEX-N-001–011 |
| O | Machine-compliance appeal and expedition application, denial and November 23 docket<br>21_Exhibit_O_Machine_Appeal_and_Expedition.pdf | 10 pages<br>GEX-O-001–010 |
| P | Manganaro records-access appeal: November 23 docket<br>22_Exhibit_P_Manganaro_Appeal_Status.pdf | 4 pages<br>GEX-P-001–004 |
| Q | County March 11 post-hearing memorandum: startup and hash testing<br>23_Exhibit_Q_County_Post_Hearing_Memorandum.pdf | 6 pages<br>GEX-Q-001–006 |
| R | Secretary’s April 2025 risk-limiting audit directive<br>24_Exhibit_R_State_RLA_Directive.pdf | 7 pages<br>GEX-R-001–007 |
| S | Machine-application proceeding: trial docket, October 29 order and complete October 30 notice of appeal<br>25_Exhibit_S_Machine_Application_Trial_Docket.pdf | 10 pages<br>GEX-S-001–010 |
| T | November 23 joint compliance request, enclosures and USPS mailing records<br>26_Exhibit_T_November_23_Candidate_Request.pdf | 11 pages<br>GEX-T-001–011 |
| U | Official PA-5 public returns display, capture record and declaration<br>27_Exhibit_U_Official_PA5_Public_Status.pdf | 3 pages<br>GEX-U-001–003 |

Each exhibit identification sheet lists its component documents and exact GEX page ranges. Excerpts are identified on those sheets. Historical captions and party names in the source records are retained. Exhibit K is a public redacted copy with voter names and registration numbers removed; comparison results and page labels are retained.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT A

## Hart Verity Voting 2.7 approval report: selected conditions

Report identification
**GEX-A-002**

Selected conditions, printed pp.26-29
**GEX-A-003 through GEX-A-006**

Excerpts from the supplied approval report, including Conditions D and J.

Original pagination is retained. Added GEX labels identify pages for citation.

# COMMONWEALTH OF PENNSYLVANIA
# DEPARTMENT OF STATE

## REPORT CONCERNING THE EXAMINATION RESULTS OF HART VERITY VOTING 2.7 WITH VERITY SCAN PRECINCT SCANNER, VERITY COUNT TABULATING AND REPORTING SOLUTION, VERITY CENTRAL - CENTRAL SCANNING SOLUTION, VERITY TOUCH WRITER AND TOUCH WRITER DUO BALLOT MARKING DEVICE, AND VERITY DATA ELECTION DATA ENTRY SOFTWARE AND VERITY BUILD ELECTION DEFINITION SOFTWARE



**Issued By:**

**Leigh M. Chapman**
**Acting Secretary of the Commonwealth**
**January 12, 2023**

of the Examiners as set forth in their reports, **the Secretary of the Commonwealth certifies the Verity Voting 2.7 subject to the following conditions:**

A. Pennsylvania counties using the Verity Voting 2.7 must comply with the Directive Concerning the Use, Implementation and Operations of Electronic Voting Systems by the County Boards of Elections issued by the Secretary of the Commonwealth on June 9, 2011, and any future revisions or directives. In particular, Pennsylvania counties must adhere to item four (4) of the directive when setting up and positioning the Verity Touch Writer Duo in the polling place to assure compliance with the constitutional and statutory requirements that secrecy in voting be preserved (*see* Pa. Const Art. VII § 4; and Section 1107-A(l) of the Election Code, 25 P.S. § 3031.7(1)).

B. No components of the Verity Voting 2.7 voting system shall be connected to any modem or network interface, including the Internet, at any time, except when used in a standalone local area wired network configuration in which all connected devices are certified voting system components. Transmission of unofficial results can be accomplished by writing results to media and moving the media to a different computer that may be connected to a network. Any wireless access points in the district components of Verity Voting 2.7, including wireless LAN cards, network adapters, etc. must be uninstalled or disabled prior to delivery or upon delivery of the voting equipment to a county board of elections.[2]

C. Because Verity Voting 2.7 is a paper-based system, counties using the Verity Voting 2.7 must comply at a minimum with Section 1117-A of the Election Code, 25 P.S. § 3031.17, that requires a "statistical recount of a random sample of ballots after each election using manual, mechanical or electronic devices of a type different than those used for the specific election." This audit must be conducted via a manual count of the voter marked paper ballots exclusively. Counties must include in the sample ballots such samples as may be marked by ADA compliant components. Counties are advised to consult the Directive Concerning the Use, Implementation and Operations of Electronic Voting Systems by the

[2] Verity Relay and Verity Transmit are not certified for use in Pennsylvania.

County Boards of Elections issued by the Secretary of the Commonwealth on June 9, 2011, and any future revisions or directives that may apply to audits of electronic voting systems.

D. All jurisdictions implementing the Verity Voting 2.7 need to carry out a full Logic and Accuracy test on each device without fail and maintain evidence of Logic and Accuracy (L&A) testing in accordance with the statutory requirements for pre-election and post-election testing. The Department does not recommend automated L&A testing and discourages the use of preprinted ballots provided by vendors. All components being used on election day, including accessible devices and any Electronic Poll Books being used, must be part of the L&A testing.

E. Verity Voting 2.7 is a paper-based system, and hence, implementation of the system for precinct or central count scanning is scalable. Jurisdictions should calculate the number of voting booths necessary to accommodate the number of registered voters in a precinct to avoid long lines. Jurisdictions must include the Verity Touch Writer Duo as an ADA compliant device in configuring a precinct polling place. Jurisdictions must also take into consideration the ballot box capacities on polling place components when deciding on the number of voting booths.

F. All jurisdictions implementing the Verity Voting 2.7 must implement administrative safeguards and proper chain of custody to facilitate the safety and security of electronic systems pursuant to the Guidance on Electronic Voting System Preparation and Security, September 2016.

G. Jurisdictions implementing the Verity Voting 2.7 with the Central Count Tabulator as the primary system where votes are counted only at the central counting location using central scanners, must comply with Section 301(a) 52 U.S.C. § 21081(a) of Help America Vote Act of 2002. The mandate requires counties using central count paper-based systems to develop voting system specific voter education programs that inform voters of the effect of over voting and instruct voters on how to correct a ballot before it is cast, including instructions on obtaining a replacement ballot. Additionally, the mandate requires that the central count voting system must be designed to preserve voter confidentiality.

H. All jurisdictions implementing the Verity Voting 2.7 must ensure that no default passwords are used on any devices including COTS components and that all passwords are complex and secured. Counties must implement an audit process to review and ensure that no default passwords are used upon equipment install/reinstall and routinely change passwords (at least once prior to preparing for each primary and election) to avoid any password compromise. The passwords and permissions management must at a minimum comply to the password requirements outlined in NIST 800-63. This publication can be accessed at https://pages.nist.gov/800-63-3/sp800-63-3.html

I. All jurisdictions implementing Verity Voting 2.7 must configure the polling place components of the voting system to notify voters when they attempt to cast overvotes. This is to ensure that the system implementation adheres to the requirement of notifying the voter of overvotes as mandated by 25 P.S. § 3031.7(16).

J. All jurisdictions implementing Verity Voting 2.7 must work with Hart to ensure that only the certified system configuration is installed upon purchase and acceptance or any time a system component is replaced or upgraded. Jurisdictions must as part of their user acceptance test verify the implementation to ensure that the components, software and firmware belong to the certified system. Jurisdictions must also perform a trusted build validation as part of the election preparation activities and post-election canvass activities utilizing the vendor supplied methods of validation and verification of voting system integrity. A sample format that can be used for the attestation is added as Attachment C to this document.

K. The direct recording components of Verity Voting 2.7 voting system, Verity Touch and Verity Touch with access identified as system components per the EAC certification scope, are not certified for use in Pennsylvania with Verity Voting 2.7. This software was not presented to the Secretary for certification by Hart.

L. Jurisdictions implementing Verity Voting 2.7 must work with Hart to ensure that the implemented configuration can operate for a period of at least two hours on backup power as required by the VVSG. If the system components do not include internal battery packs for reliable power, the Uninterruptible Power Supply (UPS) specified in the EAC

certified configuration must be purchased and used at the polling places.

M. Jurisdictions using the services of Hart or a third-party vendor for election preparation activities must work with Hart or the vendor to ensure that systems used for ballot definition activities are considered part of the voting system and use certified voting system components. The systems used for ballot definition must be configured securely following conditions outlined in this report and following any Directives and Guidance issued by the Secretary. Any data transfer between the vendor and county must be done using encrypted physical media or secure file transfer process. The file transfer and download must be tracked and audited to make sure that data has not been accessed by unauthorized personnel.

N. Jurisdictions implementing Verity Voting 2.7 must implement the use of privacy sleeves to be used by voters carrying marked ballots between the Verity Touch Writer Duo ballot marking device and Verity Scan precinct scanner.

O. Jurisdictions must work with Hart to thoroughly test and review the audio ballot instructions to ensure that the voters using an audio ballot can cast the ballot without requesting assistance.

P. Jurisdictions implementing Harty Verity Voting 2.7 must:

- Work with vendor to make sure that the audio ballot uses at the most two different voices, one for instructions and one for ballot information. If the vendor can support one voice for instructions and ballot information that would be ideal.

- Ensure that ballot instructions are as concise as possible and include only as much information as necessary, since voters will be hearing it each time a contest is selected.

- Trim recorded files as tightly as possible so that there is no lead-in or trailing silence at the beginning of each recording.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT B

## Hart document 6670-015: Hash Testing for Verity Software and Devices

Complete five-page vendor document
**GEX-B-002 through GEX-B-006**

Complete supplied document.

Original pagination is retained. Added GEX labels identify pages for citation.

VERITY®
knowledge base
*article #15 in a series*

HART intercivic™

# Hash Testing for Verity Software and Devices

## Overview

A hash function is a reproducible method of reading a data stream to produce a number (the "hash value") that serves as a digital "fingerprint" of the data. Hash testing is a common method used to verify the integrity of installed software. The process may be used to confirm that the voting system software operating on your Hart InterCivic Verity Workstation or Voting Devices matches the software as certified by the EAC or your State certifying body.
To conduct hash testing, jurisdictions can compare the hash value for software installed on computer workstations and devices with the hash value of the original source data to confirm that the software has not been altered or corrupted.

## Software Validation Process

Below are general instructions to export and verify Hart Verity Voting System software application hash values. Contact your Secretary of State's office for additional information concerning hash testing requirements in your state.

1. Contact your certifying body, and request the Verity Validated Manifest files. Contact information for the Election Assistance Commission (EAC) *(current at the time of publishing of this document)* is provided below:

   Paul Aumayr, Senior Election Technology Specialist
   paumayr@eac.gov
   202.476.9051

2. Request the certified **Validated Manifest zip file archive** appropriate to your Verity system version. If you are unsure of your Verity system version, contact Hart Support.

3. Store the files received in a convenient location on a non-Hart computer workstation.

4. On a Verity device or computer workstation, follow the steps below to export the hash values for those components:

   a. **For Verity Devices, versions 2.6 and earlier** (Verity Scan, Duo, Touch Writer, Print, Controller, etc.) follow these steps to generate the ValidatedManifest.csv file:

      i. Prepare a standard USB drive (do NOT use a vDrive): on the USB drive, create a folder named "HartValidation" (no spaces).

      ii. Set up the Verity device and connect it to AC power. Open the vDrive compartment. The device should not have a vDrive or Key inserted.

      iii. Insert the USB flash drive into one of the two USB ports inside the vDrive compartment on the device.


©Hart InterCivic

iv. Press the red power button on the back of the device to power it on. Look for the Verity Initialization screen.

v. When you see the Verity Initialization screen, press and hold the blue Validation button inside the vDrive compartment.

vi. Hold the button down until the device displays the Additional Functions screen.

*NOTE: If you see the message Validation Folder Not Found, this means that either a) the HartValidation folder was not found on the inserted USB drive, or b) the Validation button was not pressed/held as directed. Power down the device, verify the correct folder is present on the USB drive, and repeat steps c-f.*

vii. Select **Validate**.

viii. When you see the message "Hash values have been calculated and stored," you may remove the USB drive.

ix. Repeat the process with fresh USB flash drives for any additional devices.

*NOTE: Files must be written separately for each device; if the same USB drive is used for multiple devices, the previously saved file will cause subsequent attempts to fail. Therefore, either a separate USB should be used for each device, or the manifest file from the first device must be copied to the non-Hart workstation and deleted from the USB before the USB is used with a subsequent device.*

b. **For Verity Devices, versions 2.7 and later** (Verity Scan, Duo, Touch Writer, Print, Controller, etc.) follow these steps to generate the ValidatedManifest.csv file:

i. Use a standard USB drive (do NOT use a vDrive).

ii. Set up the Verity voting device and connect it to AC power. Open the vDrive compartment. The voting device should not have a vDrive or Key inserted.

iii. Insert the USB drive into one of the two USB ports inside the vDrive compartment on the voting device.

iv. Press the red power button on the back of the device to power it on. Look for the Verity Initialization screen.

v. When you see the white Verity Initialization screen, immediately press and hold the blue Validation button inside the vDrive compartment.

vi. Hold the button down until the device displays the Additional Functions screen.

*NOTE: If the Additional Functions menu does not appear, the Validation button was not pressed/held as directed. Restart the device and repeat steps 4-6.*

vii. Select **Validate**.

viii. When you see the message "Hash values have been calculated and stored," you may remove the USB drive. The exported files are saved to a folder named with the device serial number and date/time of export. You may repeat the process with additional device.

c. **For Verity Workstations**, follow these steps to generate the ValidatedManifest.txt file:

i. Power on the workstation and log into Verity (a user with access to the Verity Desktop application is required).


©Hart InterCivic

ii. Insert a *non-vDrive* USB drive into a USB port on the workstation. The USB drive *must not* be named as "vDrive."

iii. Open the Verity Desktop application.

iv. Under Export File Hashes, select **Export**.

v. Browse to the location on the USB drive where you want to save the file, type a name for the file, and then select **OK**.

vi. When you see the message "Validation export completed successfully…" click **OK**.

vii. Remove the USB drive.

**5** Compare the Validated Manifest file generated by the workstation or device to the appropriate certified Validated Manifest file received from your certifying body (see *Identifying Which Files to Compare*, on the following page).

a. Insert the USB drive containing the Validated Manifest file exported from your device or computer workstation into your non-Hart computer workstation.

b. Compare the hashes, listed at the start of each line, in the device/workstation Validated Manifest to the corresponding entry in the certified Validated Manifest. Alternatively, a file comparison utility may be used compare the entire Validated Manifest to the certified Validated Manifest. Consult your Information Technology department for assistance with file comparison tools.

**6** Repeat step 5 for each manifest file from each of your Verity device/workstation type.


©Hart InterCivic

# Identifying Which Files to Compare

When you receive the certified validated manifest files from the EAC or your State, you will most likely be given a complete set of manifest files for all possible components for your system version. Since you will need to compare only those files the correspond to the workstation types and device types that you have, you must identify which files you need to use for comparison. Each file provided by the certifying body (EAC or State) should be identified by the following information:

- System version
- Device/workstation type
- Workstation configuration (e.g. Server, Standalone, or Client)
- Tablet type (devices – e.g. 1204 or 38BT) *or* Workstation memory size (e.g. 32GB or 64GB; choose the correct memory size for your workstation. If you do not know, you can try both and the one that is correct will come up as a match)

For example:

- "Verity 2.5.1 Controller 38BT"
- "Verity 2.5.1 Count Standalone 64GB"

If you are unsure of your device/workstation type, configuration, or workstation memory size, you can also contact Hart Support. To identify the device tablet type, see the following page.


©Hart InterCivic

# Identifying the Tablet Type

Newer tablets may include a label identifying the tablet type, located on the CFAST compartment door on the back of the tablet:




If this label is not present, you can also determine the model of tablet (1204 or 38BT) by examining the device serial number label:

For the 1204 tablet, the middle two digits of the Assembly number are **53**. ▶




For the 38BT tablet, the middle two digits of the Assembly number are **58**. ▶





©Hart InterCivic

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT C

## County hash-testing procedure and verified Answer

County Voting Machine Hash Testing Procedures
**GEX-C-002 through GEX-C-003**

Complete Answer and New Matter; verification October 30, 2025; filed October 31
**GEX-C-004 through GEX-C-010**

Both supplied documents are reproduced completely.

Original pagination is retained. Added GEX labels identify pages for citation.

# Voting Machine Hash Testing Procedures

## OVERVIEW

The Delaware County Election Department performs optional hash testing on the Hart Intercivic Verity voting machines before and after each election. Hash testing is a way of testing the software being used by the voting equipment to make certain that the software is an exact match with the software that was tested and approved by an independent laboratory during the process of equipment certification by both federal and state election jurisdictions. Hash testing is a best practice. Hash testing is separate from and beyond the current Department of State requirements for performing processes that include "logic and accuracy testing" and "trusted build validation."

The pre-election hash testing typically takes place about four to eight weeks before Election Day but can be done even sooner. The post-election hash testing occurs as soon as time allows after the certification of the Election.

See attached Hart Verity knowledge base article #15 for an explanation of what hash testing is and step-by-step instructions provided by Hart Intercivic.

One hundred percent (100%) of the Hart workstations at the Delaware County central counting center are tested. This includes the servers and clients that consist of the Hart components 1) Data/Build, 2) Central, and 3) Count. By testing all of the central-count equipment, any precinct memory devices, by extension, must be compatible with the hash-tested equipment in the central count. The importance of testing 100% of the workstations at the central counting center is that these workstations will process the results from all voting methods: all ballots cast in-precinct, all mail/absentee ballots and all provisional ballots.

Meantime, a random selection of two percent (2%) of the components used in the precincts are tested. These components include the Hart Scan and Touch Writer devices. (This percentage is based on the standard set under the Pennsylvania Election Code for performing a random audit of the paper ballots from 2% of the precincts.) Ten-sided dice are used to randomly select the precincts for the hash test. (Similarly, ten-sided dice are used to randomly select the precincts for the 2% random audit of paper ballots.) The selection process takes place at the Voting Machine Warehouse (VMW) and is made accessible to the public for transparency. The same 2% of the precincts in the pre-election hash tests are re-tested after the election to verify that the software has not changed.

The source hashes from the Election Assistance Commission (EAC) for the Hart Verity system are provided to the Delaware County Elections Department by the PA Department of State Bureau of Elections.

An updated version of the source hashes is required each time the Hart operating system is updated on the county's devices. The last time the operating system was updated was ahead of the 2023 Primary, which is when Delaware County began performing hash testing.

## PROCESS

1. For in-precinct Scan and Touch Writer devices the VMW staff pulls the devices from the cages of the randomly selected precincts.

2. Using a standard USB drive, the hash is recorded following the steps in attached knowledge base article #15.

3. At the central counting center, the hashes are recorded on a standard USB drive for all workstations. This is performed by the Elections IT Business Analyst. (See attached knowledge base article #15 for steps involved.)

4. The Elections IT Business Analyst then saves the hash from each device and workstation onto a county laptop.

5. Using the open-source comparison program WinMerge, the source hash from the EAC is compared to the hash from the Delaware County Hart devices.

6. If there is an exact match, a pop-up message appears onscreen indicating that the files are identical. A screenshot capturing the match is saved and later uploaded to the county's website. The screenshot includes the file names for both hashes. The file names include the serial numbers of the devices and the time and date stamp of when the hashes were collected.

7. If any hash does not match perfectly, the cause of the difference is investigated. Typically, there is a simple answer, such as user error, such as using the wrong source hash when performing the comparison. (A different hash represents each component of the Hart balloting system.)

**Office of the Delaware County Solicitor** *Attorney for Defendants*
By: Jack Larkin
Pa. Supreme Court No. 307270
201 West Front Street
Media, PA 19063
ph. 610.800.5569
em. LarkinJ@co.delaware.pa.us

| | |
|---|---|
| GREGORY STENSTROM<br>*Plaintiffs*<br>v.<br><br>DELAWARE COUNTY, *et al.*<br>*Defendants.* | IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA<br><br>Case No: CV-2025-009036 |

**ANSWER**

Defendants, through their attorney, the Office of the Solicitor of Delaware County, hereby Answer the Petition filed by Gregory Stenstrom (**"Stenstrom"**) and, in support thereof, aver as follows:

1. Admitted in part; denied in part. It is admitted only that Gregory Stenstrom is the Petitioner in this action. It is specifically denied that Stenstrom's petition seeks only ministerial relief. The balance of this paragraph is denied.

2. Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

3. Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

4. Denied as stated. It is admitted only that the Secretary of the Commonwealth of Pennsylvania certified Verity Voting 2.7 subject to conditions. The balance of this paragraph is denied.

5. Denied.

6. Denied.

5. [sic] Admitted in part; denied in part. It is admitted only that Stenstrom is a registered elector of Delaware County and poll watcher. Following reasonable investigation, answering Defendants are without knowledge or information sufficient to form a belief as to the balance of the allegations of this paragraph, which are therefore denied.

6. [sic] It is admitted only that Plaintiff has so named.

7. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

8. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

9. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

10. [sic] Admitted in part; denied in part. It is admitted only that that Stenstrom was present and observed hash testing conducted by the Delaware County Elections Bureau, at which the blue validation button was pressed, per the process outlined by the manufacturer and approved by the United States Election Assistance Commission, on the machines involved to generate the software hash that then was compared to the software hash issued by the Election Assistance Commission on the certified equipment. The comparison yielded a perfect match. The balance of this paragraph is denied.

11. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

12. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

13. [sic] Denied as stated. Appendix C to the Department of State Certification is a Voting System Implementation Attestation form.

14. [sic] Denied. Hash Testing is performed on every central-count server and a random sampling of 5% of the precinct equipment. This process has been monitored in-person by the United States Election Assistance Commission, which subsequently issued a report endorsing Delaware County's hash-testing process as valid.

15. [sic] Admitted in part; denied in part. It is admitted only that Defendant James Allen at various points has referred to the hash testing performed by the County as a "gold standard" and a "best practice." The balance of this paragraph is denied.

16. [sic] Denied as stated. It is denied that Delaware County has conflated Hash testing with post-election ballot audits and hand recounts, which Delaware County also performs after each election. It is denied that hash testing of the software was conflated to the public as anything other than hash testing of the software.

17. [sic] Admitted in part; denied in part. It is admitted that Stenstrom was present at the County's hash testing; and the hash testing was performed by following the step of pressing the blue validation button, and that the hashes then were compared using a standard program, and that the hash comparisons showed 100% matches with the equipment software as certified by the Election Assistance Commission.

***COUNT I***
***Declaratory Judgment***

18. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

***COUNT II***
***Mandamus***

19. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

***COUNT III***
***Injunctive Relief***

20. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

***COUNT IV***
***Constitutional Violations***

21. [sic] Denied. The allegations of this paragraph constitute only conclusions of law to which no relief is necessary and that are therefore deemed denied.

***NEW MATTER***

24. The foregoing admissions and denials are incorporated by reference as if fully set forth herein.

25. Section 3031.5 of the Election Code requires all electronic voting systems to be examined and approved by the Secretary of the Commonwealth prior to their adoption and use in elections.

26. The Hart Verity 2.7 voting system was so examined and approved—but that approval was conditioned upon, among other things, each jurisdiction performing a

trusted build validation as part of the election preparation activities and post-election canvass activities utilizing the vendor supplied methods of validation and verification of voting system integrity.

27. The Hart Verity 2.7 voting system automatically performs a trusted build validation each time it is booted up and, upon being booted up, prints a tape confirming the validity of its build and that the system is operating on Hart Verity 2.7.

28. Thus, each and every Hart Verity machine used by the County has performed a trusted build validation in advance of the election using vendor supplied methods of validation and verification.

29. Each and every Hart Verity machine will perform at least one additional trusted build validation on the day of the election when it is booted up at the polls prior to the commencement of voting.

30. On or about September 23, 2025, Delaware County had staff follow the process prescribed by the manufacturer and approved by the United States Election Assistance Commission on a randomly selected five percent of its Hart Verity 2.7 precinct equipment as an added layer of security, and also performed same hash testing on all central-count servers.

31. The hash testing performed by the County is thus in addition to, and not instead of, the trusted build validation required by the Secretary's approval.

***AFFIRMATIVE DEFENSES***

32. This issue was the subject of extensive testimony in an earlier case, *Mancini, et al. v. Delaware County, et al.*, CV-2024-008838 at which Stenstrom testified.

Therein, Defendant James Allen testified to the distinctions between a trusted build validation and hash testing:

> A hash test is where you pull down the thumbprint or a fingerprint or the software facsimile if you will, of from the Election Assistance Commission. And then you pull the same fingerprint of the software from the certified equipment and you do a comparison of the two and you are determining whether or not there's anything whether they're an exact match, which is exactly what we did. And it came back an exact match. A trusted build validation is simply making sure that when you have a V-Drive that's built on hart 2.7 and you feed it into a scanner to begin setting up that scanner or that touch writer a, it accepts it. And then when you print out the tickets as we have in all these envelopes, when it prints out the when you boot it up, tickets are the wrong word, I apologize, but it, when it prints out that it's starting up or prints out a zero tape, it indicates that it's operating on Hart 2.7. They're two entirely different things.

The trial court dismissed Mr. Mancini's petition. Because of his participation in the *Mancini* matter, Stenstrom's claims are or may be barred by the doctrines of collateral estoppel, res judicata, and stare decisis.

***WHEREFORE,*** based on the foregoing, Defendants respectfully request that this Court DISMISS Stenstrom's Petition WITH PREJUDICE.

Respectfully submitted:

Date: *October 30, 2025*

By: Jack Larkin
Pa. Supreme Court No. 307270
**Deputy Solicitor, Delaware County**
201 W. Front Street
Media, PA 19063
p. 610.800.5569
e. LarkinJ@co.delaware.pa.us

***VERIFICATION***

James Allen states that he is the Director of Elections for Delaware County and is authorized to take this verification on behalf of himself and all Defendants in that capacity, and verifies that the statements made in the foregoing Answer are true and correct to the best of his knowledge, information, and belief. The undersigned understands that the statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Date: 30 October 2025 By: [signature]

James Allen

FILED
10-31-2025 04:14 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT D

## February 13, 2026 hearing: validation testimony

Transcript identification page
**GEX-D-002**

Contiguous testimony, printed pp.117-120
**GEX-D-003 through GEX-D-006**

Reporter certification, printed p.157
**GEX-D-007**

Selected complete transcript pages addressing startup, hash calculation, comparison and testing coverage.

Original pagination is retained. Added GEX labels identify pages for citation.

Additional contiguous testimony: printed pages 73?81
GEX-D-008 through GEX-D-016
Claimed EAC authority, report provenance and offered transmittal email.

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY
PENNSYLVANIA

CIVIL DIVISION

* * * * * * * * * * * * * * * * No. CV-2025-9036

**GREGORY STENSTROM**

**VS.**

**DELAWARE COUNTY**

* * * * * * * * * * * * * * * *

Media, PA, February 13, 2026

***

Courtroom No. 5

***

TRANSCRIPT OF PROCEEDINGS

BEFORE: HONORABLE JAMES BUCCI

JACK LARKIN, ESQUIRE
For the Defendant

Officemotive, Inc. DBA Capital Typing
PO Box 275, Williston, SC 29853 - (800) 785-9402

you boot up one of the pieces of equipment and it says Hart Verity 2. 7. I've testified to this.

Q. Explain how that happens.

***

THE COURT: No, no, no.

MR. ALLEN: You boot up.

THE COURT: We're over this. No. I got -- I have to -- at some point ---

MR. STENSTROM: Your Honor, there is no -- my whole point is there is no ---

THE COURT: I don't know ---

MR. STENSTROM: --- software validation ---

THE COURT: I don't know ---

MR. STENSTROM: --- test on boot.

THE COURT: I don't know if you're really getting anywhere or you're not. But if you're -- if you're -- if you're getting where you wanted to get, you got there, and if you're not getting there, it's five after five and you're just not getting there.

***

BY MR. STENSTROM:

Q. Well, I've got a couple more questions, Your Honor, for Mr. Allen. So when you run WinMerge, the open-source software not authorized by the EAC, when you run WinMerge and you compare the hash codes, the Base64 hash

codes, what are you comparing them to?
A. What the EAC gave to the Pennsylvania Department of State and the Pennsylvania Department of State gave to us.
Q. So that's not being compared to the EMS?
A. We also hash test the EMS, too.
Q. So you take the -- you take the output from this -- or hash test that you say you're on ---
A. No, not from WinMerge. WinMerge is a comparison tool.
Q. Describe the hash test. Your Honor, I'm trying to get someplace. So when you run a hash test on an Alexa machine, can you take us through those steps?
A. Do you mind if I reference?
Q. No.
A. So under Hart Assistant 2. 7, you use a standard USB drive, but not a V drive. You set up the Verity voting device and connect it to the AC power. You open the V drive compartment. The voting devices should not have a V drive or key inserted. You insert the USB drive into one of the two USB ports inside the V drive compartment on the voting device. You press the red power button on the back of the device to power it on. Then look for Verity initialization screen. When you see the white Verity initialization screen,

immediately press and hold the blue validation button inside the V drive compartment. Hold the button down until the device displays the additional functions screen. So this is not a standard process. This is not a standard process. It's outside of -- select validate. Lastly, when you see the message hash values have been calculated and stored, you may remove the USB drive. The exported files are saved to a folder named with the device serial number and date, time of export. You may repeat the process with additional devices.
From there, we take the hash that we downloaded from that piece of equipment and we compare it to the hash that the Department of State gave us for that same piece of equipment. Again, they have a different hash for the server. They have a different hash for build. They have a different hash for the scanner. They have a different hash for the Touch Writer.
Q. Is that test run on every machine?
A. This? No. I just described the hash testing.
What’s run on every machine ---
Q. No. Is that hash test that you just described ---
A. --- is we power it on and we verify that it's 2.
7.

***

THE COURT: All right, all right, all right.

MR. STENSTROM: I'm only asking a quick question.

THE COURT: You're going in circles.

MR. STENSTROM: Your Honor ---

THE COURT: You're going in circles, sir.

MR. STENSTROM: I'm not going in circles, Your Honor.

THE COURT: Yes, you are.

MR. STENSTROM: Is that hash test run on every machine, which you just described?

MR. ALLEN: Absolutely not.

MR. STENSTROM: Okay.

THE COURT: He's already told you. He told you that a half hour ago.

MR. ALLEN: It's not run on any machine elsewhere in Pennsylvania, as far as I know.

***

BY MR. STENSTROM:

Q. Who developed that procedure?

A. Hart InterCivic.

Q. Is that on the Hart InterCivic -- which document is that? I'm not aware that Hart InterCivic developed that.

***

THE COURT: All right. We're taking a 10-minute

C E R T I F I C A T E

I, Richard Coogan, hereby certify that the proceedings and evidence are contained fully and accurately on digital multi-track recording; that the recording was reduced to typewriting by my direction; and that this is a correct transcript of the same.

______________________________________
Richard Coogan, Director
Electronic Recording Center

Officemotive, Inc. DBA Capital Typing., hereby certifies that the attached pages represent an accurate transcript of the multi-track digital sound recording of the proceedings in the Court of Common Pleas of Delaware County, Pennsylvania, in the matter of:

GREGORY STENSTROM

vs.

DELAWARE COUNTY

CV-2025-9036

BY:

Mary Elizabeth Jobe
______________________________________
Mary Beth Jobe, CET-4093
Transcriber for
Officemotive, Inc. DBA Capital Typing

The foregoing record of the proceedings upon the hearing of the above cause is hereby approved and directed to be filed.

______________________________________
Judge



FILED
03-09-2026 09:22 AM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

-examination.

MR. STENSTROM: Yes, Your Honor, we were.

THE COURT: You may take the stand. You're still under oath.

MR. ALLEN: Yes, Your Honor.

MR. STENSTROM: Ready, Your Honor?

THE COURT: You may proceed.

***

BY MR. STENSTROM:

Q. Thank you, Your Honor. Mr. Allen, you have a 15-page report there. And at the bottom of that, who produced that report?

A. The Election Assistance Commission for the United States.

Q. It says in the report it was -- it was completed by Delaware County. Did I read that wrong? The 15-page report you gave me, who produced that? What's at the bottom? Front page.

A. No. That's not who produced this report. It's clear from the seal on the front of the document that this was produced by the Election Assistance Commission of the United States ---

Q. And who signed that?

A. --- just as I said.

Q. Is there a signature on there?

A. No.
Q. Who signed that? By what authority? Who signed it? If you could provide that to the Judge, if Your Honor could look at it. I only needed to look at it for a minute. Because where on the end does it say that it was produced by the EAC?

***

THE COURT: Okay. Just for the record -- for the record, what I was just handed was supposed to be a 15-page document stapled together, and at the top of each page it says U. S. Election Assistance Commission Field Services Program. That's on the top of every page of this document.
MR. STENSTROM: And at the bottom, Your Honor?
THE COURT: And at the -- at the bottom of the page, of each page, it says, "Delaware County Bureau of Elections, Commonwealth of Pennsylvania Hash Verification Project Report." And then the last page is identical. At the top it says, "U. S. Election Assistance Commission Field Services Program, 633 3rd Street, Northwest, Suite 200, Washington, D. C." And at the bottom, under a line, the very bottom, "Delaware County Bureau of Elections, Commonwealth of Pennsylvania, Hash Verification Project Report. Page 15 of 15."

MR. ALLEN: That's the title of the report, Your Honor. So it's at the bottom of each page, and I was pointing out that that's also the title of the report issued by the U. S. Election Assistance Commission.

THE COURT: Okay.

MR. STENSTROM: Your Honor, I was in the -- served in the -- served our government, the United States government, for 22 years of service. And I continued to serve for another 20 years after that, developing combat systems and other programs for the United States government. There's not a single document that I ever did or that I ever saw that didn't have a serial number on it.

THE COURT: Is there a question?

MR. STENSTROM: A date -- yes, Your Honor.

THE COURT: What's the question for ---

***

BY MR. STENSTROM:

Q. Is there a signature on the bottom of that report?

A. Not that I'm aware ---

Q. Is there a responsible managing ---

A. No.

Q. --- authority on that report?

A. The responsible authority would be ---

***

THE COURT: Is there a signature? Is there a signature?

MR. STENSTROM: It’s a yes or no?

MR. ALLEN: A signature? No.

THE COURT: Is there a signature?

MR. ALLEN: No.

MR. STENSTROM: Is there a [inaudible 04:28:35 p.m. ]?

MR. ALLEN: I don’t -- I don’t see one.

THE COURT: Okay. Okay.

MR. STENSTROM: That's a no. So who wrote that report?

THE COURT: You can answer the question.

MR. ALLEN: I can -- I can only assume it was people working with Sean Pumphrey, who was among the people who came and reviewed it.

***

BY MR. STENSTROM:

Q. Sean Humphrey?

A. Pumphrey, yes.

Q. Pumphrey.

A. Kind of ---

Q. And what was his position?

A. He's in field services.

Q. He's in field services?

A. Uh-huh (yes).
Q. Where was he employed before he was in field services for the EAC?
A. I don't know if it was North Carolina or Virginia, but I believe in the -- in the -- in the realm of elections.
Q. And the person that was working with him for that when they came here and did that field service test for the EAC, what was the other gentleman's name that worked with Mr. Pumphrey?
A. I don't recall it off the top of my head.
Q. Do you recall where he worked before he worked for the EAC field services?
A. I believe he worked for another Pennsylvania jurisdiction.
Q. And which jurisdiction would that be?
A. I don’t ---
Q. Would it be Delaware County?
A. No. I know he didn't work for Delaware County.
Q. So what we have here is we have a report that's unsigned without a responsible managing authority. Is there a serial number or date on that report?
A. I don't know.
Q. You can look at it right there.
A. I don't ---

Q. The answer is yes or no. Is there a serial number or a date on that document of when it was developed? Not when you printed it and put it on the -- in the Delco -- on the Delco, but is there a ---

A. Well, this was issued to us by the Election Assistance Commission.

Q. I'm only -- you can -- you can answer my questions. My questions are, is there a serial number on that document?

A. No.

Q. Is there a date of when it was produced by the EAC -- allegedly produced by the EAC?

A. Allegedly, no. I'd have to go to the e-mail that they used to deliver it to me.

Q. So the answer is no. Is there a signature on it again? I just want to make clear for the record.

***

THE COURT: He said no.

MR. STENSTROM: There's no person. So what we have here, the -- what's been proffered for proof to this Court is that there's an unsigned ---

THE COURT: No, wait. No, wait. No, wait. He didn't proffer that. You are.

MR. STENSTROM: Excuse me?

THE COURT: He didn't proffer that.

MR. ALLEN: I didn't.

***

BY MR. STENSTROM:

Q. It was brought up in testimony ---

A. No, it wasn't.

Q. --- Your Honor, multiple times.

A. No, I referenced that they came and reviewed ---

Q. They referenced an EAC report ---

A. Okay. This guy's making this stuff up.

Q. --- that allowed them to conduct alternate tests. I asked for that report. In the last hearing, they offered a two-page report. It was also unsigned and un-serialized. That was produced here today, which they referenced multiple times.

***

THE COURT: No. No.

MR. STENSTROM: Yes, they did, Your Honor.

THE COURT: No. I never -- he never had that marked as an exhibit. He never presented it to the court. He never read it.

MR. STENSTROM: So let's enter it into an exhibit. Let's take that to ---

THE COURT: You're objecting to it.

MR. STENSTROM: I'm saying -- no. I want to offer it ---

THE COURT: You can't have it both ways.
MR. STENSTROM: I want to install -- I want to put it ---
THE COURT: Then it's going to be your exhibit.
MR. STENSTROM: I want to put it in as an exhibit.
MR. ALLEN: You want to enter an exhibit that ---
THE COURT: All right.
MR. ALLEN: --- you already objected to.
MR. STENSTROM: I want that entered into the exhibits ---
THE COURT: Is this ---
MR. STENSTROM: --- for the court.
THE COURT: --- your exhibit?
MR. STENSTROM: My exhibit.
MR. ALLEN: I would -- I would love this to be entered in.
THE COURT: Okay, so this will be -- how do you mark exhibits here? Plaintiff 1 or ---
THE CLERK: Yeah, P-1.
THE COURT: P-1. All right. It could be marked P-1.
MR. STENSTROM: So document P-1 will be the report from the EAC, the alleged report from the EAC,

without serial number, without date, without responsible managing authority. Please enter that as exhibit. It's right behind you, sir. It's over your left-hand shoulder.

THE COURT: Oh, I see.

MR. STENSTROM: Thank you.

THE COURT: Thank you.

MR. STENSTROM: Is that -- you said that's available on the website, Mr. Larkin?

MR. LARKIN: [Inaudible 04:32:08 p.m. ]. Okay.

MR. STENSTROM: I just want to make sure I can get it afterwards. It's on the website?

MR. LARKIN: I haven't said anything.

MR. ALLEN: I can -- I can forward you the email from Sean Pumphrey, who's an employee of the Election Assistance Commission.

MR. STENSTROM: Okay. So I'll be -- can I get a copy of that now, Your Honor? Because I don't have a copy. It wasn't offered.

THE COURT: No. Next question. Next question.

MR. STENSTROM: It was -- it was provided by ---

THE COURT: Next question.

MR. ALLEN: Thank you, sir.

MR. STENSTROM: It was provided by the Defense, Your Honor.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT E

## September 1, 2026 observer attendance and conduct records

Observer sign-in log
**GEX-E-002**

Two signed conduct forms
**GEX-E-003 through GEX-E-004**

Complete supplied photographs.

Original pagination is retained. Added GEX labels identify pages for citation.



AUTHORIZED BY JACQUELINE DUNN, SUPERVISOR

| DATE | FULL NAME (PRINT) | SIGNATURE | TIME IN | PURPOSE OF VI |
|---|---|---|---|---|
| 8/31 | Euphrosyne Schwartz | [signature] | 9:00 | OBSERVER |
| 8/31 | Scott Thomas | [signature] | 9:00 | OBSERVER |
| 9/1 | Scott Thomas | [signature] | 9:00 | OBSERVER |
| 9/1 | GREGORY STENTZ | [signature] | 9:00 | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |
| | | | | OBSERVER |

Delaware County Bureau of Elections
2501 Seaport Dr., Suite BH120
Chester, Pennsylvania 19013

## Rules Governing the Conduct of Party, Campaign and Authorized Representatives for Observing Hash Testing

1. The representative shall be certified by the respective party chairs and/or presiding officer of entitled organization. Such certification shall be submitted by email at least one day in advance.
2. One representative of a campaign or political party may attend at any time.
3. Photography, videotaping, all other recording is strictly prohibited. Additionally, representatives may not bring into the Union Power Plant any bags, purses, backpacks, laptops, cameras, binoculars, nor any other devices that could be used to record or capture images of documents or used to reveal operator passwords. Cell phones will be allowed, but cell-phone use will be limited to the vestibule or outside the office.
4. Representatives shall stay in the designated area for representatives and not interfere with the Hash Testing process.
5. The representative shall not interact with personnel conducting the testing. All questions, comments, and/or concerns shall be addressed to the designated manager.
6. The representative shall adhere to other reasonable rules of conduct, as circumstances may warrant, established by this department.
7. Representatives who are removed will not be allowed to return.

GREGORY STENSTROM
Representative Name

[signature]
Representative Signature

9/1/2026
Date

Delaware County Bureau of Elections
2501 Seaport Dr., Suite BH120
Chester, Pennsylvania 19013

## Rules Governing the Conduct of Party, Campaign and Authorized Representatives for Observing Hash Testing

1. The representative shall be certified by the respective party chairs and/or presiding officer of entitled organization. Such certification shall be submitted by email at least one day in advance.
2. One representative of a campaign or political party may attend at any time.
3. Photography, videotaping, all other recording is strictly prohibited. Additionally, representatives may not bring into the Union Power Plant any bags, purses, backpacks, laptops, cameras, binoculars, nor any other devices that could be used to record or capture images of documents or used to reveal operator passwords. Cell phones will be allowed, but cell-phone use will be limited to the vestibule or outside the office.
4. Representatives shall stay in the designated area for representatives and not interfere with the Hash Testing process.
5. The representative shall not interact with personnel conducting the testing. All questions, comments, and/or concerns shall be addressed to the designated manager.
6. The representative shall adhere to other reasonable rules of conduct, as circumstances may warrant, established by this department.
7. Representatives who are removed will not be allowed to return.

Representative Name

Representative Signature

9/1/2026
Date

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT F

## Records-request and certification chronology

October 27 entered order
**GEX-F-002 through GEX-F-004**

October 28 filing notice, receipt and service email
**GEX-F-005 through GEX-F-007**

November 18 entered orders
**GEX-F-008 through GEX-F-009**

Selected dated records establishing the examination requests, their submission and the later certification dispositions.

Original pagination is retained. Added GEX labels identify pages for citation.

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **NICK MANGANARO, KATHRYN BUCKLEY, and GREGORY STENSTROM** Plaintiffs | : | **No. CV-2026 - 009462** |
| v. | : | |
| **DELAWARE COUNTY, DELAWARE COUNTY BOARD OF ELECTIONS, and JAMES P, ALLEN, in his official capacity,** Defendants | : | |

**ORDER**

**AND NOW**, this 27th day of October, 2026, after argument on Plaintiffs, Nick Manganaro, Kathryn Buckley and Gregory Stenstrom's Emergency Motion for Special and Preliminary Injunction Under Pa.R.Civ.P. 1531, review of Plaintiffs' exhibits, consideration of post-argument memorandum submitted by Plaintiffs and Defendants, County of Delaware, Delaware County Board of Elections and James P. Allen in his official capacity, and review of Plaintiffs' Reply to Defendants' Post Hearing Memorandum, it is hereby **ORDERED** and **DECREED** that said Motion is **DENIED**.

The six essential prerequisites that a moving party must demonstrate to obtain a preliminary injunction are as follows: (1) the injunction is necessary to present immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the

offending activity; and (6) the preliminary injunction will not adversely affect the public interest. *Warehime v. Warehime*, 860 A.2d 41, 46-47 (Pa. 2004).

Plaintiffs' complaint seeks immediate access to election records pursuant to sections 25 P.S. §§ 2648, 3146.8, 3146.9 (a)-(c), and 3150.17(a)-(c) of the election code. The Plaintiffs have an extensive election litigation history with Delaware County. In the instant action, Petitioners seek two classes of documents: physical records in electronic format maintained by the Delaware County Board of Elections and voter data compiled by the Election Board. To the extent the data is covered by Sections 3146.9 and 3150.17 of the Election Code, the records are available to Plaintiffs immediately, online, from the Department of State. Additional Plaintiffs' requests are subject to the express procedural mandates under 25 P.S. § 2648.

Public access to county election records is governed by the Election Code, not the Right to Know Law. *Honey v. Lycoming Cnty. Offs. of Voter Servs.*, 355 A.3d 801, 823 (Pa. 2026) ("... requesters **must follow the procedure for review as laid out in the Election Code** – they cannot simply obtain review *via* the RTKL, as the Election Code governs the disclosure of these records.") (emphasis in original). Plaintiffs have failed to specify in their pleadings any demand/request for documents, access or information made directly to the Board of Elections which has been denied. This court lacks jurisdiction to entertain and examine initial election records demands which have not been initially submitted and responded to by the Board of Election.

The election in Delaware County and the Commonwealth of Pennsylvania is scheduled for next Tuesday, November 3, 2026. The Election Code contains existing procedures for Plaintiffs to monitor and access election records. Demands for enhanced or additional authority cannot be considered by this Court.

BY THE COURT:

ANTHONY D. SCANLON, J.

## IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY PENNSYLVANIA CIVIL DIVISION

NICK MANGANARO, KATHRYN BUCKLEY, and GREGORY STENSTROM, Plaintiffs
v.
DELAWARE COUNTY, DELAWARE COUNTY BOARD OF ELECTIONS, and
JAMES P. ALLEN, in his official capacity, Defendants

No. CV-2026-009462 Hon. Anthony D. Scanlon

### Notice of Filing and Request for Expedited Scheduling

Moving party: Gregory Stenstrom, Plaintiff pro se.
Filed October 28, 2026. Assigned judge: Hon. Anthony D. Scanlon.

Stenstrom requests a response by noon October 29 and sworn examination October 29 or the morning of October 30, before the 5:00 p.m. challenge deadline. These are requested times; the Court must set the shortened schedule under Local Rule 208.3(b)(a)(2).

Absent a shortening order, Local Rule 208.2 provides the ordinary twenty-day response period, ending November 17 on an October 28 filing. This filing and its scheduling request are designated for contemporaneous submission to the assigned judge under Local Rule 208.3(b)(a)(2). Notice is provided to Larkin, counsel for Defendants, and Plaintiffs Manganaro and Buckley.

Respectfully submitted,
/s/ Gregory Stenstrom, Plaintiff pro se
1541 Farmers Lane, Glen Mills, PA 19342
856-264-5495 | gregorystenstrom@gmail.com
October 28, 2026

# E-Filing Submission Confirmation

The following electronic filing(s) were successfully submitted. Please keep a copy of this confirmation for your records.

**Submitted Date** 10-28-2026 04:02 PM
**E-File Confirmation No.** 225811793217766992

**Filings Submitted:**

| Court | Case Number | Filing Type(s) | Documents | Fees |
|---|---|---|---|---|
| Delaware County Court of Common Pleas | CV-2026-009462 | Petition/Motion - Motion | 1 | $ 0.00 |
| Total | | | | $ 0.00 |

Gmail Gregory Stenstrom <gregorystenstrom@gmail.com>

# CV-2026-009462 — Service and prompt presentation to Judge Scanlon — Verification records motion

**Gregory Stenstrom** <gregorystenstrom@gmail.com> Wed, Oct 28, 2026 at 4:04 PM
To: "Larkin, Jack" <LarkinJ@co.delaware.pa.us>
Cc: Nick Manganaro <n.manganaro@comcast.net>, Kathryn Buckley <kathy1070@comcast.net>, "Awbrey, Lee" <AwbreyL@co.delaware.pa.us>, "Myers, Rachel" <myersr@co.delaware.pa.us>, "White, Veronica" <WhiteV@co.delaware.pa.us>, "Layden, Diane" <LaydenD@co.delaware.pa.us>, "Walk, Mary J." <WalkM@co.delaware.pa.us>, "Harkin, Thomas" <HarkinT@co.delaware.pa.us>, "Montella, Gerald" <MontellaG@co.delaware.pa.us>

Mr. Larkin, Diane, and Judge Scanlon's Administrative Staff:

Attached please find the final Motion for Expedited Examination of Mail Ballot Verification Records and Responsible Officials, including proposed orders, verification, certificates, and Exhibits A and B. I am submitting this filing electronically today, October 28, 2026.

Please promptly provide the attached filing to Judge Scanlon for consideration of the requested examination and production schedule before the October 30, 5:00 p.m. challenge deadline.

I emailed the proposed filing to Mr. Larkin at approximately 10:50 a.m., requested a response by 1:00 p.m., and offered an immediate telephone discussion to resolve or narrow the dispute. No response had been received as of 4:00 p.m.

The final filing incorporates clarified exhibits and supporting authorities. It requests records, sworn examination, and enforcement of the Board's independent investigative duties, together with alternative protective relief. The proposed orders appear first.

This email provides service to counsel and the other Plaintiffs and a courtesy copy for presentation to the assigned judge. All recipients are included together.

Please acknowledge receipt and advise promptly of any scheduling direction from the Court.

Gregory Stenstrom
Plaintiff, pro se
1541 Farmers Lane
Glen Mills, PA 19342
856-264-5495
gregorystenstrom@gmail.com

**2 attachments**

**Unified_MIB_Verification_Filing_28OCT2026_For_Filing.pdf**
400K

**SubmissionConfirmation225811793217766992 Receipt for Motion to Examine.pdf**
27K

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**

**CIVIL ACTION – LAW**

| | |
|---|---|
| **NICK MANGANARO ET AL,**<br>**PLAINTIFF**<br>**V.**<br><br>**COUNTY OF DELAWARE ET AL,**<br>**DEFENDANTS** | **No. CV-2026-010608** |

**ORDER**

AND NOW, this 18th day of November, 2026, upon consideration of Plaintiff's Emergency Application for Temporary Restraint and Preliminary Injunction against Premature Certification, this Court noting that the Petition was filed in the Office of Judicial Support on November 17, 2026 at 4:27 pm and the Certification having been scheduled for and occurring on November 18, 2026 at 9:00 am, it is hereby ORDERED that said Petition is DENIED as MOOT without prejudice to the Plaintiffs' right to file for additional relief as Certification has already occurred.

**BY THE COURT:**

______________________, J.

**BACKUP JUDGE**

ANTHONY D. SCANLON
BACKUP JUDGE

FILED
11-18-2026 12:09 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

SWEX-0048

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**

**CIVIL ACTION – LAW**

| | |
|---|---|
| **IN RE: PETITIONS OF QUALIFIED ELECTORS TO OPEN BALLOT BOXES AND RECOUNT VOTES IN SEVEN ELECTION DISTRICTS OF DELAWARE COUNTY**<br><br>**GENERAL ELECTION OF NOVEMBER 3, 2026.** | **No. CV-2026-010609** |

**ORDER**

AND NOW, this 18th day of November, 2026, upon consideration of Plaintiff's Consolidated Verified Petitions To Open Ballot Boxes And Recount Votes In Seven Election Districts, and said Petition seeking to do so before the Certification of the November 3, 2026 election results, and this Court noting that the Petition was filed in the Office of Judicial Support on November 17, 2026 at 4:43 pm and the Certification having been scheduled for and occurring on November 18, 2026 at 9:00 am, it is hereby ORDERED that said Petition is DENIED as MOOT without prejudice to the Plaintiffs' right to file for additional relief as Certification has already occurred.

**BY THE COURT:**

ANTHONY D. SCANLON
BACKUP JUDGE

______________________, **J.**

**BACKUP JUDGE**

FILED
11-18-2026 12:12 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

SWEX-0049

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. __________________

## EXHIBIT G

## NVRA notice, Department response and renewed inspection demand

August 18 notice: complete 13-page notice body
**GEX-G-002 through GEX-G-014**

September 10 Department response: complete four pages
**GEX-G-015 through GEX-G-018**

September 18 renewed demand: printed p.1 and pp.5-11, including complete Schedule A and service certificate
**GEX-G-019 through GEX-G-026**

The notice appendices and the renewed demand's legal discussion on printed pp.2-4 are omitted. The signed supporting declarations are Exhibit H.

Original pagination is retained. Added GEX labels identify pages for citation.

Historical source documents are reproduced as filed. Prior appearances and communications shown in them do not identify counsel in this action; all current plaintiffs appear individually pro se.

**NOTICE OF VIOLATIONS AND DEMAND FOR CORRECTIVE ACTION**

**PURSUANT TO 52 U.S.C. § 20510(b)**

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
**AND ELECTRONIC MAIL**

August 18, 2026

**The Honorable Al Schmidt**
Secretary of the Commonwealth of Pennsylvania
Department of State Office of the Secretary
401 North Street, Room 302
Harrisburg, PA 17120

CC:
**The Honorable Dave Sunday**
Attorney General, Office of the Attorney General of the Commonwealth of Pennsylvania
16th Floor, Strawberry Square
Harrisburg, PA 17120

**Eric V. Neff Acting Chief, Voting Section**
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street, NE
Room 8.923
Washington, DC 20530

## I. INTRODUCTION

This Notice is provided pursuant to Section 11(b) of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20510(b).

Unite 4 Freedom, Inc. ("U4F"), together with the identified aggrieved person(s), provides this Notice of Violations and Demand for Corrective Action concerning the State's continuing implementation of voter-registration list-maintenance programs, maintenance, preservation of records concerning those programs, and public inspection obligations imposed by the National Voter Registration Act.

The attached U4F Election Validity Scorecards, Vote Tampering Reports, and supporting machine-readable data identify documented record-level conditions requiring investigation, explanation, correction, preservation, or disclosure under the NVRA. These materials are presented to identify suspected statutory violations requiring review and corrective action. They are not presented as proof that every individual record independently establishes an NVRA violation.

This Notice identifies the statutory duties at issue, the categories of alleged violations, the supporting factual bases, individual records that appear to be in violation of legal requirements, and the corrective actions requested. The summary report is provided as a guide to the violations, but each record must be resolved and explained. It is intended to provide the notice and opportunity to cure required by Congress before a civil action may be commenced under 52 U.S.C. § 20510(b).

## II. NATURE OF THE NOTICE

Congress enacted the National Voter Registration Act to establish uniform national standards governing voter-registration administration, voter-list maintenance, and public inspection of records concerning those programs and activities.

Section 20510(b) authorizes an aggrieved person to provide written notice of violations to the chief State election official and affords the State an opportunity to investigate, correct, explain, or otherwise cure those violations before civil litigation is commenced.

This Notice concerns three categories of continuing statutory duties imposed by the NVRA:

1. The duty to conduct a reasonable and uniform voter-list maintenance program consistent with federal law;
2. The duty to maintain, preserve, and make available for public inspection those records Congress expressly identified in 52 U.S.C. § 20507(i); and
3. The duty to document, preserve, and explain the implementation of those list-maintenance programs sufficiently to permit meaningful public review and statutory compliance.

For administrative efficiency, the identified record-level conditions are summarized in this Notice and presented in detail within the attached appendices. Each documented record is documentation of a suspected violation and must be reviewed

individually. These individual records also identify a suspected pattern of violation and form part of the factual basis for this Notice of Suspected Statutory Violations.

## III. FACTUAL BASIS OF THIS NOTICE

U4F has analyzed official voter-registration, voter-history, and related election records obtained from the State and its election officials. Using those official records, U4F generated State-specific Election Validity Scorecards, Vote Tampering Reports, and supporting machine-readable datasets identifying documented conditions requiring further investigation, explanation, correction, preservation, or disclosure.

The attached analyses identify recurring categories of record-level conditions that include, where applicable:

- apparent changes to voter-history records following election certification;
- apparent irregularities in voter-registration records;
- duplicate or conflicting registration records;
- unexplained registration-date anomalies;
- record changes requiring supporting implementation documentation;
- apparent inconsistencies in voter-list maintenance activities; and
- other documented conditions relevant to the statutory duties identified in this Notice.

To the extent any documented condition arises from voter-registration or voter-list maintenance activities involving Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") registrants, this Notice likewise requests the implementation records, explanatory documentation, audit records, and preservation records sufficient to determine whether those activities were administered consistently with the National Voter Registration Act and other applicable federal law. This Notice does not assert an independent UOCAVA claim but requests records concerning any list-maintenance activities affecting UOCAVA registrants to the extent those activities are relevant to the statutory duties identified herein.

**The analyses identify documented record-level conditions requiring investigation under the National Voter Registration Act.**

Whether any individual condition ultimately constitutes a statutory violation depends upon the implementation records and explanations required by federal law and requested in this Notice.

The attached appendices identify the documented record-level conditions and the corresponding categories of implementation records requested for each alleged statutory violation.

---

## IV. ALLEGED STATUTORY VIOLATIONS

The record-level conditions identified in the attached appendices fall into three principal categories of continuing statutory violations under the National Voter Registration Act.

Each category corresponds to a separate statutory duty imposed by Congress. Although individual records may implicate more than one statutory provision, the categories above are presented separately to facilitate investigation, response, and corrective action.

The factual allegations supporting each category are contained in the attached U4F Election Validity Scorecards, Vote Tampering Reports, and supporting machine-readable datasets incorporated by reference into this Notice.

---

### A. Failure to Conduct a Reasonable and Uniform List-Maintenance Program

**52 U.S.C. § 20507(a)(4)**

The attached analyses identify documented conditions requiring investigation concerning the State's continuing implementation of voter-list maintenance programs.

These conditions include, where applicable:

- duplicate or conflicting voter-registration records;
- unexplained changes in voter-registration status;
- registrations containing internally inconsistent or illogical data;
- apparent irregular registration changes;

- registration conditions requiring documented explanation under established list-maintenance procedures; and
- other record-level conditions identified within Appendix A.

This Notice does not presume that every identified condition independently establishes a violation of federal law. Rather, the documented conditions require the State to determine whether its list-maintenance program has been implemented in a reasonable, uniform, and nondiscriminatory manner consistent with the requirements imposed by Congress.

The corresponding record-level instances are identified within the attached U4F Election Validity Scorecards and supporting datasets.

---

**B. Failure to Maintain and Make Available Records Concerning List-Maintenance Programs**

**52 U.S.C. § 20507(i)**

The attached analyses further identify documented conditions requiring production, preservation, or explanation of records concerning the implementation of the State's voter-list maintenance programs.

Among other matters, the appendices identify documented record-level conditions for which implementation records, implementation  documentation, or explanatory materials are necessary to determine:

- the basis for recorded changes;
- the authority under which those changes occurred;
- the implementation of voter-list maintenance procedures;
- the preservation of required records; and
- the completeness of the State's public-inspection obligations under the National Voter Registration Act.

To the extent those implementation records exist, this Notice requests their production or inspection as part of the corrective actions described below.

To the extent such records do not exist, this Notice requests written confirmation identifying the specific records unavailable and the reasons for their absence.

---

### C. Failure to Preserve and Document Record-Level Changes Relevant to List-Maintenance Activities

The attached U4F analyses identify numerous documented changes to voter-history and voter-registration records occurring across successive official statewide voter-file snapshots.

These documented changes do not, standing alone, establish that any particular modification violated federal law. They do, however, identify record-level conditions requiring investigation, explanation, and implementation documentation sufficient to determine whether the State has maintained and preserved records concerning the implementation of its voter-list maintenance programs as required by the National Voter Registration Act.

The corresponding record-level instances are identified throughout the attached Vote Tampering Reports and implementation of machine-readable datasets.

---

## V. REQUESTED CORRECTIVE ACTION

Pursuant to 52 U.S.C. § 20510(b), U4F and the identified aggrieved person(s) respectfully request that the State **investigate, document, explain, correct, preserve, or otherwise resolve the statutory matters identified in this Notice**, and appendices.

Specifically, U4F requests that the State undertake the following corrective actions.

---

### A. Investigation of Identified Record-Level Conditions

Investigate each category of documented record-level conditions identified in the attached U4F Election Validity Scorecards, Vote Tampering Reports, and implementation of machine-readable datasets.

The investigation should determine, at a minimum:

- whether the identified condition reflects a lawful implementation of the State's voter-list maintenance program;
- the statutory or administrative authority relied upon;
- the records supporting that determination; and
- whether corrective action is required.

### B. Production and Inspection of Implementation Records

Produce, or make available for inspection, all records concerning the implementation of the State's voter-list maintenance programs that are required to be maintained or made available under 52 U.S.C. § 20507(i).

To the extent records exist, they should include, where applicable:

- identification of the records reviewed in reaching the State's conclusions;
- implementation records supporting voter-list maintenance activities;
- records documenting additions, changes, removals, or corrections to voter-registration records;
- records identifying the authority for those actions;
- records identifying the responsible officials or offices;
- confirmation-notice records required by federal law;
- written procedures governing implementation of voter-list maintenance programs; and
- any other records necessary to explain the documented conditions identified in the attached appendices.

Electronic production in the format maintained by the State is preferred whenever reasonably available.

---

### C. Written Explanation of Documented Record-Level Conditions

Provide a written explanation describing the procedures, policies, and implementation practices responsible for the documented record-level conditions identified in the attached appendices.

Where a documented condition reflects a lawful administrative process, identify:

- the applicable procedure;
- the authority under which it occurred;
- the records documenting that action; and

- the basis upon which the State concludes the action complied with the National Voter Registration Act.

Where a documented condition reflects an error, omission, or deficiency, identify:

- the corrective action taken;
- the date correction occurred;
- the records documenting the correction; and
- any prospective measures implemented to prevent recurrence.

---

## D. Preservation of Relevant Records

Preserve all records, electronic data, audit logs, implementation records, correspondence, database transaction logs, database change-history tables, import/export transaction logs, system event logs, and implementation documentation relevant to the matters identified in this Notice until the issues presented herein have been resolved.

Such preservation should include all records reasonably necessary to reconstruct, explain, or verify the implementation of the voter-list maintenance activities identified in the attached appendices.

This preservation request includes active records, archived records, backup media, disaster-recovery copies, cloud-hosted records, replicated databases, audit repositories, and any other electronic storage containing implementation records relevant to the matters identified in this Notice.

---

## E. Written Disposition

Provide a written response addressing each record level violation identified and the category patterns identified in this Notice.

For each category, indicate whether the State:

- agrees that corrective action is required;
- disputes the asserted statutory duty;
- disputes the factual basis;
- has undertaken corrective action;

- requires additional information; or
- contends that no violation exists.

Where corrective action is denied, identify the statutory, regulatory, or legal authority upon which the State relies.

The violation categories described below are supported by the record-level documentation contained in the incorporated appendices.

---

## VI. STATUTORY CURE PERIOD

This Notice is provided pursuant to 52 U.S.C. § 20510(b). Because this Notice is served within **one hundred twenty (120) days before the November 3, 2026 federal general election**, U4F and the identified aggrieved person(s) request that the State investigate, document, explain, correct, preserve, produce, or otherwise resolve the matters identified herein within the **twenty (20) day statutory cure period** prescribed by 52 U.S.C. § 20510(b), to the extent applicable.

If the State contends that any portion of this Notice is not subject to the **twenty (20) day cure period** provided by 52 U.S.C. § 20510(b), the State should identify the specific factual and legal basis for that position in its written response.

The applicable statutory cure period shall be determined in accordance with 52 U.S.C. § 20510(b), including the provisions governing notices provided within one hundred twenty (120) days before a federal election and the provisions applicable to notices provided within thirty (30) days before such an election.

Nothing contained in this Notice shall be construed as shortening or enlarging any period established by Congress.

---

## VII. RESERVATION OF RIGHTS

Nothing contained in this Notice should be construed as:

- an allegation that any identified individual voter is ineligible to vote;
- an allegation that any particular ballot was unlawfully counted or rejected;
- an allegation that any identified record independently establishes an NVRA violation;
- a request that any voter be removed from the registration rolls;

- a challenge to any completed election result; or
- a waiver of any right, remedy, claim, or cause of action available under federal or state law.

This Notice concerns only the continuing statutory duties imposed by the National Voter Registration Act and the State's opportunity to investigate, explain, correct, preserve, or otherwise resolve the matters identified herein before litigation is commenced.

Nothing contained in this Notice limits the right of U4F or any aggrieved person to pursue any additional administrative, judicial, or other lawful remedy arising from the matters identified herein.

---

## VIII. INCORPORATION OF APPENDICES

Each documented record identified within the appendices is a suspected violation and forms part of the factual basis supporting one or more of the statutory violation categories identified in this Notice.

The appendices accompanying this Notice consist of:

- **Appendix A** — U4F Election Validity Scorecard (Pennsylvania 2024 General Election)
- **Appendix B** — U4F Vote Tampering Report (Pennsylvania)
- **Electronic Exhibit 1** (USB Media) — Machine-Readable Supporting Data

The USB media accompanying this Notice contains the machine-readable supporting datasets, including the Pennsylvania NVRA Scorecard Section 01 and Section 02 datasets, the Pennsylvania Election Validity Scorecard dataset, and the Pennsylvania Vote Tampering Report dataset. Due to file size, certain record-level datasets are provided exclusively on USB media rather than as paper attachments.

---

## IX. REQUEST FOR WRITTEN RESPONSE

The identified aggrieved person(s) and U4F respectfully request a written response addressing the matters identified in this Notice.

The written or machine readable response should identify, for each requested record and implementation record category, whether the record is being produced, made available for inspection, withheld, unavailable, never created, destroyed pursuant to

an established retention schedule, or otherwise unavailable. For every category not produced, the response should identify the statutory, regulatory, administrative, or other legal authority supporting that determination and the official responsible for that determination.

To facilitate meaningful review and resolution, the response should identify, for each violation presented herein:

1. whether the State agrees or disagrees that the identified statutory duty applies;
2. whether the documented record-level conditions have been investigated;
3. whether corrective action has been undertaken;
4. whether responsive records exist and will be produced or made available for inspection;
5. whether additional information is requested from the identified aggrieved person(s) or U4F; and
6. the name, title, office, and contact information of the individual responsible for coordinating the State's response.

If the State concludes that any requested implementation record does not exist, the response should identify the official responsible for maintaining that category of record and state whether the record was never created, no longer exists, or cannot be located.

To the extent the State concludes that any requested corrective action is unnecessary, the response should identify the statutory, regulatory, administrative, or judicial authority upon which that determination is based.

---

## X. GOOD-FAITH RESOLUTION

The purpose of this Notice is to provide the opportunity for voluntary compliance contemplated by Congress.

The identified aggrieved person(s) and U4F remain willing to confer with the State concerning the matters identified herein, provide additional information reasonably necessary to facilitate review, and discuss appropriate corrective measures consistent with the requirements of the National Voter Registration Act.

Nothing in this Notice should be interpreted as discouraging voluntary cooperation, clarification, or resolution during the statutory cure period.

---

U4F and the identified aggrieved person(s) respectfully request the State's timely attention to the matters identified in this Notice and appreciate its cooperation in achieving voluntary compliance with the National Voter Registration Act.

---

**Respectfully submitted,**



**For Unite4Freedom**
167 LAMP & LANTERN VILLAGE,
Suite 194
CHESTERFIELD, MO 63017
314-498-2569
harryhaury@protonmail.com



**Harry R Haury**
167 LAMP & LANTERN VILLAGE,
Suite 194
CHESTERFIELD, MO 63017
314-498-2569
harryhaury@protonmail.com



**Gregory Stenstrom, Pro Se**
1541 Farmers Lane
Glen Mills, PA 19342
856-264-5495
gregorystenstrom@gmail.com

August 18, 2026

---

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE OF GENERAL COUNSEL

Michelle Rupp
Assistant Counsel

mirupp@pa.gov

September 10, 2026

*Via Email*

Mr. Harry R. Haury
167 Lamp & Lantern Village
Suite 194
Chesterfield, MO 63017
harryhaury@protonmail.com

Mr. Gregory Stenstrom
1541 Farmers Lane
Glen Mills, PA 19342
gregorystenstrom@gmail.com

**RE: Notice of Violations Letter**

Dear Mr. Haury and Mr. Stenstrom:

On August 21, 2026, the Pennsylvania Department of State received your letter labeled "notice of violations and demand for corrective action pursuant to 52 U.S.C. § 20510(b)." I have reviewed your letter and the included flash drive.

As you know, "[a] person who is aggrieved by a violation of [the National Voter Registration Act of 1993 (NVRA)] may provide written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1). However, your letter neither provides notice of an NVRA violation nor provides any indication that you or Unite 4 Freedom are aggrieved by any such alleged violation.

Your letter first alleges a "failure to conduct a reasonable and uniform list-maintenance program" pursuant to 52 U.S.C. § 20507(a)(4). That section requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of— (A) the death of the registrant; or (B) a change in the

residence of the registrant, in accordance with subsections (b), (c), and (d)." Thus, it applies only to removals for reason of death or change in residence.[1]

The materials you sent do not appear to relate in any way to a failure to remove dead registrants. The materials do relate in some way to addresses, but not to a change in residence. Specifically, you identified registrants who purportedly fall into one of several address-related categories: "Address in multi-unit building No unit number"; "Missing or incomplete address"; "Different Street – Same City and House Number"; "Different house number – Same City and Street." None of these categories appear to indicate that the registrants have changed their residence. Again, however, the NVRA requires only a "general program that makes a reasonable effort" to remove registrants who are no longer eligible due to a death or change in residence.[2] Because of the NVRA-required notice and waiting period, 52 U.S.C. § 20507(d)(1)(B), one should expect registrants who may have moved to remain on the voter rolls for some time prior to being removed.

Your letter next alleges a "failure to maintain and make available records concerning list-maintenance programs" pursuant to 52 U.S.C. § 20507(i). That section requires that each state "shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered."

Your letter does not indicate that any violation of this section has occurred. Instead, your letter requests the production of documents. One cannot simultaneously request documents and allege that the Department has failed to provide the documents.[3]

---

[1] *American Civil Rights Union v. Philadelphia City Commissioners*, 872 F.3d 175, 182 (3d Cir. 2017) ("By its terms, the mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away."). *See also Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019) ("[The NVRA] requires the states to conduct a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of a change of address or death. Although the statute also allows and encourages the states to conduct additional programs of list maintenance . . . the statute requires nothing more of the state.").

[2] *Judicial Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 407 (M.D. Pa. 2021) (". . . Section 8(a)(4) does not require a perfect removal effort . . . ."). *See also Public Interest Legal Foundation v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied* 146 S.Ct. 1772 (2026) (defining "reasonable effort" as "a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality"); *Bellitto v. Snipes*, 935 F.3d 1192, 1205 (11th Cir. 2019) (holding that a general removal program does not fail to make a "reasonable effort" just because other, "more robust" procedures may exist or because a state has not "exhaust[ed] all available methods"); *United States v. Caldwell*, 2026 WL 2186615, *3 (D.N.J. July 29, 2026) ("[the 'reasonable effort'] requirement has been understood to be modest, affording states significant discretion so long as its program reflects a 'serious attempt that is rational and sensible.'") (citing *Benson*, 136 F.4th at 625); *Republican National Committee v. Benson*, 754 F. Supp. 3d 773 (W.D. Mich. 2024) (rejecting plaintiffs' request that defendants be ordered to "'ensure that ineligible registrants are not on the voter rolls'").

[3] *See, e.g., Judicial Watch, Inc.*, 524 F. Supp. 3d at 409-10; *Bellitto v. Snipes*, 268 F. Supp. 3d 1328, 1334-35 (S.D. Fla. 2017).

As to the records requested, your letter is insufficiently specific for the Department to conduct any reasonable search. If there are specific records that you request be made available for your inspection and possible photocopying, please let us know which records you request. In the meanwhile, please be advised that the NVRA does not obligate the Department to evaluate more than a million and a half voter registration records (many of which have likely been updated since the January 13, 2025 voter file that you used for your "Scorecard") just because you flagged them as possibly having problems unrelated to the NVRA.

Finally, your letter alleges a "failure to preserve and document record-level changes relevant to list-maintenance activities," based on "numerous documented changes to voter-history and voter-registration records occurring across successive official statewide voter-file snapshots." Neither the attached "Vote Tampering Report" nor the explanation in the attached "Appendix B" establish that Pennsylvania fails to maintain records of changes to registration records.

The Department works diligently with all of Pennsylvania's sixty-seven counties to ensure the list maintenance requirements mandated by both federal and Pennsylvania law are completed. County election officials conduct list maintenance efforts throughout the year to ensure accurate and updated voter registration rolls. These efforts are detailed in the Department's most recent annual report on the Administration of Voter Registration in Pennsylvania issued on June 30, 2026 which can be found at https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/reports/voter-registration/dos-voter-registration-report-2025-final-pdf.pdf. As you will see in the report, Pennsylvania's counties sent approximately 437,599 list maintenance notices to their registrants last year. They also cancelled approximately 338,295 registration records, many based on death or a change in residence, as required by the NVRA.

The concerns you have presented do not establish that the NVRA has been violated or that you have been aggrieved by any such violation, as required to bring suit pursuant to 52 U.S.C. § 20510(b)(1). Moreover, your claims reveal fundamental misunderstandings of what the NVRA requires and of Pennsylvania's registration and list maintenance procedures. For example, you flagged a number of records as "registration changed during cut-off period." The voter registration deadline is the deadline for application forms to be *received* by the counties. 25 P.S. § 3071(b); 52 U.S.C. § 20507(a)(1). It is not a deadline for counties to actually register the applicants or update their records. Indeed, because the number of applications received tends to increase immediately before the deadline, counties will often need those few days between the voter registration deadline and the election for the processing of applications to occur in time for the election, as required by law. You also flagged a number of records that have registration dates older than the registrants' birth dates. Many of those registrants were registered to vote before the Statewide Uniform Registry of Electors was built in the early 2000s, and when their records were imported from county legacy systems, SURE populated default dates for their registration dates. Some dates can also be placeholders for voters whose identity is protected. Again, neither of these constitute NVRA violations.

The Department takes list maintenance responsibilities quite seriously and works closely with Pennsylvania's counties to ensure that our voter rolls are accurate and updated in accordance with both federal and Pennsylvania law.

Respectfully,

Michelle Rupp
Assistant Counsel

CC: Renee Mazer, reneemazer@gmail.com

**UNITE 4 FREEDOM INC**

167 Lamp and Lantern Village, Suite 194, Chesterfield, Missouri 63017
314-498-2569 | harryhaury@protonmail.com

**VIA EMAIL AND CERTIFIED MAIL**

September 18, 2026

Michelle Rupp
Assistant Counsel
Governor's Office of General Counsel
Office of Chief Counsel Department of State
306 North Office Building
Harrisburg, Pennsylvania 17120-0102
mirupp@pa.gov

**Re Response to September 10, 2026 Letter and Renewed Demand for Inspection Under 52 U.S.C. Section 20507(i)**

Dear Ms. Rupp:

The Pennsylvania Department of State's September 10, 2026 letter does not cure the violations identified in the August 18, 2026 Notice of Violations and Demand for Corrective Action. The Department did not produce or offer inspection of a single requested implementation record; identify any responsive search, custodian, database, or retention system; state that any requested category does not exist; or identify a legal basis for withholding an existing covered record. The Department instead answered a claim U4F expressly disclaimed - that every analytical flag conclusively establishes an ineligible voter or an independent violation of the National Voter Registration Act - and substituted selected categorical explanations for the records needed to determine whether those explanations apply.

U4F does not contend that 52 U.S.C. Section 20507(i) requires Pennsylvania to create records that do not exist, produce perfect voter rolls, or adjudicate more than 1.5 million voters merely because a database condition was flagged. U4F does contend that Section 20507(i) requires Pennsylvania to maintain for at least two years and make available for public inspection all existing records concerning implementation of programs and activities conducted to ensure the accuracy and currency of its official lists of eligible voters. The Department has not done so.

This letter therefore (1) responds to the Department's principal legal positions; (2) renews and particularizes U4F's demand for inspection of existing records; (3) requests a category-by-category production status; and (4) confirms the continuing preservation obligation applicable to the requested records.

## 1 The Department Did Not Answer the Central Inspection Demand

The August 18 Notice identified three related but distinct matters: the reasonableness and uniformity of Pennsylvania's list-maintenance program; the maintenance and

## 7 Summary of the Uncured Inspection Demand

| U4F demand | September 10 response |
|---|---|
| Inspection of existing implementation records | No inspection offered and no production schedule supplied. |
| Identification of records reviewed | No responsive record, custodian, database, or search identified. |
| Transaction and change-history records | No production or category-specific disposition. |
| Audit and database logs | No production or category-specific disposition. |
| Confirmation-notice records | No production or inspection offered. |
| Legacy-conversion documentation | Categorical explanation offered; supporting records not identified or produced. |
| Placeholder-date documentation | Categorical explanation offered; supporting rules and affected population not identified. |
| Post-deadline transaction records | Legal explanation offered; transaction-level support not identified or produced. |
| Preservation confirmation | No complete confirmation addressing the requested electronic record categories. |
| Machine-readable disposition | No record-level or category-level electronic disposition supplied. |

## 8 Renewed and Particularized Demand for Inspection

U4F renews its demand under 52 U.S.C. Section 20507(i) for inspection and, where available, electronic copying at reasonable cost of the existing records listed in Schedule A. The demand covers records created, received, generated, maintained, used, or controlled by the Department of State in connection with Pennsylvania's programs and activities for ensuring the accuracy and currency of its official voter-registration lists.

For each Schedule A category, please provide one of the following written dispositions: (1) available for inspection; (2) produced electronically; (3) maintained but withheld, with the legal basis; (4) not maintained; (5) no longer available, with the applicable retention authority and disposition date; (6) maintained by an identified county, contractor, or other custodian; or (7) claimed not to be covered by Section 20507(i), with the supporting legal basis.

To minimize burden, U4F proposes native electronic production through a secure transfer method, followed by a remote or in-person inspection only for materials not reasonably produced electronically. U4F will confer promptly concerning data security, protected-voter information, reasonable redactions, sequencing, representative records,

and costs. U4F does not request disclosure of ballot selections or information expressly excluded by Section 20507(i)(1).

Please acknowledge this renewed demand within five business days after receipt, identify the responsible Department official and technical custodian, and provide a rolling production or inspection schedule. Because the November 3, 2026 Federal election is imminent and the original statutory cure period has expired without inspection, U4F requests that inspection begin no later than seven calendar days after receipt.

## 9 Preservation

The August 18 preservation demand remains in effect. Please preserve native data, metadata, transaction histories, database change tables, audit logs, import and export records, system event logs, confirmation-notice records, procedures, correspondence, backup copies, disaster-recovery copies, cloud-hosted records, replicated databases, and other materials responsive to Schedule A. Preservation should suspend routine deletion, overwriting, log rotation, backup expiration, or other disposition to the extent necessary to preserve responsive records while the dispute remains pending.

Nothing in this demand requests alteration of the live voter-registration system or disclosure of ballot choices. U4F seeks preservation of the evidentiary record necessary to determine what occurred, why it occurred, and whether the Department's explanations can be independently reproduced.

## 10 Continuing Noncompliance and Reservation of Rights

Pennsylvania's September 10 letter is not a cure under 52 U.S.C. Section 20510(b). It neither provides the inspection required by Section 20507(i) nor demonstrates that the requested existing records fall outside that provision. The Department's failure or refusal to identify and make covered records available leaves the noticed inspection violation unresolved and continuing.

U4F remains willing to confer immediately and to sequence inspection in a manner that reduces burden without surrendering the statutory right of access. Nothing in this response waives any claim, remedy, preservation demand, evidentiary position, or right to seek declaratory or injunctive relief. Nothing herein alleges that every flagged record identifies an ineligible voter or independently proves an unlawful ballot. The issue is whether Pennsylvania will permit inspection of the existing records Congress made public so that the official data and the Department's explanations can be tested.

Please direct all communications concerning inspection and production to Harry R. Haury and Gregory Stenstrom at the contact information below.

**Respectfully submitted,**

**For Unite 4 Freedom Inc**

**Harry R. Haury**

167 Lamp and Lantern Village, Suite 194
Chesterfield, Missouri 63017
314-498-2569
harryhaury@protonmail.com

**Gregory Stenstrom**

1541 Farmers Lane
Glen Mills, Pennsylvania 19342
856-264-5495
gregorystenstrom@gmail.com

# SCHEDULE A

## Particularized Existing Record Categories Requested for Inspection

This schedule identifies existing record categories requested under 52 U.S.C. Section 20507(i). It does not require the Department to create a new record. For each category, the Department should state the applicable production status described in Section 8 of the accompanying response.

| No | Record category | Existing records requested |
|---|---|---|
| 1 | **Voter-registration data dictionaries** | Current and historical field definitions, code tables, status values, transaction types, change-reason codes, source-system identifiers, and documentation necessary to interpret the official statewide voter-registration and voter-history files used in the U4F analyses. |
| 2 | **Legacy-system migration records** | Conversion specifications, mapping tables, default-value rules, validation procedures, exception reports, quality-control records, and documentation supporting the Department's statement that legacy imports generated registration dates predating dates of birth. |
| 3 | **Protected-voter and placeholder rules** | Policies, code definitions, procedures, system rules, and non-identifying aggregate records supporting the Department's statement that placeholder dates may be used for voters whose identities are protected. |
| 4 | **Registration-application transaction records** | Existing records showing application receipt date, entry date, processing date, transaction type, source, county, responsible system, and final disposition for records within the submitted post-cutoff analytical categories. |
| 5 | **Record-level change histories** | Existing change-history tables, audit histories, transaction logs, before-and-after values, timestamps, source identifiers, and reason codes for the representative record identifiers and categories supplied with the August 18 Notice. |
| 6 | **Voter-history adjustment records** | Procedures and existing logs documenting creation, correction, removal, restoration, or other modification of voter-participation history, including post-certification adjustments appearing across official file snapshots. |

| No | Record category | Existing records requested |
|---|---|---|
| 7 | **List-maintenance procedures** | Current and historical written procedures governing death matching, change-of-residence processing, duplicate review, returned mail, confirmation notices, inactive status, cancellation, restoration, and coordination with counties. |
| 8 | **Confirmation-notice records** | Lists and records maintained under 52 U.S.C. Section 20507(i)(2), including names and addresses of persons sent notices under Section 20507(d)(2) and information concerning responses as of the inspection date, subject to lawful security procedures. |
| 9 | **Batch and interface records** | Existing batch import and export logs, file-transfer records, interface-control documents, exception reports, reconciliation reports, and processing summaries relating to changes in statewide voter-registration and voter-history data. |
| 10 | **County-to-State synchronization records** | Existing procedures, schedules, exception queues, error reports, unresolved-item reports, and reconciliation records governing transmission and synchronization of county voter-registration transactions with the statewide system. |
| 11 | **List-maintenance source records** | Existing records identifying data sources, source dates, match standards, review procedures, and disposition rules used for death, address, duplicate, and other list-maintenance activities. |
| 12 | **Records supporting the September 10 explanations** | Every existing record, report, procedure, query result, memorandum, data extract, or technical document reviewed or relied upon to formulate the factual explanations in the Department's September 10 letter. |
| 13 | **Retention schedules and disposition records** | Records schedules, deletion rules, log-retention settings, archival procedures, backup-retention rules, legal holds, and disposition records applicable to the requested categories. |
| 14 | **Responsible custodians and systems** | Existing records identifying the State office, county, contractor, database, application, repository, or official responsible for maintaining each requested category. |
| 15 | **Public-inspection procedures** | Existing policies and procedures used by the Department to receive, search, process, redact, price, schedule, and fulfill requests under 52 U.S.C. Section 20507(i). |

### Production Format and Scope

Electronic records should be produced in the native format in which they are maintained, together with available field definitions and metadata necessary to interpret them. Searchable PDF is acceptable for procedures, correspondence, and static reports. For databases or large tables, U4F requests CSV, delimited text, database export, or another reasonably usable machine-readable format rather than screenshots or print images.

U4F is prepared to begin with representative records or prioritized categories while a complete rolling inspection proceeds. Any agreed sequencing is intended to reduce burden and does not waive inspection of other covered records. Personally identifiable information may be handled through reasonable security procedures and lawful redactions that do not prevent meaningful inspection of the implementation record.

## CERTIFICATE OF SERVICE

I certify that on September 18, 2026, a true and correct copy of the foregoing Response to September 10, 2026 Letter and Renewed Demand for Inspection Under 52 U.S.C. Section 20507(i) was transmitted by electronic mail to the following:

Michelle Rupp
Assistant Counsel
Governor's Office of General Counsel
Office of Chief Counsel  Department of State
306 North Office Building
Harrisburg, Pennsylvania 17120-0102
mirupp@pa.gov

Al Schmidt
Secretary of the Commonwealth
Pennsylvania Department of State
401 North Street, Room 302
Harrisburg, Pennsylvania 17120

Eric V. Neff
Acting Chief  Voting Section
Civil Rights Division  United States Department of Justice
4 Constitution Square
150 M Street NE  Room 8.923
Washington, District of Columbia 20530

**Gregory Stenstrom**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT H

## Signed declarations of Harry R. Haury and Gregory Stenstrom

Haury declaration, September 23, 2026
**GEX-H-002 through GEX-H-005**

Stenstrom declaration, September 24, 2026
**GEX-H-006 through GEX-H-009**

Both signed declarations are reproduced completely with their original execution dates.

Original pagination is retained. Added GEX labels identify pages for citation.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITE 4 FREEDOM, INC.,<br>GREGORY STENSTROM, PRO SE, and<br>HARRY HAURY, PRO SE,<br><br>Plaintiffs,<br><br>v.<br><br>AL SCHMIDT, in his official capacity as<br>Secretary of the Commonwealth of Pennsylvania,<br><br>Defendant. | **CIVIL ACTION NO.**<br><br>____________________ |

## DECLARATION OF HARRY R. HAURY IN SUPPORT OF VERIFIED COMPLAINT AND EMERGENCY MOTION

I, Harry R. Haury, declare as follows:

1. I am an adult United States citizen and a Plaintiff in this action. I am the founder, Chair, and President of Unite 4 Freedom, Inc. (U4F), a national nonprofit election-integrity organization. I make this declaration from personal knowledge and from U4F records maintained under my direction. If called as a witness, I could and would testify competently to these facts.
2. U4F analyzes official voter-registration and voter-history records, publishes state-specific Election Validity Scorecards and Vote Tampering Reports, maintains supporting machine-readable datasets, communicates record-specific findings to election officials, and seeks inspection, investigation, reconciliation, and lawful correction.
3. I direct U4F's multistate election-data analysis, publication, record-inspection, statutory-notice, and official-communication work. U4F has conducted NVRA notice activity in approximately thirty-five States, including Pennsylvania.
4. Before the Department's September 10, 2026, response and before this action, U4F had established and was conducting a Pennsylvania program of analyzing official statewide voter-registration and voter-history data, maintaining supporting datasets, publishing Pennsylvania findings, communicating those findings to election officials, and seeking investigation, reconciliation, and correction. Those activities were not created for this litigation.
5. On August 18, 2026, I signed and submitted, for U4F and for myself, U4F's written Notice of Violations and Demand for Corrective Action to Pennsylvania officials under 52 U.S.C. §

20510(b). Gregory Stenstrom also joined that Notice. A true and correct copy of the Notice and its appendices is attached as Exhibit A.

6. The August 18 Notice identified the asserted statutory violations, the official Pennsylvania datasets analyzed by U4F, recurring record categories, and the existing implementation records requested for inspection. U4F supplied its Pennsylvania Scorecard, Vote Tampering Report, appendices, and record-level machine-readable data on electronic media with the Notice.
7. On September 10, 2026, I received the written response sent by Assistant Counsel Michelle Rupp on behalf of the Pennsylvania Department of State. A true and correct copy is attached as Exhibit B. The response stated that counsel reviewed U4F's Notice and the included flash drive, discussed the source data and several specific categories identified by U4F, and referred to more than 1.5 million implicated voter-registration records.
8. The Department's response did not produce a responsive record, identify a records custodian, offer an inspection, or propose a production schedule. As of the execution of this declaration, U4F has not received the requested Pennsylvania list-maintenance and implementation records.
9. Exhibit E identifies and summarizes the native file named 2024_PA_NVRA_ScorecardSection01(1).csv. That is a true and correct copy of the Section 1 machine-readable file maintained by U4F and supplied with its Pennsylvania Notice. Its SHA-256 hash is ea615a430e017bb5a3dc563c06aa63249a615837b8686152627180c13c4fdbd7.
10. The Section 1 file contains 2,865,011 flagged record-level conditions associated with 2,555,665 unique registration identifiers. The six categories displayed in the Appendix A summary account for 2,704,791 flagged conditions. Exhibit E supplies the complete eleven-category breakdown, including five additional categories totaling 160,220, and reconciles exactly to 2,865,011.
11. Exhibit F identifies and summarizes the native file named 2024_PA_NVRA_ScorecardSection02(1).csv. That is a true and correct copy of the Section 2 machine-readable file maintained by U4F and supplied with its Pennsylvania Notice. Its SHA-256 hash is dde6753eda6988c65a1a0ae3884d947fbf4e06c16ae21e7dbd0ad649bcdf6a11.
12. The Section 2 file contains 1,668,861 flagged record-level conditions associated with 1,527,639 unique registration identifiers connected in U4F's analysis with records reflecting a vote in the 2024 General Election.
13. These figures describe analytical flags and do not mean that U4F has adjudicated the eligibility of 2,865,011 or 1,668,861 separate voters, established that every flagged record is erroneous, or concluded that every identified condition is an individual statutory violation. U4F seeks the State's implementation records to determine which conditions have lawful administrative explanations and which require reconciliation or correction.

14. The native CSV files contain the complete record-level data. Exhibits E and F identify the files by filename, exact byte size, record count, and SHA-256 hash and provide category, subcategory, county, and masked representative-entry summaries derived from the complete native files. U4F has also made byte-for-byte identical copies publicly available at https://cloud.patriot.online/s/9nKYFyYM6BSDDaH . The printed hashes permit the Court, Defendant, and any reviewer to verify that a downloaded or separately delivered copy is identical to the file summarized.
15. U4F seeks Pennsylvania's existing list-maintenance and implementation records so it can test the Department's explanations against the governing procedures and record-level histories, distinguish explainable administrative conditions from unresolved errors, and pursue lawful correction of verified errors affecting eligible voters and accurate voter-registration records.
16. Upon receiving the requested records, I will direct U4F personnel to compare them with the identified Pennsylvania entries; test the Department's explanations concerning post-cutoff processing, migration, default dates, protected placeholders, confirmation notices, and cancellations; identify conditions that can be resolved and those that remain unexplained; present supported findings to responsible State and county officials; request timely correction of verified errors; notify affected voters where lawful and practicable; and update U4F's published Pennsylvania findings.
17. U4F's planned work is directed to accurate and current Pennsylvania voter-registration rolls, the lawful participation of eligible voters, and prevention of erroneous registration classifications. It is not limited to abstract study, generalized advocacy, or the expense of bringing this litigation.
18. The Department's categorical explanations are not a substitute for the requested inspection. Without the governing procedures, definitions, notice and response information, transaction and change histories, exception records, and dispositions, U4F cannot determine on a record-specific basis whether an identified condition is explained, unresolved, or requires correction.
19. The Department stated that many implicated records had likely been updated since the January 13, 2025, source file. U4F's incorporated Vote Tampering Report and Appendix B also compare successive official snapshots and document changes between them. A later current-state file will not necessarily disclose the prior status, sequence, authority, or disposition of a changed record.
20. Prompt preservation is therefore necessary to prevent ordinary alteration, replacement, rotation, or expiration of responsive histories, logs, extracts, snapshots, and disposition records from defeating meaningful inspection. U4F seeks preservation of the responsive information or verified preservation copies without interruption of lawful voter-registration operations.

21. The continued nonproduction prevents U4F from completing the inspection for which it gave statutory Notice and from performing the specific Pennsylvania activities described above before the November 3, 2026, federal election. U4F is prepared to begin that work immediately upon production or supervised inspection.
22. Inspection after November 3 cannot restore the lost opportunity to identify verified errors, present them to responsible officials for timely individualized correction, assist affected eligible voters where lawful and practicable, or use the information during the federal-election period for which U4F requested it. Money damages would not replace that lost opportunity, and U4F does not seek damages in this action.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on September 23, 2026, at Chesterfield, Missouri.

Harry R. Haury, Pro Se
Founder, Chair, and President
Unite 4 Freedom, Inc.

167 Lamp & Lantern Village, Suite 194
Chesterfield, MO 63017
314-498-2569
harryhaury@protonmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITE 4 FREEDOM, INC.,<br>GREGORY STENSTROM, PRO SE, and<br>HARRY HAURY, PRO SE,<br><br>Plaintiffs,<br><br>v.<br><br>AL SCHMIDT, in his official capacity as<br>Secretary of the Commonwealth of Pennsylvania,<br><br>Defendant. | **CIVIL ACTION NO.**<br><br>____________________ |

## DECLARATION OF GREGORY STENSTROM IN SUPPORT OF VERIFIED COMPLAINT AND EMERGENCY MOTION

I, Gregory Stenstrom, declare as follows:

1. I am an adult United States citizen, a resident of Delaware County, a registered Pennsylvania voter, and a Plaintiff in this action. I am also a personal requester of the records at issue and a participant in Unite 4 Freedom, Inc.'s (U4F) Pennsylvania election-data, publication, record-review, official-contact, and corrective work. I make this declaration from personal knowledge. If called as a witness, I could and would testify competently to these facts.
2. Since 2020, I have personally requested Pennsylvania election records and supporting documentation; reviewed and analyzed official voter-registration and voter-history data; published or assisted in publishing Pennsylvania findings; communicated record-specific findings to responsible State and county election officials; and sought investigation, reconciliation, and lawful correction.
3. My Pennsylvania work has also included election observation, service as an authorized representative, administrative proceedings, and litigation concerning election records and administration. These activities began years before the present statutory notice and were not created for this litigation.
4. Before the Department's September 10, 2026 response and before this action, U4F and I had established and were conducting a Pennsylvania program of analyzing official statewide voter-registration and voter-history data, maintaining supporting datasets, publishing Pennsylvania Scorecards and Vote Tampering Reports, communicating findings to election officials, and seeking investigation and correction. I participated personally in those activities and have personal knowledge of them.

5. On August 18, 2026, I joined U4F and Harry Haury in submitting the written Notice of Violations and Demand for Corrective Action to Pennsylvania officials under 52 U.S.C. § 20510(b). I was identified as an aggrieved person and personal requester, and I requested inspection of the existing Pennsylvania records described in the Notice. A true and correct copy of the Notice and its appendices is attached as Exhibit A.
6. I participated in preparing and reviewing the Notice and supporting Pennsylvania materials. The Notice identified the asserted statutory violations, the official Pennsylvania datasets analyzed, recurring record categories, and the existing implementation records requested for inspection. The submission included U4F's Pennsylvania Scorecard, Vote Tampering Report, appendices, and record-level machine-readable data on electronic media.
7. I reviewed the September 10, 2026 written response sent by Assistant Counsel Michelle Rupp on behalf of the Pennsylvania Department of State, which is attached as Exhibit B. The response stated that counsel reviewed the Notice and included flash drive, discussed the source data and several specific categories identified in the submission, and referred to more than 1.5 million implicated voter-registration records.
8. The Department's response did not produce a responsive record, identify a records custodian, offer an inspection, or propose a production schedule. As of the execution of this declaration, I have not received the requested Pennsylvania list-maintenance and implementation records or access to inspect them.
9. I participated in the analysis and review of the Pennsylvania machine-readable files supplied with the Notice. Exhibit E identifies and summarizes the native file named 2024_PA_NVRA_ScorecardSection01(1).csv. Its SHA-256 hash is ea615a430e017bb5a3dc563c06aa63249a615837b8686152627180c13c4fdbd7.
10. The Section 1 file contains 2,865,011 flagged record-level conditions associated with 2,555,665 unique registration identifiers. The six categories displayed in the Appendix A summary account for 2,704,791 flagged conditions. Exhibit E supplies the complete eleven-category breakdown, including five additional categories totaling 160,220, and reconciles exactly to 2,865,011.
11. Exhibit F identifies and summarizes the native file named 2024_PA_NVRA_ScorecardSection02(1).csv. Its SHA-256 hash is dde6753eda6988c65a1a0ae3884d947fbf4e06c16ae21e7dbd0ad649bcdf6a11.
12. The Section 2 file contains 1,668,861 flagged record-level conditions associated with 1,527,639 unique registration identifiers connected in U4F's analysis with records reflecting a vote in the 2024 General Election.
13. These figures describe analytical flags. They do not mean that I or U4F has adjudicated the eligibility of 2,865,011 or 1,668,861 separate voters, established that every flagged record is erroneous, or concluded that every identified condition is an individual statutory violation. The requested implementation records are necessary to determine which conditions have lawful administrative explanations and which remain unresolved or require correction.
14. The native CSV files contain the complete record-level data. Exhibits E and F identify the files by filename, exact byte size, record count, and SHA-256 hash and provide category, subcategory, county, and masked representative-entry summaries

derived from the complete native files. Byte-for-byte identical copies are publicly available at https://cloud.patriot.online/s/9nKYFyYM6BSDDaH. The printed hashes permit verification that a downloaded or separately delivered copy is identical to the file summarized.

15. I seek Pennsylvania's existing list-maintenance and implementation records so I can compare them with the official Pennsylvania data already analyzed, test the Department's explanations against governing procedures and record-level histories, distinguish explainable administrative conditions from unresolved errors, and pursue lawful correction of verified errors affecting eligible voters and accurate voter-registration records.
16. Upon production or supervised inspection, I will compare the requested records with the identified Pennsylvania entries; examine the Department's explanations concerning post-cutoff processing, migration, default dates, protected placeholders, confirmation notices, and cancellations; identify conditions that can be resolved and those that remain unexplained; present supported findings to responsible State and county officials; request timely administrative correction of verified errors; notify affected voters where lawful and practicable; and participate in updating published Pennsylvania findings.
17. My intended use is tied directly to my established work as a Pennsylvania voter, requester, analyst, publisher, and participant in official-contact and corrective activities. It concerns accurate and current Pennsylvania voter-registration rolls, the lawful participation of eligible voters, and prevention of erroneous registration classifications. It is not limited to abstract study, generalized advocacy, or the expense of bringing this litigation.
18. The Department's categorical explanations are not a substitute for inspection. Without the governing procedures, definitions, notice and response information, transaction and change histories, exception records, and dispositions, I cannot determine on a record-specific basis whether an identified condition is explained, remains unresolved, or requires correction.
19. Appendix B to the Notice compares successive official data snapshots and documents changes between them. The Department also stated that many implicated records had likely been updated since the January 13, 2025 source file. A later current-state file will not necessarily disclose the prior status, sequence, authority, or disposition of a changed record.
20. Based on my work with electronic election records, a live voter-registration system continues processing additions, status changes, corrections, exceptions, and election-related transactions. Histories, logs, extracts, snapshots, exception records, and dispositions can be altered, replaced, rotated, overwritten, or expire through ordinary operations. Prompt preservation of the responsive information, or verified preservation copies, is necessary to prevent those ordinary processes from defeating meaningful inspection.
21. The continued nonproduction prevents me from completing the inspection for which I gave statutory Notice and from performing the specific Pennsylvania activities described above before the November 3, 2026 federal election. I am prepared to begin that work immediately upon production or supervised inspection.

22. Inspection after November 3 cannot restore the lost opportunity to identify verified errors, present them to responsible officials for timely individualized correction, assist affected eligible voters where lawful and practicable, or use the information during the federal-election period for which I requested it. Money damages would not replace that lost opportunity, and I do not seek damages in this action.
23. Through the emergency motion, I do not seek removal or correction of any voter, disclosure of ballot choices, alteration of election rules or deadlines, or interference with voting, counting, or certification. I seek prompt preservation and meaningful inspection of existing implementation records while the Court adjudicates the statutory claims.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on September 24, 2026, at Glen Mills, Pennsylvania.

1541 Farmers Lane
Glen Mills, PA 19342
856-264-5495
gregorystenstrom@gmail.com

______________________________

Gregory Stenstrom, Pro Se

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT I

## Department of State 2026 General Election Calendar

Official calendar, selected printed p.16
**GEX-I-002**

The selected page identifies the November computation, certification and reporting dates.

Original pagination is retained. Added GEX labels identify pages for citation.

| | | |
|---|---|---|
| Tuesday, November 17, 2026 | **County Deadline to Complete Computation of Returns (General)** | Not later than this day, the county boards of elections must complete the computation of votes so as to meet the certification deadline in Section 302(k) of the Election Code, 25 P.S. § 2642(k). |
| Wednesday, November 18, 2026 | **County Deadline to Begin Statewide Automatic Recount (General)** | Last day on which a recount or recanvass ordered by the Secretary of the Commonwealth can be scheduled to begin. |
| Friday, November 20, 2026 | **Secretary's Casting of Lots to Break Tie (General)** | On this day, candidates receiving tie votes at the election shall cast lots at 12:00 Noon before the Secretary of the Commonwealth or the county boards of elections, as the case may be, to determine the winner. (If the fact of the tie vote is not authoritatively determined until after November 20, the time for casting lots will be 12:00 Noon on the second day after the fact of such tie is determined). |
| Monday, November 23, 2026 | **County Deadline to Certify Official Returns (General)** | Last day for the county boards of elections to certify returns from the November election with the Secretary of the Commonwealth.<br><br>*NOTE: Counties that received an Election Integrity Grant must also submit the outcome of any post-election audit required under the Election Code with their certified results. The Department shall post the audit information on its publicly accessible website.*<br><br>*NOTE: State level write-in winners of elections from the November election must file "Statements of Financial Interests" with the State Ethics Commission, Room 309 Finance Building, P.O. Box 11470, Harrisburg, PA 17108-1470 within thirty days of having been elected unless said person resigns within that time. County and local-level public office write-in winners of elections must file the "Statement" with the governing authority of the political subdivision where they were elected within 30 days of having been elected unless said person resigns within that time.* |
| Monday, November 23, 2026 | **Deadline to File a Petition to Contest Election** | Last day to file petitions to contest the election of any candidate.<br>(Not applicable to elections of the first class.) |
| Tuesday, November 24, 2026 | **County Deadline to Complete Statewide Automatic Recount (General)** | No later than Noon on this day, a recount or recanvass ordered by the Secretary of the Commonwealth must be completed. |
| Wednesday, November 25, 2026 | **County Deadline to Report Results of Statewide Automatic Recount (General)** | By Noon on the day after completion of a recount or recanvass ordered by the Secretary of the Commonwealth, but no later than Noon on this day, the county boards of elections must submit to the Secretary of the Commonwealth the results of the recount or recanvass. |
| Thursday, December 3, 2026 | **2026 Campaign Finance Cycle 6 Deadline** | 2026 Campaign Finance Cycle 6 Deadline: Last day for all candidates and treasurers of political committees and lobbyists to file campaign expense reports or statements due 30 days after the election in the office of the Secretary of the Commonwealth and/or the county boards of elections as the case may be. Such report shall be complete as of November 23.<br><br>*NOTE: Postmarks are acceptable as proof of timely filing where report is postmarked by the U.S. Postal Service no later than the day prior filing deadline.* |
| Thursday, December 3, 2026 | **County Deadline to Submit Absentee Ballot Reimbursement Request (General)** | Not later than this day, the county boards of elections shall file with the Secretary of the Commonwealth a statement of expenses incurred in preparing, handling, mailing, delivering, counting and storing such official Military, Veterans' and other absentee ballots as they are entitled by law to receive compensation for in the sum of sixty cents each. |
| Thursday, December 3, 2026 | **County Deadline to Report District Level Vote Totals (General)** | Last day for each county board of elections to submit to the Bureau of Elections a report stating the total number of votes cast in each voting district for each candidate for any Statewide Office, United States Representative, State Senator and State Representative. |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT J

## Secretary of the Commonwealth Directives 2 and 3 of 2026

Directive 2: Use, Implementation and Operation; April 6, 2026; complete seven pages
**GEX-J-002 through GEX-J-008**

Directive 3: Access to Electronic Voting Systems; April 6, 2026; complete five pages
**GEX-J-009 through GEX-J-013**

Both directives are reproduced completely. They identify the Secretary's administration of equipment preparation and access.

Original pagination is retained. Added GEX labels identify pages for citation.

TLP: CLEAR

Pennsylvania
Department of State

# Directive Concerning the Use, Implementation, and Operation of Electronic Voting Systems by County Boards of Elections

Directive 2 of 2026

Date: April 6, 2026

Version: 1.3

# Directive 2 of 2026

The following Directive is issued April 6, 2026, by the Secretary of the Commonwealth pursuant to authority contained at Sections 201 and 1105-A of the Pennsylvania Election Code, 25 P.S. §§ 2621, 3031.5(a).

The use, implementation, and operation of electronic voting systems by county boards of elections are governed by the following procedures. Electronic voting systems are defined at Section 1101-A of the Pennsylvania Election Code, 25 P.S. § 3031.1.

## Activities prior to selecting voting system

1. ***Review Department of State's list of certified voting equipment.*** All voting systems in Pennsylvania must be approved by the Secretary of the Commonwealth and must meet other federal qualification standards.[1] Counties can review which voting systems have been approved by the Secretary on the Department's Voting Systems in Pennsylvania webpage. Counties should review the list of certified voting systems when contemplating the selection of any new voting systems.
2. ***Ensure that the county procurement process for voting system accounts for selection of qualifying systems***. As counties prepare to select new voting systems, they should prepare for submissions by vendors whose systems may not yet be certified. Counties should consult with their solicitors and, if appropriate, their procurement office to ensure that the process accounts for these submissions and that the county plans accordingly. Successful examination to federal standards, while a prerequisite to examination and certification in Pennsylvania, does not guarantee certification by the Secretary of the Commonwealth in a separate examination process under state law. The Pennsylvania Election Code contains distinct requirements for voting systems to be certified for use in elections. County selection of a voting system prior to Commonwealth certification does not guarantee that the system will be certified under Commonwealth standards.
3. ***Prepare contingency plans for non-certification***. Counties anticipating the use of a voting system that has not yet been certified must make plans to ensure that voting on election day can occur without that system.

[1] Section 1105-A of the Election Code, at 25 P.S. § 3031.5. Once a voting system has been found to meet any set of federal standards, it may be examined by the Secretary for approval and remain approved unless and until the Secretary removes certification for that system or withdraws it from permissible use. The issuance of new federal standards or latter determinations by a federal body relating to that voting system do not impact the use of that voting system in the Commonwealth.

## Activities prior to opening the polls on Election Day

1. ***Notice of voting system preparation.*** On or before the fortieth (40th) day preceding any primary or election, a county board of elections shall mail a notice stating the times and places where preparation of the voting system will be started.[2] This letter shall be sent to the chairmen of the county committee of each political party that is entitled to participate in primary elections in the county, as well as to the presiding officer of any organization of citizens in the county whose purpose is to investigate or prosecute election frauds and which organization has registered with the county board of elections at least fifty (50) days before the primary or election. For more information, see the Directive on Logic & Accuracy Testing.

2. ***Instructions on use of electronic voting systems.*** A county board of elections shall instruct voters on the use of electronic voting systems in the following way.

   a. *Public exhibition thirty (30) days before each primary or election.* During the thirty (30) days before an election, the county board of elections shall place on public exhibition the components of an electronic voting system that are used by the voter, containing a sample ballot for instructional use. "Such components shall be under the charge and care of a person competent as custodian and instructor. No voting system component which is assigned for use in an election shall be used for such public exhibition and instruction after having been prepared and sealed for the election."[3]

3. ***Testing central automatic tabulating equipment.*** A county that uses an electronic voting system that provides for central tabulation of ballots shall have the central automatic tabulating equipment publicly tested to ascertain that it will accurately count the votes cast for all offices and all questions consistent with the Directive on Logic & Accuracy Testing. A county may publicly test the central automatic tabulating equipment as part of its logic and accuracy testing for voting system preparation, or it may hold a separate test that is open to the public no later than four days before the election. Testing of the central automatic tabulating equipment must be done publicly, and public notice must be given at least forty-eight (48) hours prior to the test.

4. ***Secrecy in voting.*** To assure compliance with the constitutional and statutory requirements that secrecy in voting be preserved,[4] boards of elections should use privacy screens or hoods or take other physical measures that prevent other individuals in the polling place from seeing how an elector has cast their ballot on

[2] Section 1110-A(d) of the Election Code, 25 P.S. § 3031.10(d).
[3] Section 1111-A(a) of the Election Code, 25 P.S. § 3031.11(a).
[4] *See*, *e.g.*, Pa. Const. Art. VII, § 4; and 25 P.S. § 3031.7(1).

the machine. Electronic voting machines shall be positioned in the polling place in such a manner that other individuals may not watch an elector casting their ballot.

## Activities while the polls are open on Election Day

1. ***Instructions on use of electronic voting systems.*** Elections officials may use diagrams to show a voter how to use an electronic voting system before the voter enters the voting booth and may give the voter audible instructions while the voter is in the voting booth whenever the voter asks for such help.[5] When providing this help, elections officials shall not enter the voting booth with the voter or while the voter occupies the voting booth, and shall not request, suggest, or try to persuade or induce the voter in any manner to vote for any particular candidate, ticket of candidates, or other persons, or in favor of or against a ballot question.

2. ***Inoperable electronic voting systems — repairs, substitutes and emergency back-up paper ballots.*** If a county board of elections uses a voting machine as both a ballot marking device and tabulator and if at least 50% of the electronic voting machines in a precinct are inoperable, then the county board of elections must ensure that "paper ballots, either printed or written and of any suitable form" for registering votes (described herein as "emergency back-up paper ballots") are distributed immediately to eligible voters.[6] These emergency back-up paper ballots shall be used thereafter until the county board of elections is able to make the necessary repairs to the machine(s) or can place into operation a suitable substitute machine(s).

   A county board of elections must supply an adequate amount of emergency back-up paper ballots to ensure that voting continues uninterrupted until the voting machines become operable.

   County boards of elections may use the following as emergency back-up paper ballots: ballots specifically designed for use as emergency back-up paper ballots; surplus, uncompleted absentee ballots; surplus, uncompleted alternative ballots; ballots that the county board of elections has supplied to the district election board for use as provisional ballots; or other paper ballots that are "either printed or written and of any suitable form."

3. ***Inoperable precinct scanners – repairs, substitutes, and emergency ballot box.*** A county board of elections that uses a precinct scanner must ensure that if all precinct scanners in a precinct are inoperable, district election boards must allow voters to drop completed ballots in a secure container to be tabulated after

[5] *See* Section 1111-A(b) of the Election Code, 25 P.S. § 3031.11(b).
[6] *See* Section 1120-A(b) of the Election Code, 25 P.S. § 3031.20.

the polls close. County boards of elections can use the emergency bin on the precinct ballot box used by precinct scanners. County boards of elections must train poll workers on proper methods for instructing voters to insert the ballots into the secure ballot box.

4. ***Accessible electronic voting systems.*** County boards of elections must direct the district election boards to prepare, in the manner provided by the Election Code, an electronic voting system for voting in a precinct where such system is necessary to provide to a disabled voter the same opportunity for access and participation in the voting process as is afforded voters who do not have a disability.[7] Audio components for the visually impaired must be in working order and must present instructions and information in a user-friendly and understandable format. **All district election boards must comply with this requirement regardless of whether the district board anticipates that a disabled voter will present themself to vote on the day of the primary or election.**

## Activities after closing the polls on Election Day

1. ***Computation and canvass of returns – random sampling.*** As part of the computation and canvass of returns, the county board of elections must conduct a statistical recount of a random sample of at least two percent (2%) of the ballots cast or two thousand (2,000) ballots, whichever number is fewer.[8]

   a. For those counties using optical scan electronic voting systems, the county board of elections shall conduct the statistical recount manually or by scanning on a scanner of a separate make and model than used originally; provided that **the method used for the statistical recount must also comply with the conditions for certification identified in the Department's final examination and certification report for the county's electronic voting system.**

2. ***Sealing voting system terminals for recounts and election contests.*** A county board of elections shall keep voting terminals sealed or otherwise locked against voting for at least twenty (20) days or longer if there are recounts or election contests pending, unless a court should order the terminals to be opened.[9]

[7] *See* Section 1110-A(g) of the Election Code, 25 P.S. § 3031.10(g); *see also* Section 301(a)(3) of the Help America Vote Act, 52 U.S.C. § 21081(a)(3).
[8] Section 1117-A of the Election Code, 25 P.S. § 3031.17.
[9] *See* Section 1230 of the Election Code, 25 P.S. § 3070.

3. ***Reuse of memory cards and retention of ballot images.*** A county board of elections may reuse memory cards for the next election if the board fully reformats the cards and the county maintains either a printed or electronic copy of the ballot images contained in the system. For federal elections, a county board of elections must retain these ballot images for twenty-two (22) months from the date of the election.[10] For municipal elections, the county board of elections must retain the ballot images for at least twenty (20) days, unless ordered otherwise by a court.[11]

## Conducting recounts

1. In counties with an election district that uses an electronic voting system utilizing paper ballots (that is, optical scan systems), the recount should be conducted as follows:[12]
    a. The county board of elections must recount all ballots using manual, mechanical, or electronic devices of a different type than what was used for the specific election.[13] Moreover:
        i. Counties using a central-count tabulator shall conduct the recount using a precinct-count tabulator or conduct the recounts by a hand count of the paper ballots.
        ii. Counties using a precinct-count tabulator shall conduct the recounts by using a central-count tabulator or conduct the recounts by a hand count of the paper ballots.
    b. All ballots containing overvotes must be counted ***manually.***
        i. For additional guidance on recounts, please review the Department's Directives and Procedures for Statewide Returns and Recounts Under Section 1404(E).
2. Appeals of determinations made by a county board of elections following an order for a recount by the Secretary of the Commonwealth subject to the statewide recount must be taken to the Commonwealth Court — even after the recount and recounts ordered by the Secretary have been completed.[14]

---

[10] 52 U.S.C. § 20701.
[11] *See* Section 1230 of the Election Code, 25 P.S. § 3070.
[12] *See* Section 1404(e)(3)(i) of the Election Code, 25 P.S. § 3154(e)(3)(i) (requiring that the recount be conduct using manual, mechanical or electronic devices of a different type used for the specific election.)
[13] *See* Section 1404(e)(3)(i) of the Election Code, 25 P.S. § 3154(e)(3)(i) (requiring that the recount be conduct using manual, mechanical or electronic devices of a different type used for the specific election.)
[14] *See* Section 1407(a) of the Election Code, 25 P.S. § 3157(a).

###

| Version | Date | Description |
|---|---|---|
| 1.0 | 06.09.11 | Initial document release |
| 1.1 | 09.25.23 | Updates for paper-based voting machines |
| 1.2 | 09.22.25 | Updates to reference related directives and voting system certifications |
| 1.3 | 04.06.26 | Updates to activities prior to selecting a voting system |

TLP: CLEAR

Pennsylvania
Department of State

# Directive Concerning Access to Electronic Voting Systems, Including But Not Limited to the Imaging of Software and Memory Files, Access to Related Internal Components, and the Consequences to County Boards for Allowing Such Access

Directive 3 of 2026
Date: April 6, 2026
Version: 1.1

# Directive 3 of 2026

The following Directive is issued April 6, 2026, by the Secretary of the Commonwealth pursuant to authority contained at Section 1105-A the Pennsylvania Election Code, 25 P.S. § 3031.5. This Directive supersedes Directive 1 of 2021.

## Background

The Secretary of the Commonwealth ("Secretary") has duties pursuant to Article XI-A of the Pennsylvania Election Code, Sections 1101-A through 1122-A, to examine, evaluate and certify electronic voting systems. These reviews include verifying that the voting system conforms to federal and state law and any regulations or standards regarding confidentiality, security, accuracy, safety, reliability, usability, accessibility, durability, resiliency, and auditability. The Secretary's evaluation is in addition to the federal testing and certification undertaken by the U.S. Election Assistance Commission.

The U.S. federal government has played a leading role in efforts to ensure that security and resiliency of infrastructure fulfilling unique and crucial aspects in our society are identified and protected. Executive Order 13636, issued February 12, 2013, focuses on measures required for infrastructure security. In January 2017, the U.S. Department of Homeland Security designated election infrastructure as critical infrastructure under the "Government Facilities" sector, one of the 16 critical infrastructure sectors in the United States.

The Pennsylvania Department of State recognized the significance of this designation while it was developing the security standards for certification of voting systems to be used in Pennsylvania elections. As a result, during the Department's examination, each voting system successfully completed penetration testing, access control testing, and testing to ensure that every access point and all software and firmware are protected from tampering prior to certification by the Secretary.

## Access to electronic voting systems

Over the past several years, demands have been made to allow entities to have access to electronic voting systems, specifically to review and copy the internal electronic, software, mechanical, logic, and related components of such systems. These demands have included the desire to image electronic memory spaces, to download operating systems and software, and to copy information that is internal and proprietary. Such access by entities undermines chain of custody requirements and strict access limitations necessary to prevent both intentional and inadvertent tampering with electronic voting systems. It also jeopardizes the security and integrity of those systems and could negate the ability of the Secretary or electronic voting system vendors to affirmatively state that such systems continue to meet Commonwealth security standards, are validated as not posing security risks, and are able to be certified to

perform as designed by the electronic voting system vendor and as certified by both the U.S. Election Assistance Commission and the Department of State.

## Limits on Access to Electronic Voting Systems

The following Directive is effective immediately:

a. **Unauthorized Access:** Unless such access complies with the requirements of "Qualified Access" prescribed herein, County Boards of Elections shall not permit or facilitate (1) physical access to voting systems or components thereof, including but not limited to internal memory, hard drives, printed circuit boards, mother boards, or other similar computer electronic boards; (2) access to any component of electronic voting systems for the purposes of copying voting systems software, source code, or proprietary data that the Department has certified with the voting system, or for the purposes of conducting penetration testing, security reviews, forensic examinations, or other vulnerability testing of an electronic voting system.

If unauthorized access occurs, the Secretary may, in his or her sole discretion, prohibit the future use of some or all of the components of that county's electronic voting system (the "compromised equipment"), without decertifying the voting system on a statewide basis. Such a prohibition applies only to the compromised equipment and does not otherwise prevent the continued use of the electronic voting system by county boards of elections. Alternatively, if the Secretary determines that the unauthorized access has compromised the security of the electronic voting system as a whole, or any related voting system, or any components thereof (collectively, individually, and in any combination, the "compromised voting system"), the Secretary may decertify (i.e., revoke the authority to use) the compromised voting system on a statewide basis. Any such decertification decision will be made in accordance with Section 1105-A(c) of the Election Code, 25 P.S. § 3031.5(c).

The Commonwealth of Pennsylvania will not reimburse any cost for replacement voting equipment for which certification or use authority has been withdrawn pursuant to this Directive. The Secretary may seek reimbursement of any costs incurred in re-examining an electronic voting system or components thereof as a result of Unauthorized Access.

b. **Qualified Access:** Nothing in this Directive is intended to limit the ability of county boards of elections to allow their elections officials to perform their duties pursuant to the Election Code or to engage vendors to assist in the maintenance and security of electronic voting systems for purposes of conducting an election as permitted by the Election Code, provided that such access is given and such functions are performed pursuant to a contract or agreement between the vendor and the county board of elections, the Department, or the manufacturer of the voting system. If the county board of elections intends to contract with a vendor that is not the manufacturer of the electronic voting system, the County Board of Elections must provide notice to the

Department 10 days in advance of the contract being executed via email to ra-stbest@pa.gov. Any such contract or agreement must provide for the vendor's indemnification of the county, the County Board of Elections, and the Commonwealth for any damage arising from such access, including the potential decommissioning or decertification of any equipment as a result thereof. Prior to such access, the vendor must agree in writing to be bound by the requirements of the Election Code, including its requirements regarding security and chain of custody of electronic voting systems. Any such access must be conducted in accordance with industry best practices, and no data, information, or reports collected during or generated from such access may be disclosed other than to the contracting county board of elections, the Department, or the manufacturer of the electronic voting system.

c. **Access sought pursuant to a valid judicial warrant:** For avoidance of doubt, this Directive's prohibition on Unauthorized Access applies with equal force to requests for Unauthorized Access to electronic voting systems or their components made by (or on behalf of) any federal, state, or local government officials without a valid judicial warrant. Like any other individual, election officials should never obstruct the execution of a valid judicial warrant, including a warrant requiring access to electronic voting systems. However, if served with a judicial warrant by a law enforcement officer, election officials must take the following steps to preserve, to the best of their ability, the security of sensitive equipment and materials and the public's interest in voter privacy and the timely certification of elections: (1) election officials should confirm that the warrant is a valid judicial warrant, *i.e.*, a warrant signed by a judge, rather than an administrative warrant; (2) election officials should request to speak to their attorneys or have the law enforcement officer speak to their attorneys, to make sure they are properly complying with the warrant and other applicable legal duties, and that the warrant is executed with the least disruption possible; (3) to the maximum extent practicable, election officials should document the execution of the warrant, including by videotaping the transfer of any data or seizure of equipment, and should ensure that an inventory is created and retained detailing precisely what equipment and data are seized, from where, and by whom; (4) election officials should make every effort to create and retain a copy of all software and data on any equipment subject to seizure. While the Secretary must ultimately evaluate the safety and usability of specific pieces of election equipment on a case-by-case basis, fidelity to chain-of-custody and security requirements make it more likely that the equipment will remain in (or can be returned to) a certified state and be approved for use in future elections.

## Notice

County Boards of Elections shall notify the Secretary immediately upon receipt of any written or verbal request for access to a voting system that does not comply with the requirements of Qualified Access set forth above, including the service of warrants or any other requests from government officials. In addition, County Boards of Elections and electronic voting system manufacturers have an affirmative duty to notify the

Secretary immediately of any breach or attempted breach in the chain of custody of its voting system components, including through Unauthorized Access.

## Other obligations of County Boards of Elections regarding access to election-related material

County Boards of Elections are advised to:

a. Review all contracts, lease agreements, or other documents evidencing agreements between vendors and the county to determine the contractual impacts of providing any such requested access.

b. Comply with federal law regarding the retention and preservation of records.

c. Protect the privacy of voters as required by the Pennsylvania Constitution and state law.

## Future actions

This Directive shall remain in force until cancelled or rescinded by the Secretary of the Commonwealth, by a subsequent Directive, or by another issuance.

# # #

| Version | Date | Description |
|---|---|---|
| 1.0 | 07.08.21 | Initial document release |
| 1.1 | 04.06.26 | Updated to clarify unauthorized access |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT K

## October 28 records motion excerpts, verification and source comparisons

Motion excerpts, printed pp.8-10: paragraphs 11-30
**GEX-K-002 through GEX-K-004**

Verification and good-faith certification, printed p.16
**GEX-K-005**

Complete comparison exhibits, printed pp.18-22
**GEX-K-006 through GEX-K-010**

Selected factual and records-request passages from the filed motion, with its verification and complete attached comparisons. Other argument, proposed orders and service pages are omitted. Comparisons are party analyses of identified official records, not adjudications of voter eligibility.

Original pagination is retained. Added GEX labels identify pages for citation.

Public copy: voter names and registration numbers redacted.

11. The officials should explain under oath what checks Larkin described. They should separately address checking a person's identification and determining whether the person meets the legal qualifications to vote. They should identify the records showing that a ballot with an unresolved issue is kept separate until it may lawfully be processed. They should also explain how candidates can inspect the supporting records before the challenge deadline. Observing a tray of envelopes on Election Day does not provide those records before the preceding Friday.

**IV What the SURE comparisons show**

12. Plaintiff Stenstrom compared data exported from the SURE voter database for the May primary and the coming November election, matching each person by voter registration number. The records show people previously marked identification verified who are now marked identification not verified. Exhibit A identifies eleven such people.

13. The primary records also list 300 people whose applications initially carried a not-verified label but whose identification was later shown as verified and whose ballots were recorded as received. Those records do not show when verification occurred. Defendants should produce the records showing when each person was verified and whether verification occurred before the ballot was released for counting.

14. One of those 300 people, [redacted], appears again as identification not verified for November. Her November ballot is not listed as returned. Of the eleven people in Exhibit A, three have already returned November ballots that remain pending for an identification issue. The question is direct: Why are people previously marked verified now marked not verified?

15. For those three people ([redacted], [redacted], and [redacted]), the primary and November records show the same application dates. Defendants should explain whether the same applications were used for both elections, whether identification was checked again, and what caused the recorded change from verified to not verified.

16. A general description of how SURE labels applications does not explain these particular records. Defendants should identify when each person was verified, why the result changed, what remains unresolved, and who authorized any ballot to proceed toward counting.

17. The October records separately identify thirty-five returned ballots for people marked identification not verified. These include both paper and online applicants. Whatever method a person used to apply, Defendants should explain the unresolved identification issue and produce the records showing how it was resolved before the ballot was released for counting.

## V Existing statutory duties and the challenge deadline

18. Section 1302.2-D(a), 25 P.S. section 3150.12b(a), requires application qualification determinations and limits application challenges to elector qualifications. Subsection (a)(3) sets the Friday-before-election, 5:00 p.m. deadline. Section 1308(f), 25 P.S. section 3146.8(f), requires the $10 cash deposit. The deposit purchases no substitute for the missing facts.

19. The Board has its own duties under 25 P.S. § 2642(g) and (i): to inspect election conduct systematically and thoroughly, investigate election frauds, irregularities and statutory violations, and report suspicious circumstances to the district attorney. Plaintiffs request enforcement of those existing duties as to the identified discrepancies, supported by production and a court-ordered sworn accounting. Section 3146.8(f) addresses deposits for private ballot challenges. It does not condition the Board's own investigative duties on Plaintiffs first paying $10 for each affected record. The Board must explain its examination and findings, not shift that public responsibility to candidates.

20. Section 1308(h), 25 P.S. section 3146.8(h), provides the identification-cure timetable and the consequence of an unresolved identification failure. Sections 1302.2-D(c) and 1308(h) distinguish a pending identification issue from a completed verification. Stenstrom seeks proof of compliance with that sequence, including the timing of verification and release for canvassing, rather than an additional voter qualification.

21. Sections 3146.9 and 3150.17 designate specified election records public, subject to their exclusions. The limited applicant-status compilation required by their subsections (b)-(c) and an unexplained status code do not themselves supply the underlying verification history. The complaint separately demands the existing supporting records.

22. The challenge deadline and the identification-cure period serve different purposes. Saying that identification can be verified after Election Day does not explain how candidates can examine the supporting records before the Friday challenge deadline. The Court should order actual access, identify its timing, and require the responsible officials to substantiate the process.

## VI Records investigation and sworn examination requested

23. For each of the eleven people in Exhibit A, produce the primary and general-election application records and the records showing when identification was checked, the result, why the result changed, and who or what computer process made the change. Produce records showing when the ballot was held, released for processing, counted, or rejected. For the three returned November ballots, also produce existing images of the signed outer envelopes and the records connecting each envelope to its application and receipt date.

24. For the 300 primary returns described in paragraph 13, produce the dated records showing when identification was verified and when each ballot was held or released for processing. An existing report is sufficient if it supplies that information. A report marking identification verified as of June 8 does not establish when verification occurred.

25. For the forty-nine people in Exhibit B and every other November applicant whose identification remains unresolved, produce the current list showing when it was prepared, how each person applied, whether identification is verified, why any ballot is pending, when it was issued and returned, and the records connecting the application and envelope. Identify any exemption from identification requirements relied upon. For the fourteen people marked identification verified whose ballots are nevertheless pending for identification, explain which entry is correct and produce the supporting records. An overseas or military application label alone is not alleged to establish a violation.

26. Produce the instructions explaining the report entries, when identification must be checked again for a new election, how changes are recorded, how long supporting records are kept, and how ballots with unresolved issues are kept out of counting. If the Department of State holds a requested record, identify who holds it, whether the County can obtain it, and what information the County used.

27. Require Allen, Hagan, and Winterbottom to explain under oath their responsibilities, the records in paragraphs 23–26, the eleven changes in verification, and the unresolved November cases. Require the County and Board to designate knowledgeable representatives under Rule 4007.1(e) for topics beyond the named officials' personal knowledge. Each witness should identify what was done, what the records establish, and what remains unanswered.

28. Direct Defendants to arrange and secure Hagan's and Winterbottom's attendance. On information supplied to Stenstrom, they work at the courthouse Government Center or nearby counting center. Require Defendants to bring any claimed inability to arrange attendance promptly before the Court for resolution. Limit the initial sworn examination to three hours collectively, subject to extension. All parties may participate.

29. Produce electronic records in the form in which they are kept or another usable form that preserves the information and the numbers needed to match the records. Pa.R.C.P. 4009.1(b). Do not publicly disclose protected identification numbers or identification documents. Preserve the originals, provide copies with protected information removed, and provide nonprotected records of dates and processing events. Ask the Court to resolve any specific dispute over protected material, including private review by the judge where appropriate.

30. Preserve the original records, the record of changes and processing actions, and the existing numbers connecting each voter, application, and envelope. If a requested record is not kept or cannot be found, require the responsible official to state under oath what is missing, where the official searched, how long such records are kept, and what other records can supply the answer. Stenstrom requests an order requiring that explanation.

**Verification of Gregory Stenstrom**

I, Gregory Stenstrom, verify that factual statements concerning my participation are true to my personal knowledge. Descriptions of the transcript, order, and election reports are based on those identified records. Allegations concerning underlying verification events, staffing, and expenditures are made on information and belief as stated; I seek the records and sworn explanation establishing those facts. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

/s/ Gregory Stenstrom
October 28, 2026

**Certification of Good Faith Under Local Rule 208.2(e)**

I certify that on October 28, 2026, at approximately 10:50 a.m., I emailed the proposed motion, exhibits, and proposed orders to Defendants' counsel, John Edwin Daniel (Jack) Larkin, Esquire, copying the other Plaintiffs. I requested agreement to production, sworn examination, preservation, and accounting, or an alternative resolving or narrowing the dispute before the challenge deadline. I requested a response by 1:00 p.m. and offered immediate telephone discussion. Defendants had previously opposed pre-election access in court. No response was received as of 2:00 p.m. The dispute remains unresolved. This filing incorporates clarified exhibits and supporting grounds developed after that conferral submission.

/s/ Gregory Stenstrom
Plaintiff pro se
October 28, 2026

## Exhibit A
## Verification Status Comparison

Eleven people have the same voter registration number in the primary and November reports. Identification is marked verified in the June 8 primary report, which lists their ballots received, and not verified in the October 27 report. Three have returned November ballots. The comparison does not show when verification occurred or why it changed.

| Name | Voter number | June ID check | October ID check | November return | Source rows primary / October |
|---|---|---|---|---|---|
| [redacted] | | Verified | Not verified | 2026-10-15 | 411888 / 32899 |
| [redacted] | | Verified | Not verified | 2026-10-15 | 389273 / 25012 |
| [redacted] | | Verified | Not verified | 2026-10-22 | 403784 / 54867 |
| [redacted] | | Verified | Not verified | No date listed | 403946 / 7991 |
| [redacted] | | Verified | Not verified | No date listed | 415183 / 40891 |
| [redacted] | | Verified | Not verified | No date listed | 418822 / 25132 |
| [redacted] | | Verified | Not verified | No date listed | 400949 / 28063 |
| [redacted] | | Verified | Not verified | No date listed | 405385 / 29356 |
| [redacted] | | Verified | Not verified | No date listed | 396290 / 26600 |
| [redacted] | | Verified | Not verified | No date listed | 393699 / 30411 |
| [redacted] | | Verified | Not verified | No date listed | 390531 / 18215 |

[redacted], [redacted], and [redacted] have returned November ballots pending for identification.
other eight have no November return date in the report. Nine of the eleven pairs retain the same application issue and return dates.

### Source identification

Primary: VR_SWMailBallot_External 20260608 V2.TXT. General: DelCo MIBs 2026_10_27(1).csv. Source rows count the heading as row 1. Comparisons match complete voter registration numbers. Repeated transactions are not counted as additional people. Primary-file fingerprint: eff75051393cb4f26941221f0762c6af0d2a3dde980b5c0a6abd61c5c58eacc2

# Exhibit A Continued
# Three Returned Ballots

The primary was May 19, 2026; the general election is November 3. Each primary record below marks identification verified and ballot received. Each October record marks identification not verified and the returned ballot pending for identification. Application labels describe the application and may differ from the later result.

[redacted]

| Record entry | Primary report | November report |
|---|---|---|
| Application label | Paper mail application | Paper mail application |
| Identification result | Verified | Not verified |
| Application approval | Identification verified | Identification not verified |
| Application issued and returned | 02/18/2026 | 2026-02-18 |
| Ballot received | 2026-05-01 | 2026-10-15 |

[redacted]

| Record entry | Primary report | November report |
|---|---|---|
| Application label | Paper mail application | Paper mail application |
| Identification result | Verified | Not verified |
| Application approval | Identification verified | Identification not verified |
| Application issued and returned | 04/22/2026 | 2026-04-22 |
| Ballot received | 2026-05-22 | 2026-10-15 |

[redacted]

| Record entry | Primary report | November report |
|---|---|---|
| Application label | Online application labeled verified | Online application labeled not verified |
| Identification result | Verified | Not verified |
| Application approval | Identification verified | Identification not verified |
| Application issued and returned | 02/27/2026 | 2026-02-27 |
| Ballot received | 2026-05-19 | 2026-10-22 |

## Exhibit B
## Returned Ballots Pending for Identification

All 49 returned ballots below are pending because of an identification issue. A separate entry says identification is not verified for 35 people and verified for 14. For those 14, the same report contains conflicting entries. They are marked CONFLICT below.

This exhibit seeks examination and reconciliation, not a finding that a verified person is unqualified. It does not establish a sequence across earlier elections; Exhibit A separately compares primary and November results.

| Elector name | Voter number | ID result | Ballot received | Ballot status and issue |
|---|---|---|---|---|
| [redacted] | | Not verified | 2026-10-22 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-23 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-15 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-16 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-13 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-15 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-21 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-16 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-23 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-16 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-16 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-20 | CONFLICT: Pending for identification |
| [redacted] | | Verified | 2026-10-21 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-21 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-13 | CONFLICT: Pending for identification |

| Elector name | Voter number | ID result | Ballot received | Ballot status and issue |
|---|---|---|---|---|
| [redacted] | | Not verified | 2026-10-23 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-22 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-13 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-21 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-15 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-15 | CONFLICT: Pending for identification |
| [redacted] | | Verified | 2026-10-21 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-23 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-13 | CONFLICT: Pending for identification |
| [redacted] | | Verified | 2026-10-15 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-15 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-23 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-22 | CONFLICT: Pending for identification |
| [redacted] | | Verified | 2026-10-20 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-15 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-15 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-23 | Pending for identification — unresolved |

| Elector name | Voter number | ID result | Ballot received | Ballot status and issue |
|---|---|---|---|---|
| [redacted] | | Not verified | 2026-10-23 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-15 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-21 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-13 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Verified | 2026-10-20 | CONFLICT: Pending for identification |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-23 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-20 | Pending for identification — unresolved |
| [redacted] | | Not verified | 2026-10-22 | Pending for identification — unresolved |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT L

## October 27 machine application excerpts and signed observer declarations

Application identification, requested examination and factual basis, printed pp.6-9
**GEX-L-002 through GEX-L-005**

Signatures and verification, printed pp.19-21
**GEX-L-006 through GEX-L-008**

Signed declarations: Stenstrom, Thomas and Lewis, printed pp.28-30
**GEX-L-009 through GEX-L-011**

Application excerpts and complete signed observation declarations from the supplied court-filed machine proceeding. Proposed orders and other application sections are omitted. The application requests relief; it is not an entered order. Historical signatures and the source watermark are preserved.

Original pagination is retained. Added GEX labels identify pages for citation.

**IN THE COURT OF COMMON PLEAS
OF DELAWARE COUNTY, PENNSYLVANIA**

**CIVIL DIVISION – ELECTIONS**

**No.** 26-009865

FILED DIS DELAWARE CO, 2026 OCT 27 PM4:07:49

NICK MANGANARO, GREGORY STENSTROM, ROBERT MANCINI, SCOTT THOMAS, LAURA LEWIS, and JOHN PROCTOR CHILD,
Plaintiffs

v.

DELAWARE COUNTY, DELAWARE COUNTY BOARD OF ELECTIONS, and JAMES ALLEN, in his official capacity,
Defendants

**EMERGENCY APPLICATION FOR PRELIMINARY AND SPECIAL INJUNCTIVE RELIEF UNDER Pa.R.C.P. 1531**

Plaintiffs request an emergency order prohibiting Delaware County from using voting machines in the November 3, 2026 election until the required software validation is completed and documented for every covered machine.

**What software was tested, against what certified reference, and where are the results?**

James Allen's sworn testimony across related cases has supplied contradictory answers about what testing is required, what the County performs, and which machines it tests. His October 21, 2026 presentation to County Council compounded those contradictions by promoting testing he had described in court as unnecessary. With the election imminent, Plaintiffs ask the Court to promptly observe the validation procedure on two court-selected machines, examine its actual output against the corresponding certified reference, and prohibit use of covered equipment until compliance is demonstrated. The two-machine demonstration would establish what the procedure does; it would not replace the required validation of every covered machine. Allen's assurances cannot substitute for that proof.

## I. Relief requested and procedural basis

Exhibits A–K are incorporated by reference.

1. Plaintiffs apply in this action under Pa.R.C.P. 1531(a) for interim relief supporting their Verified Complaint for Declaratory and Permanent Injunctive Relief. They incorporate its factual allegations, Exhibits A–K and expressly pleaded statutory and constitutional claims. This Application identifies the immediate relief requested and applies each preliminary-injunction prerequisite separately.

2. Plaintiffs request a noticed evidentiary hearing within twenty-four hours after presentation, or at the earliest practicable time allowing adjudication before November use. At that hearing, they request the pre-use restraint in proposed order paragraph 8, effective on approved security, together with preservation, production and a sworn deployment inventory. Within twenty-four hours after effectiveness, Defendants should produce existing completion records and identify any specific objection to the courtroom demonstration. The demonstration and release hearing





Copying Prohibited

should occur on the earliest feasible date before use. The Court should rule separately on restraint and each evidentiary measure.

3. Pa.R.C.P. 1531(a) permits consideration of the verified pleadings, party declarations and other proof required by the Court. Plaintiffs request notice and hearing. They ask the Court to determine the evidence supporting each measure and enter a specific order rather than postpone the validation dispute until the equipment has been used.

4. Pa.R.C.P. 1532 concerns an action to perpetuate testimony for a contemplated action. This action is brought to enforce current election-preparation duties and obtain interim relief. Rule 1531 governs that relief. Inspection and testing are supported by Pa.R.C.P. 4009.1(a); its Official Note also recognizes the Court's common-law power to preserve or protect a document or thing. Plaintiffs seek the examination through a court-approved protocol and an expedited order in this action.

5. Plaintiffs request that the Court fix the bond or cash-security amount under Pa.R.C.P. 1531(b) based on the actual scope and risks of the relief, permit prompt posting, and state when the restraint becomes effective. They request separately stated scheduling and discovery directions so the hearing and evidentiary measures can proceed promptly.

## II. Governing duty and evidence of current noncompliance

6. Under 25 P.S. § 3031.5(b), the County Board must comply with use requirements in the Secretary's examination report. Condition J of the January 12, 2023 Hart Verity Voting 2.7 report requires trusted-build validation during election preparation and post-election canvass using vendor-supplied methods. Exhibit A-1, printed p. 28, EX0033. Plaintiffs seek enforcement of that identified duty before November use.

7. Hart document 6670-015 calls for obtaining the applicable certified manifest, invoking the dedicated validation or workstation export, retaining equipment-specific outputs and comparing corresponding entries against the appropriate certified reference. Device steps 4(b), workstation step 4(c), comparison step 5 and repetition step 6 are reproduced in Exhibit B-1, Bates 000050–000054, EX0107–0111. The method identifies operations and retained results beyond ordinary power-on.

8. Appendix A of SLI Compliance's Verity 2.7 *Certification Test Report* describes System Validation Tool exports of Verity-related file hashes and files. Appendix C lists SHA-256 values for named executable packages. Exhibit D-2, printed pp. 27 and 37, EX0423, EX0433. Plaintiffs request comparison of corresponding executable packages with Appendix C, and device or workstation exports with their authenticated, configuration-appropriate certified manifest. Each comparison must identify the artifact and applicable baseline.





Copying Prohibited

## Certified reference values the test must match

Appendix C lists the certified SHA-256 values for named executable packages. These are the expected values, not results generated from County equipment. The Court should require the actual output and compare the same artifact with its corresponding certified reference. Device and workstation manifests require their matching certified manifests. Exhibit D-2, Appendix C, printed p. 37, EX0433; Exhibit B-1, EX0107–0111.

| Executable Files | sha2 (256) |
|---|---|
| Devices: | |
| Verity_Controller_v2.7.1-Kiosk-2022-04-25_15-12-05.exe | AC8B2169F272A0B639937E106CF29C29E89191D5C65A5A095C26B33178117D1C |
| Verity_Print_v2.7.1-Kiosk-2022-04-25_15-13-03.exe | 88CDEC7F148F07D7B75C82F45407B9413C674888C7744E23E950CAEFAA3F6844 |
| Verity_Reader_v2.7.1-Kiosk-2022-04-25_15-13-16.exe | 42BD9AF3ABC67153F837F388D87DC2BA47D6D9A4AF91CB1FB078CF896347E76F |
| Verity_ScanWithRelay_v2.7.1-Kiosk-2022-04-25_15-11-27.exe | 8C34C13FB7FF89DCC879C1610DC30EAD622D0F40DDE3FD1199459DDE83B8F008 |
| Verity_Scan_v2.7.1-Kiosk-2022-04-25_15-11-02.exe | F7E1FB64F271CC3406F9A07946444F108DA6387050E371926589C4FCD5A46AFE |
| Verity_TouchDuoIndie_v2.7.1-Kiosk-2022-04-25_15-12-34.exe | 47121E5FD3872C7C4098B246193C322683EB9AA3E93CC9029041D1D86D26A9C6 |
| Verity_TouchDuo_v2.7.1-Kiosk-2022-04-25_15-12-13.exe | CE96BB8EFC041B3C2DAD46CC6EF5D8A03D8E8950C1D6CB3F7FA95178500FBAB |
| Verity_Translit_v2.7.1-Kiosk-2022-04-25_15-12-55.exe | 2A849C1023E94FA4870AC6F39B24F670D3654655923160318D9BAE8EA6F7F483 |
| Verity_Writer_v2.7.1-Kiosk-2022-04-25_15-11-40.exe | 39C797F5F2E2DE1A549BDB34E471A0AE4D86F47940C410704205BEA306AC715B |
| Workstations: | |
| Verity_CentralClient_v2.7.1-Kiosk-64GB-2022-04-25_15-08-00.exe | E96B7D68535B1F2C9B04E1FB53AC55C145559EA1BBF7851E58224E819265DDDF |
| Verity_CentralDatabaseServer_v2.7.1-Kiosk-64GB-2022-04-25_15-08-50.exe | F5AE92757A1E5E44C298CCF37675D1A3D16D0C20A81C874980F171469008FAE8 |
| Verity_CentralServer_v2.7.1-Kiosk-64GB-2022-04-25_15-09-13.exe | 71BB1C2BAC3462CC23A822F9FA5F7B694E0A792623EBE82C4595127CDCC686AE |
| Verity_CountClient_v2.7.1-Kiosk-64GB-2022-04-25_15-08-27.exe | 8E8C3F3892BE45FCE26070A8C697E5538104958ED7023E6D6910181BDF4DC172 |
| Verity_CountServer_v2.7.1-Kiosk-64GB-2022-04-25_15-09-40.exe | 6C84AA4E176F737AEA16EF8F3F3EC6BE54770B91F33A5985D80E85899A96EA1B |
| Verity_CountStandalone_v2.7.1-Kiosk-64GB-2022-04-25_15-09-50.exe | 94EDF8609F12DEBD8429BE7F4E3C1883FE596F062D77DBF0612AFD178AB8164F |
| Verity_Database_v2.7.1-Kiosk-GB-2022-04-25_15-11-00.exe | 896E67803932E84AE52AB711007D85A04528A058E7E0ECE920EF8131A2315411 |
| Verity_DataBuildClient_v2.7.1-Kiosk-64GB-2022-04-25_15-08-37.exe | CBA1192414412A92EDEC06809E534470F8FF843121D70102402B3C089F7BEB39 |
| Verity_DataBuildCountStandalone_v2.7.1-Kiosk-64GB-2022-04-25_15-10-00.exe | B8332CDD7E508BAF96B97E0E52CE895DF1248B8B87C3D8A51F3A2C495613851 |
| Verity_DataBuildServer_v2.7.1-Kiosk-64GB-2022-04-25_15-10-15.exe | 79778BA21D860EA6F38E2F686AD7BA4DF71B213887C0A08D275AE108B859C92E |
| Verity_DataBuildStandalone_v2.7.1-Kiosk-64GB-2022-04-25_15-10-26.exe | FD3E4D6A5DAFE984A8088CD5CD4F277BE9CCD8C54891FBAFDFC96E1FC2522879 |
| Verity_RelayTranslit_v2.7.1-Kiosk-64GB-2022-04-25_15-10-51.exe | ED82B6F9FFCF523195DDF1B7549344204F62A12519B87D305A89ACC87B1B53C0 |
| Verity_Relay_v2.7.1-Kiosk-64GB-2022-04-25_15-10-41.exe | 541F58199882CD5A31FA21D136A065A234E0E8DCCDE271FCF7A35F284858090F |

*Appendix C table reproduced from Exhibit D-2, EX0433. Two entries are enlarged below.*

| Certified executable package | Expected SHA-256 value |
|---|---|
| Verity_Scan_v2.7.1-Kiosk-2022-04-25_15-11-02.exe | F7E1FB64F271CC3406F9A07946444F10<br>8DA6387050E371926589C4FCD5A46AFE |
| Verity_Writer_v2.7.1-Kiosk-2022-04-25_15-11-40.exe | 39C797F5F2E2DE1A549BDB34E471A0AE<br>4D86F47940C410704205BEA306AC715B |

For each covered unit, preserve the generated output, identify the software and matching reference, and record the comparison result. A match on a different file does not answer this comparison. The full County inventory requires its own completion records; the two-machine demonstration does not establish countywide performance.

Copying Prohibited

9. Plaintiffs challenge both the County's alternative comparison and its limited coverage. Their previously filed analysis identifies County-provided CSV entries differing from Appendix C's executable packages. Exhibit H-3, EX0508–0509. They allege that the County's selected inputs and reference do not establish validation of the required software. The Court should examine the original compared files and certified references. The use of a comparison utility does not answer which software was compared or whether the reference was the correct certified one.

10. Allen acknowledged a dedicated validation function and denied its performance on every machine in the February 13, 2026 hearing. *Gregory Stenstrom v. Delaware County et al.*, No. CV-2025-009036, N.T. 87:6–10, 88:11–19, 119:18–120:11; Exhibit C-1, EX0201–0202, EX0233–0234. The County's verified Answer describes every central-count server and a five-percent precinct sample; New Matter ¶¶ 27–31 asserts startup supplies required validation. Exhibit C-3, EX0350–0353. Those identified sources establish the pleaded startup position. The September 9 Mancini hearing is a separate record; no generalized assertion about Allen's preferred method replaces citation to the particular testimony relied upon. The source comparison below adds the 2024 Mancini testimony before Judge Whelan and Allen's October 21 Council presentation; it identifies the operation, scope, reference and output the Court should require Defendants to substantiate.

11. Allen claimed an EAC recommendation, a "thumbs-up" and a favorable report. N.T. 61:6–63:1, EX0175–0177. When questioned about authorship, he could "only assume"; he acknowledged no signature or serial number and referred to the delivery email for the production date. N.T. 75:19–76:16, 77:20–78:18, EX0189–0192. The supplied report copy has a March 13, 2025 cover date. Exhibit C-4, EX0356. Plaintiffs request the original report, transmittal and attachments. An asserted endorsement does not identify an equipment-specific validation result.

12. Stenstrom and Thomas describe September 1 dice selection of approximately two percent of precinct machines. Stenstrom reports approximately thirty-foot separation and unreadable identifying and comparison details. Thomas describes partial menu visibility, tester explanations and viewing codes and the comparison, without full step-by-step verification. Exhibits F-1–F-2, EX0440–0441. Lewis confirms September 1 attendance and restrictions preventing meaningful verification. Her declaration separately describes first-floor screens facing away, second-floor side viewing from about eight feet, and Union Power Plant viewing from about six feet, with small writing unreadable. Those historical conditions are not assigned uniformly to September 1. Exhibit F-3, ¶¶ 2–8, EX0442. The September two-percent sample remains distinct from the earlier five-percent pleading.

13. Signed conduct forms restrict recording, binoculars, location and interaction. Exhibits E-2–E-3, EX0437–0438. Lewis describes restrictions on September 1 and other 2025–2026 sessions, while identifying particular 2024 and 2025 sessions that permitted phones. Exhibit F-3, ¶¶ 3–4, 9–13, EX0442. Stenstrom reports Allen gave no explanation when asked about startup and the separate comparison and instructed him not to interfere. Exhibit F-1, ¶ 7. Plaintiffs request operation- and session-specific findings, readable courtroom displays and preserved native results.

13(a). Stenstrom states that he has not received the report-transmittal email Allen offered to forward on February 13, 2026. N.T. 81:14–22, Exhibit C-1, EX0195. Allen again invoked the EAC report at Council on October 21. Exhibit J-1, 44:56 block, EX0811. Plaintiffs request the



Copying Prohibited

**Respectfully submitted**

Nick Manganaro, Plaintiff pro se
429 Montgomery Ave
Apt C403
Haverford, PA 19041
Telephone: 610-662-9291
Email: n.manganaro@comcast.net

Gregory Stenstrom, Plaintiff pro se
1541 Farmers Lane
Glen Mills, PA 19342
Telephone: 856-264-5495
Email: gregorystenstrom@gmail.com

Robert Mancini, Plaintiff pro se
4 Guernsey Lane
Media, PA 19063
Telephone: 610-506-9827
Email: Robcmancini@gmail.com

Copying Prohibited

Scott Thomas, Plaintiff pro se
703 Barclay Lane
Broomall, PA 19008
Telephone: 610-717-8857
Email: scthomas61@hotmail.com

Laura Lewis, Plaintiff pro se
473 St. Davids Ave
Wayne, PA 19087
Telephone: 610-733-1023
Email: scanarchpc@aol.com

John Proctor Child, Plaintiff pro se
308 Rockingham Road
Bryn Mawr, PA 19010
Telephone: 610-203-6458
Email: JohnBuysProperty@gmail.com
Submitted by Gregory Stenstrom, filing plaintiff

Date: October 27, 2026

Copying Prohibited

**Verification of Gregory Stenstrom**

I verify that the factual averments in this Emergency Application are true and correct upon my personal knowledge as to matters within that knowledge, and upon information and belief as to the remainder, based on the identified records and witness accounts. I do not represent that I personally witnessed another person's observations. Legal arguments and requests for relief are submitted for the Court's determination. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Date: October 27, 2026
Gregory Stenstrom, Plaintiff pro se

Copying Prohibited

**DECLARATION OF GREGORY STENSTROM September 1, 2026 election-equipment observation**

1. I am a resident of Delaware County, Pennsylvania.

2. On September 1, 2026, I attended the County's election-equipment testing at the Union Power Plant in Chester as an authorized candidate representative.

3. I observed James Allen and Robert Wright conducting a WinMerge comparison during the hash-testing activity.

4. The separately compared precinct machines were selected by dice, and the sample was approximately two percent of the precinct machines.

5. Observers were kept in a designated area approximately thirty feet from the equipment. From that position, I could not independently read and document the machine identifiers, the certified reference values, or the comparison results.

6. The County's written conduct rules prohibited photography, videotaping and other recording of the testing; prohibited binoculars; required observers to remain in the designated area; and restricted interaction with testing personnel.

7. I asked Allen why he continued the separate comparison if simply starting the machines was sufficient to validate them, and why the stated sample was sufficient. He did not explain and instructed me not to interfere.

8. I photographed the observer log and the signed conduct forms reproduced as Exhibits E-1 through E-3. Those exhibits are accurate reproductions of the records I photographed. The observer log shows Scott Thomas and me signing in at 9:00 on September 1.

9. The restrictions and viewing distance prevented me from meaningfully verifying and documenting the software comparison performed on the equipment.

I verify that the statements in this declaration are true and correct upon my personal knowledge. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Date: October 27, 2026

Gregory Stenstrom

Copying Prohibited

**DECLARATION OF SCOTT THOMAS September 1, 2026 election-equipment observation**

1. I am a resident of Delaware County, Pennsylvania.

2. On September 1, 2026, I attended election-equipment testing at the machine warehouse and the Union Power Plant in Chester as a member of a community group registered with the County to observe the event.

3. I observed James Allen and Robert Wright conducting WinMerge comparisons during hash-testing activities at those locations.

4. The separately compared precinct machines were selected by dice, and the sample was approximately two percent of the precinct machines.

5. My view did not permit complete step-by-step verification. Upon request, a scanner was positioned so that menu selections were partly visible. I asked the tester to clarify the menu text and selections and received explanations. Wright allowed us to view displayed codes and observe the WinMerge comparison.

6. The County's written conduct rules prohibited photography, videotaping and other recording of the testing; prohibited binoculars; required observers to remain in the designated area; and restricted interaction with testing personnel.

7. The September 1 entry bearing my name in Exhibit E-1 records my attendance at 9:00.

8. Although I could observe parts of the activity, I could not meaningfully verify and document the complete hash procedure step by step. My account does not assert that all screen viewing or interaction was prohibited.

I verify that the statements in this declaration are true and correct upon my personal knowledge. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Date: October 27, 2026

Scott Thomas

Scott Thomas

Copying Prohibited

**DECLARATION OF LAURA LEWIS**

Observations of hash testing and logic-and-accuracy testing

1. I am a resident of Delaware County, Pennsylvania.
2. On September 1, 2026, I attended election-equipment testing at the Union Power Plant in Chester as a member of a community group registered with the County to observe the event.
3. The County prohibited photography, videotaping and other recording of the testing; prohibited binoculars; and restricted interaction with testing personnel.
4. The restrictions and viewing distance prevented me from meaningfully verifying and documenting the software comparison performed on the equipment.
5. I also attended election-equipment testing at the warehouse and the Union Power Plant in Chester for L&A and Hash Testing, and vote tabulation at the Union Power Plant, on numerous occasions in 2023, 2024, 2025 and 2026. My experience of viewing restrictions differed by the type of testing and session.
6. During L&A Testing at the warehouse on the first floor, all but one of the election-equipment screens were invisible, facing away from the observation area.
7. During L&A Testing and Hash Testing at the warehouse on the second floor, observers could get within approximately eight feet of the screens and view them from the side. Small writing was not visible, but some steps were clear enough to observe.
8. During L&A Testing and Hash Testing at the Union Power Plant, observers were permitted access to the screens from approximately six feet. Small writing was not visible, but steps were clear enough to observe.
9. In 2023, for election day tabulation at the Union Power Plant, there were no restrictions on phones and purses were permitted in observation areas.
10. In 2024, up until the general election, for Hash and L&A Testing, the County prohibited photography, videotaping and other recording of the testing; prohibited binoculars; required observers to remain in the designated area; and restricted interaction with testing personnel.
11. In 2024, immediately preceding the general election, for L&A Testing at the warehouse on the first floor, there were no restrictions on phones and purses were permitted in the observation area.
12. In 2025, immediately preceding the general election, for Hash Testing at the warehouse on the second floor, there were no restrictions on phones in the observation area.
13. In 2025 and 2026, for other Hash and L&A Testing I attended, the County prohibited photography, videotaping and other recording of the testing; prohibited binoculars; required observers to remain in the designated area at the warehouse; and restricted interaction with testing personnel.

I verify that the statements in this declaration are true and correct upon my personal knowledge. I understand that false statements herein are subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

Date: October 27, 2026



Laura Lewis

Copying Prohibited

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

## EXHIBIT M

## Logic and accuracy directive excerpts and complete certification form

Directive cover, printed pp.1-2 and p.4
**GEX-M-002 through GEX-M-005**

Appendix A divider and complete blank two-page certification form
**GEX-M-006 through GEX-M-008**

Official directive excerpts showing the mandatory county-to-Department completion certification and relevant preparation requirements. The prescribed blank form is reproduced completely. No executed November 2026 county certification is included. The cover is dated April 7, 2025; the directive body states April 4, 2025. Source: Pennsylvania Department of State, version 3.1, retrieved November 22, 2026.

Original pagination is retained. Added GEX labels identify pages for citation.

TLP: CLEAR

Pennsylvania
Department of State

# Directive on Logic & Accuracy Testing

Directive 1 of 2025
April 7, 2025
Version: 3.1

# Directive 1 of 2025

The following directive is issued April 4, 2025, by the Secretary of the Commonwealth of Pennsylvania pursuant to authority contained in Sections 201 and 1105- A of the Election Code, 25 P.S. §§ 2621, 3031.5.

# Background

All counties in Pennsylvania must conduct pre-election logic and accuracy testing (L&A testing) prior to every election (primary, general, special, or municipal) that is conducted in their jurisdiction.

L&A testing is a series of pre-election steps intended to ensure that ballots, scanners, ballot-marking devices, and all components of a county's certified voting system are properly configured and in good working order prior to being used in an election. These steps must include every procedure that counties will use in the actual election.

L&A testing promotes election integrity by:

1) Providing election officials an opportunity to identify and redress errors in election definition, ballot format, and layout, including, but not limited to, appropriate locations for folds on absentee/mail-in ballots, missing races, missing party identification, misspellings of candidate names, incorrectly worded ballot questions, and incorrect tabulation.

2) Exposing inadequate, incorrect, or faulty election supplies, such as incorrect paper stock and memory cards that have not been properly wiped of data and reformatted.

3) Demonstrating to political parties, candidates, the media, and voters that the county is prepared for the upcoming election and the voting equipment has been adequately tested, which promotes confidence in the integrity of Pennsylvania elections.

Following completion of L&A testing, each county election board shall certify to the Secretary when they have completed their L&A testing and shall identify the system configuration for the election. The certification shall be on a form prescribed and furnished by the Secretary, a copy of which is attached as Appendix A. County election boards must complete the certification at least ***fifteen (15) days prior to every election*** held in their jurisdiction and must submit the certification electronically to the Department of State as prescribed by the Bureau of Elections.

## Summary of L&A Testing Goals

- Verify that all ballots are accurately defined, including:
  - All necessary contests (races) are properly programmed, including special elections, retention elections, and ballot questions.
  - Ballot styles are properly mapped to their respective precincts. A "ballot style" is a ballot's particular array of election contests and candidates, specific to each election precinct.
  - Candidate names are correctly spelled.
  - Contests and candidates are displayed in the required order.
  - The parties or political bodies of candidates are properly identified.
  - Names of all parties/independent political bodies are correctly spelled.
  - Audio files are present and properly configured for all candidates and ballot questions.
- Verify that all votes are aggregated and tabulated correctly, and that all accompanying hardware is in working order.
- Verify that all voting system component configurations meet federal and state certification standards and conditions.
- Verify that the voting system software/firmware works as expected.

## Testing of Absentee and Mail-in Ballots

Prior to beginning the structured L&A testing, test the printed ballots that will be issued to voters to confirm that the ballots are accurate and can be read by the tabulating equipment once they are returned for counting. Test these ballots on the equipment that will be used to centrally count mail ballots. If using a ballot-on-demand (BOD) printer to print mail ballots, test the functionality of the printer for all ballot styles.

4) Prepare the BOD printer following the manufacturer's procedures and load the required ballot definition files on the BOD printer. Print ballots of all ballot styles and sets that will be printed for election use.

5) If using pre-printed ballots or a mailing house, gather from the print vendor test ballots for all ballot styles to be used in the election.

Further, county boards should provide at least forty-eight (48) hours' notice to the public of the time and place of the test to provide the public an opportunity to attend. The public notice:

- may be placed in a newspaper or legal publication that has a countywide distribution;
- should outline the starting time and location of the testing; and
- need not include an ending time for the testing.

The preparation and testing of voting equipment must be open to the public to observe; however, such members of the public shall not in any manner interfere with the preparation and testing of the voting equipment units. To prevent any interference by the public when observing, the county may make reasonable rules and regulations concerning the conduct of those members of the public who wish to observe. These rules shall not prevent members of the public from fairly observing and should be published after public approval by the elections board subject to 25 P.S. § 2642(f).

## Preparing for Testing

In addition to issuing notice, counties should do the following when preparing for L&A testing:

1) Review the Secretary's certification report for the county's voting system to ensure that the voting system components are being prepared to meet all conditions of the report that apply in the county's upcoming election.
2) Proofread all balloting materials. The Department recommends using more than one proofreader and proofreading at multiple stages. Proofread ALL ballot types, including Election Day ballots, absentee ballots, mail-in ballots, provisional ballots, bilingual or alternative language ballots, accessible (audio) ballots, federal ballots, partisan and non-partisan ballots, and emergency ballots.
3) Ensure that there are enough multi-partisan teams to conduct the testing. If the county needs to employ additional staff, the Department recommends employing precinct officials and not third-party vendor personnel.
4) Ensure a county election official is present to independently verify and attest to the testing results if a vendor will be participating in L&A testing.
5) Ensure the designated location has adequate space to conduct testing.

# APPENDIX A

TLP: CLEAR

# COMMONWEALTH OF PENNSYLVANIA
# DEPARTMENT OF STATE
# CERTIFICATION OF LOGIC AND ACCURACY TESTING

County name: ________________________ Election date: ________________________
Number of precincts participating in election: ______________________
Voting system vendor:_______________________________________________________
Voting system name and version:_______________________________________________
Primary system configuration: ☐ hand-marked paper ballots ☐ ballot-marking devices

I do hereby certify that ______________County has completed pre-election logic and accuracy testing for all its electronic voting system components pursuant to the Directive on Logic and Accuracy Testing on (date)_____________.

During the test process, a predetermined test deck was prepared, and ballots were marked and tabulated. The results reported by the voting system matched the expected results, and the testing included all equipment to be used for the election, including backup devices.

The testing included the following:

| Component | Details | Completed? |
|---|---|---|
| **Test Deck**<br>• The test deck included absentee, mail-in, Election Day, and provisional ballots (ballot sets) for each precinct (ballot styles).<br>• The test deck included ballots produced on all vendor and county BOD printers and BMDs. | Test pattern used in the test deck:<br>Recommended (unique totals) ☐<br>Incremental/Decremental ☐<br>Alternating ☐ | Yes ☐<br>No ☐ |
| **Notice**<br>• The county board timely notified the chair of each recognized political party. | Notice was sent to the chairman of each recognized political party on ________________. | Yes ☐<br>No ☐ |
| • The county board timely notified each registered citizens' organization. | Notice was sent to the chair or presiding officer of each registered citizens' organization on ________________. | Yes ☐<br>No ☐<br>N/A ☐ |
| • The county board provided at least 48 hours' notice to the public. | The county board provided public notice on ________________. | Yes ☐<br>No ☐ |
| **Ballot-Marking Devices (BMDs) and Backup BMDs**<br>• Each BMD was tested to ensure functionality for each feature.<br>• Printed ballots matched candidate selections on screen.<br>• Ballots created by BMD were included in the test deck to enable testing of precinct scanners.<br>• Hybrid BMDs accurately tabulated results. | Standard BMDs ☐<br>Hybrid BMDs ☐<br># of BMDs to be deployed: ______<br># of BMDs tested: ______<br># of backup BMDs in reserve: ______<br># of Backup BMDs tested: ______ | Yes ☐<br>No ☐ |

TLP: CLEAR

| | | |
|---|---|---|
| **Precinct Scanners and Backup Scanners**<br>• Test deck was scanned into each precinct scanner that will be deployed.<br>• Ballots were accepted and rejected appropriately.<br>• Ballots produced the expected results. | # of scanners to be deployed: ______<br># of scanners tested: ______<br># of backup scanners in reserve: ______<br># of backup scanners tested: ______ | Yes ☐<br>No ☐<br>N/A ☐ |
| **Central Count Scanners and Backup Scanners**<br>• Test deck was scanned into each Central Count Scanner that will be used.<br>• Ballots were accepted and rejected appropriately.<br>• Ballots produced the expected results. | # of scanners to be deployed: ______<br># of scanners tested: ______<br># of backup scanners in reserve: ______<br># of backup scanners tested: ______ | Yes ☐<br>No ☐ |

**Test deck sources:**

The test decks used in our testing were prepared by (check all that apply):

☐ Vendors only

☐ County staff

☐ Voting system automated testing functions

☐ Other: ____________________________________________

______________________________________________________________________

Signature of Chief Clerk or Authorized Representative | Name of Chief Clerk or Authorized Representative | Date

TLP: CLEAR

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury
v.
Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. __________________

## EXHIBIT N

## October 20 Manganaro hearing on records and pre-canvassing access

Transcript identification
**GEX-N-002**

Contiguous proceedings, printed pp.6-13
**GEX-N-003 through GEX-N-010**

Reporter certification, printed p.58
**GEX-N-011**

Selected complete transcript pages from CV-2026-009462. Party statements, counsel's arguments and judicial remarks remain attributed to their speakers. The October 27 entered order is separately reproduced in Exhibit F. This transcript is not a separate entered order denying all observation or all pre-canvassing access.

Original pagination is retained. Added GEX labels identify pages for citation.

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY
PENNSYLVANIA

CIVIL DIVISION

* * * * * * * * * * * * * * * * No. CV-9462-26

**MANGANARO, ET AL.** *

**VS.** *

**COUNTY OF DELAWARE, ET AL.** *

* * * * * * * * * * * * * * * *

Media, PA, October 20, 2026

***

Courtroom No. 10

***

TRANSCRIPT OF PROCEEDINGS

BEFORE: THE HONORABLE ANTHONY D. SCANLON

JOHN EDWIN DANIEL LARKIN, ESQUIRE
For the Defendant

what are you alleging for a basis for those -- for those arguments?

MR. STENSTROM: Your Honor, with your permission, I have a short, written statement. It makes things a lot easier for the record.

THE COURT: How short is your written statement?

MR. STENSTROM: About a minute and a half, two minutes max.

THE COURT: Okay.

MR. STENSTROM: It's right one page.

THE COURT: And Petitioner's all joining the written statement? Okay.

MR. STENSTROM: Everyone's [inaudible 09:44:05 a.m.].

THE COURT: All right.

MR. STENSTROM: Thank you, Your Honor. Your Honor, Plaintiffs request timely access to the county's existing election records, preservation of the records and matching identifiers, and compliance with the statutory application and envelope comparisons before ballot separation. Those are the claims already pleaded. Exhibit A, which was provided for both the Complaint and this Rule 1531 hearing, identifies 167,553 distinct voter IDs with source conditions and original record references retained. This is a specific

examination task. In the May primary records, 25,640 listed IDs match applicant IDs. Sixty-four percent of the 39,734 distinct applicants.

Of the matched IDs, 19,579 have a vote-recorded receipt entry. These figures establish the scale and relevance of the requested reconciliation. The receipt entry is not a finding that a ballot was counted. The additional exhibits make this controversy concrete. Historical, not verified, NV entries traced into the current voter files show that 4,254 master list records included in the Complaint and the Rule 1531 shows blank house number fields, sample ballot images requiring reconciliation with tabulation records, photographs of discarded mail-in ballot application envelopes. The accompanying authorities, which we have an exhibit for, explains the statutory basis for access and preservation. Plaintiffs have identified specific records. The county controls the supporting applications, corrections, and disposition history. Plaintiffs cannot make informed, elector-specific challenges without timely examination of the authorizing applications, applicable registration records, return declaration envelopes, and maintained links among them.

I'm almost done, Your Honor. We seek that examination before the October 30th challenge deadline

at 5:00 p.m., which is a Friday at 5:00 p.m., and the November 3rd pre-canvassing, which is also allowed by statute. Later production cannot restore that opportunity. We've been previously denied. We've had multiple hearings over the last six years. We've been denied pre-canvassing and we've been denied examination of the -- of the voters and the voter applications. Basically, we've been denied just about everything that would provide transparencies. These discrepancies were not created by Plaintiffs' request for access. So the precise relief requested, Your Honor, if you blanked out on the earlier thing for the record, is preserve the existing records, an elector-to-application-to-outer-envelope link ---

THE COURT: What was the second thing you said? Preservation?

MR. STENSTROM: Preserve the existing records.

THE COURT: Okay. Got that.

MR. STENSTROM: An elector-to-application, that's the mail-in ballot application to the ---

THE COURT: Elector-application?

MR. STENSTROM: Elector-applications-to-the-outer-envelope links immediately while preserving ballot secrecy after separation. Two, enforce the statutory applicant status compilation deadline measured from

proven receipt, which was -- actually, if we're counting the deadline, it was -- we're at the 48-hour mark now. Order the other existing disclosable records mentioned in the briefs to be presented by October 23rd with supplements as requested and file proposed Order. Require a sworn identification of records produced, unresolved, exceptions, and records not maintained or located. Establish candidate representative access arrangements before pre-canvassing. What we really want to do, Your Honor, in a nutshell, is we want to be able to examine the -- primarily the mail-in ballots as a pre-canvassing.

THE COURT: And you're claiming you've been denied that?

MR. STENSTROM: Yes, Your Honor.

THE COURT: All right. Response?

MR. LARKIN: Yeah, Your Honor. So the reason they've been denied that is because they're not entitled to that. So by way of quick background, the Supreme Court of Pennsylvania in Honey v. Lycoming, which is 355 A.3d 801, they made pretty clear that there is no right to these records under the Right-to-Know Law. Instead, the appropriate statutory vehicle to access the kinds of records that are associated with elections is through the elections. So specifically, the Supreme

Court says, we address whether the Right-to-Know Law applies to documents subject to the Election Code. The Right-to-Know Law specifically yields to any federal or state law provisions that conflict with those in the Right-to-Know Law.

Here, there is a conflict between the Right-to-Know Law and the Election Code with respect to the process by which an individual may access public records. As the counties and supporting [inaudible 9:49:40 a.m.] emphasize, the Right-to-Know Law requesters may seek records during the agency's regular business hours for any reason so long as they are legal residents of the United States. By contrast, Election Code requesters must be qualified electors and may only access public records during normal business hours in the presence of a member of an authorized county board member, and subject to the county board of elections' safekeeping concerns. So in Honey v. Lycoming, the Court focuses really on Section 308 of the Election Code, which is at 25 P.S. 2648 -- 25 P.S. Section 2648. And Section 2648 emphasizes that you can get access to a lot of the items that Mr. Stenstrom is asking for, but only when they are not being used by the board or its employees having duties to perform there, too.

And at a later point in the paragraph, it

provides that there is an exception for general and duplicate returns, tally papers, affidavits of voters, and others, and all other papers required to be returned by the election officers of the county [inaudible 09:50:51 a.m.] sealed, which shall be opened to public inspection only after the county board shall, in the course of the computation and canvassing of returns, have broken such seals and finished for the time their use of said papers in connection with such computation and canvassing.

THE COURT: Let me stop you there for a second.

MR. LARKIN: Sure.

THE COURT: If -- time is obviously a factor.

MR. LARKIN: With respect, it's not, Your Honor.

THE COURT: It's not? Why? Well ---

MR. LARKIN: It's not, because [inaudible 09:51:18 a.m.].

THE COURT: Well, if votes are counted and they're not legitimate, then the election's over, it's a little late. The horse is out of the barn, don't you think?

MR. LARKIN: On the contrary, that's the time. Once they're done being counted, at that point, they can come back and request the records that they are asking for. They can review them and they can make challenges

within the statutory time frame.

THE COURT: And if there's -- if there's a defect found in the procedure, what's the remedy? You're not going to have another election.

MR. LARKIN: You're not going to have another election, but there are challenges that are made to the individual ballots and the count would change. So let's say Mickey Mouse wrote in. Mickey Mouse had an absentee ballot. Mickey Mouse votes in the election, and Mickey Mouse's vote is counted. It never happened because we do a great job, but let's say we overlook this one.

THE COURT: Right, okay.

MR. LARKIN: The election occurs. At that point, you can look at Mickey Mouse's ballot. You realize Mickey Mouse is a cartoon character. He doesn't live in Delaware County.

THE COURT: Right.

MR. LARKIN: That vote is subtracted from the total. And if there were a one-vote margin of victory, then it would become a tie.

MR. STENSTROM: If it please the Court, Your Honor?

THE COURT: No, not yet.

MR. STENSTROM: Thank you.

THE COURT: Okay. So -- but in that -- in that

scenario you just mentioned with Mickey Mouse, if there's a tie or that -- the petitioning party loses because of the count, well, they have no relief, do they, at that point? Because now the election is over. Am I right?

MR. LARKIN: No.

THE COURT: If it ever gets that close?

MR. LARKIN: You can finally challenge the election after the election is over. In fact, you must.

THE COURT: And then you have to have another election.

MR. LARKIN: It depends, Your Honor. There are circumstances in which you would just be the winner when [inaudible 09:52:49 a.m.].

THE COURT: And there are circumstances where you could be the loser.

MR. LARKIN: Correct. So if you won by one, and Mickey, Goofy, and Minnie are all found to have voted in the election for your opponent ---

THE COURT: Right.

MR. LARKIN: --- then at that point, you become the winner, even though you were previously the loser and vice-versa.

THE COURT: Oh, is that the procedure, then, you're saying? So if the count is tabulated and the

C E R T I F I C A T E

I, Richard Coogan, hereby certify that the proceedings and evidence are contained fully and accurately on digital multi-track recording; that the recording was reduced to typewriting by my direction; and that this is a correct transcript of the same.

Richard Coogan, Director
Electronic Recording Center

Officemotive, Inc. DBA Capital Typing., hereby certifies that the attached pages represent an accurate transcript of the multi-track digital sound recording of the proceedings in the Court of Common Pleas of Delaware County, Pennsylvania, in the matter of:

MANGANARO, ET AL.

vs.

COUNTY OF DELAWARE, ET AL.

CV-9462-26

BY:

Mary Elizabeth Jobe

Mary Beth Jobe, CET-4093
Transcriber for
Officemotive, Inc. DBA Capital Typing

The foregoing record of the proceedings upon the hearing of the above cause is hereby approved and directed to be filed.

Judge



FILED
10-26-2026 10:41 AM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

# EXHIBIT O

## Machine-compliance appeal and request for expedited disposition

expedite motion.pdf: GEX-O-002 through GEX-O-005

denial of expedite.pdf: GEX-O-006 through GEX-O-006

PacDocketSheet 23NOV.pdf: GEX-O-007 through GEX-O-010

Complete supplied documents. The application states the relief requested; the entered order and docket identify the recorded disposition and status. Docket status is as of November 23, 2026.

Historical source documents are reproduced as filed. Prior appearances and communications shown in them do not identify counsel in this action; all current plaintiffs appear individually pro se.

Filed 09/29/2026 01:12 PM Commonwealth Court of Pennsylvania
499 CD 2026

**COMMONWEALTH COURT OF PENNSYLVANIA**

**Case No. 499 CD 2026**

---

**Gregory Stenstrom, Pro Se**
*Appellant,*

v.

**Delaware County; Delaware County Council;**
**Delaware County Board of Elections;**
**and James Allen, Director of Elections**
*Appellees.*

---

# APPELLANT'S APPLICATION FOR EXPEDITED DISPOSITION PURSUANT TO Pa.R.A.P. 123

---

Appellant Gregory Stenstrom, pro se, requests expedited submission and disposition of this fully briefed appeal. In support, he states:

1. This appeal concerns whether Delaware County demonstrated that its Hart Verity 2.7 electronic voting system conforms to the certified configuration and mandatory conditions governing its use under Section 1105-A(a) of the Pennsylvania Election Code, 25 P.S. § 3031.5(a).

2. Appellant filed the underlying verified petition on **October 6, 2025**, before the **November 2025** general election. The trial court held evidentiary hearings on election day, **November 4, 2025**, and again on **February 13, 2026**, then denied relief. Appellant timely appealed. The matter thus has already passed through one election without a final judicial determination of the statutory conformity question Appellant presented.

3. Appellees contend that their election preparation procedures, primarily comprised of machine startup, establish compliance. Appellant contends that startup does not perform the trusted-build

validation required by the Secretary's certification conditions or compare the deployed system to its certified baseline. The trial court's treatment of that question, and the appropriate remedy, are before this Court on the existing record.

4. The appeal is fully briefed. Appellant's brief and reproduced record were filed **July 24, 2026**; Appellees' brief was filed **August 24, 2026**; and Appellant's reply brief was filed the following day, on **August 25, 2026**. The Court's September 29, 2026, docket sheet lists the case as "Awaiting Consideration." No further merits briefing is necessary.

5. The next general election is **November 3, 2026**. Absent prompt disposition, the same unresolved statutory question may pass through a second election cycle. A ruling after Election Day could still address the law, but it could not provide a determination before the impending use of the system, and any remand ordered immediately before Election Day might leave too little time for meaningful proceedings.

6. The Supreme Court of Pennsylvania has adopted three-day periods to initiate appeals and petitions for allowance of appeal in matters arising under the Election Code. Pa.R.A.P. 903(c)(4), 1113(c)(1). Those provisions do not impose a three-day deadline on this Court to decide an already pending appeal. **They do reflect the importance of prompt appellate review in election matters**; case-management deadlines remain within this Court's authority.

7. Appellant requests an order promptly submitting the appeal for decision, or listing it for the earliest practicable argument if argument would assist the Court. **He requests a merits ruling by October 16, 2026, if practicable, to preserve a meaningful opportunity for proceedings on any remand before November 3**. This application seeks scheduling relief, not an advance ruling on the merits.

---

**WHEREFORE**, Appellant respectfully requests that the Court:

1. Grant expedited consideration of this Application;

2. Submit the appeal immediately for decision or schedule argument at the earliest practicable date;
3. Issue a merits decision by October 16, 2026, if practicable, or otherwise sufficiently before November 3, 2026, to permit meaningful proceedings on any remand; and
4. Grant such further scheduling relief as the Court deems just.

---

Respectfully submitted,



Gregory Stenstrom, Pro Se
1541 Farmers Lane
Glen Mills, PA 19342
gstenstrom@xmail.net
(856) 264-5495

Dated: September 29, 2026

---

**CERTIFICATE OF SERVICE**

I certify that on September 29, 2026, I served a true and correct copy of this Application and proposed order upon John E. D. Larkin, Esquire, counsel for Appellees, by PACfile and email.

/s/ Gregory Stenstrom
Gregory Stenstrom

---

**COMMONWEALTH COURT OF PENNSYLVANIA**

**Case No. 499 CD 2026**

---

**Gregory Stenstrom, Pro Se**
*Appellant,*

v.

**Delaware County; Delaware County Council;**
**Delaware County Board of Elections;**
**and James Allen, Director of Elections**
*Appellees.*

---

## PROPOSED ORDER

---

AND NOW, this _____ day of _______________, 2026, upon consideration of Appellant's Application for Expedited Disposition, it is ORDERED that the Application is GRANTED. This fully briefed appeal shall be submitted for decision promptly [or listed for argument on __________]. The Court will endeavor to issue a decision sufficiently before November 3, 2026, to permit meaningful proceedings on any remand.

BY THE COURT:

______________________________

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Gregory Stenstrom, | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| Delaware County, Delaware County | : | |
| Council, and Delaware County Board | : | |
| of Elections | : | No. 499 C.D. 2026 |

**O R D E R**

NOW, October 23, 2026, upon consideration of Appellant Gregory Stenstrom's September 29, 2026 "Application for Expedited Disposition Pursuant to Pa.R.A.P. 123" (Application to Expedite), to which no response has been filed, the Application to Expedite is DENIED.

This matter shall be submitted to a panel of Judges for disposition on the briefs filed, without oral argument, unless otherwise ordered.

*/s/ Renée Cohn Jubelirer*
**RENÉE COHN JUBELIRER,** President Judge

Order Exit
10/23/2026

**Commonwealth Docket Sheet** **Commonwealth Court of Pennsylvania**

**Docket Number: 499 CD 2026**



**November 23, 2026**

## CAPTION

Gregory Stenstrom,
Appellant
v.
Delaware County, Delaware County Council, and Delaware County Board of Elections

## CASE INFORMATION

| | | | |
|---|---|---|---|
| Initiating Document: | Notice of Appeal | | |
| Case Status: | Active | | |
| Case Processing Status: | August 24, 2026 | Awaiting Consideration | |
| Journal Number: | 33-12-2026 | | |
| Case Category: | Civil | Case Type(s): | Declaratory Judgment |

## CONSOLIDATED CASES

## RELATED CASES

| Docket No / Reason | Type |
|---|---|
| 1402 CD 2025<br>Same Party | Related |

## COUNSEL INFORMATION

**Appellant** **Stenstrom, Gregory**
IFP/Waiver:
Pro Se: Yes
Pro Se: Gregory Stenstrom
Address: 1541 Farmers Lane
Glen Mills, PA 19342
Phone No: (856) 264-5495 Fax No:

---

**Appellee** **Delaware County Council**
IFP/Waiver:
Pro Se: No
Attorney: Larkin, John Edwin Daniel
Law Firm: Delaware County Solicitor's Office
Address: 201 W Front St
Media, PA 19063
Phone No: (610) 800-5569 Fax No:

---

**Appellee** **Delaware County Board of Elections**
IFP/Waiver:
Pro Se: No
Attorney: Larkin, John Edwin Daniel
Law Firm: Delaware County Solicitor's Office
Address: 201 W Front St
Media, PA 19063
Phone No: (610) 800-5569 Fax No:

---

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on the docket sheets.

**Commonwealth Docket Sheet** **Commonwealth Court of Pennsylvania**

**Docket Number: 499 CD 2026**



**November 23, 2026**

## COUNSEL INFORMATION

**Appellee** **Delaware County**

IFP/Waiver:

Pro Se: No

Attorney: Larkin, John Edwin Daniel
Law Firm: Delaware County Solicitor's Office
Address: 201 W Front St
Media, PA 19063
Phone No: (610) 800-5569 Fax No:

## FEE INFORMATION

| Fee Dt | Fee Name | Fee Amt | Receipt Dt | Receipt No | Receipt Amt |
|---|---|---|---|---|---|
| 04/03/2026 | Notice of Appeal | 91.25 | 04/13/2026 | 2026-CMW-H-000625 | 91.25 |

## AGENCY/TRIAL COURT INFORMATION

Order Appealed From: April 2, 2026 Notice of Appeal Filed: April 3, 2026
Order Type: Lower Court Order
Documents Received: April 13, 2026

Court Below: Delaware County Court of Common Pleas
County: Delaware Division: Delaware County Civil Division
Judge: Bucci, James M. OTN:
Docket Number: CV-2025-009036 Judicial District: 32

## ORIGINAL RECORD CONTENT

| Original Record Item | Filed Date | Content Description |
|---|---|---|
| Trial Court Record | June 05, 2026 | |

**Date of Remand of Record:**

## BRIEFING SCHEDULE

**Appellant**

**Stenstrom, Gregory**

**Brief**

Due: July 20, 2026 Filed: July 24, 2026

**Reply Brief**

Due: Filed: August 25, 2026

**Reproduced Record**

Due: July 20, 2026 Filed: July 24, 2026

**Appellee**

**Delaware County**

**Brief**

Due: August 26, 2026 Filed: August 24, 2026

**Delaware County Board of Elections**

**Brief**

Due: August 26, 2026 Filed: August 24, 2026

**Delaware County Council**

**Brief**

Due: August 26, 2026 Filed: August 24, 2026

## DOCKET ENTRY

| Filed Date | Docket Entry / Filer | Representing | Participant Type | Exit Date |
|---|---|---|---|---|
| **April 3, 2026** | Notice of Appeal Filed<br>Stenstrom, Gregory | | Appellant | |

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on the docket sheets.

## DOCKET ENTRY

| Filed Date | Docket Entry / Filer | Representing | Participant Type | Exit Date |
|---|---|---|---|---|
| **April 15, 2026** | Notice of Docketing Appeal Exited | | | 04/15/2026 |
| | Commonwealth Court of Pennsylvania | | | |
| **June 5, 2026** | Trial Court Record Received | | | |
| | Delaware County Court of Common Pleas | | | |
| **June 9, 2026** | Briefing Schedule Issued | | | |
| | Commonwealth Court Filing Office | | | |
| **July 13, 2026** | Docketing Statement Filed | | | |
| | Stenstrom, Gregory | | Appellant | |
| **July 24, 2026** | Application for Relief | | | |
| | Stenstrom, Gregory | | Appellant | |
| Document Name: | Application for Leav to File Brief and Reproduced Record Nunc Pro Tunc | | | |
| **July 24, 2026** | Appellant's Brief Filed | | | |
| | Stenstrom, Gregory | | Appellant | |
| **July 24, 2026** | Appellant's Reproduced Record Filed | | | |
| | Stenstrom, Gregory | | Appellant | |
| **July 30, 2026** | Order Granting Application for Relief | | | 07/30/2026 |
| | Tsai, Stella M. | | | |
| Document Name: | Court accepts the brief and RR as timely filed. | | | |
| Comment: | NOW, July 30, 2026, upon consideration of Gregory Stenstrom's (Appellant) July 24, 2026 "Application for Leave to File Appellant's Brief and Reproduced Record Nunc Pro Tunc" (Application), in which Appellant requests this Court to accept his brief and reproduced record as timely filed, the Application is GRANTED. | | | |
| **August 24, 2026** | Appellee's Brief Filed | | | |
| | Delaware County | | Appellee | |
| | Delaware County Council | | Appellee | |
| | Delaware County Board of Elections | | Appellee | |
| **August 25, 2026** | Appellant's Reply Brief | | | |
| | Stenstrom, Gregory | | Appellant | |
| **September 29, 2026** | Application to Expedite | | | |
| | Stenstrom, Gregory | | Appellant | |
| Document Name: | Appellant's Application for Expedited Disposition | | | |

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on the docket sheets.

**Commonwealth Docket Sheet** **Commonwealth Court of Pennsylvania**

**Docket Number: 499 CD 2026**



**November 23, 2026**

## DOCKET ENTRY

| Filed Date | Docket Entry / Filer | Representing | Participant Type | Exit Date |
|---|---|---|---|---|
| **October 23, 2026** | Order Denying Application to Expedite<br>Cohn Jubelirer, Renee | | | 10/23/2026 |

Document Name: This matter shall be submitted to a panel of Judges for disposition on the briefs filed

Comment: NOW, October 23, 2026, upon consideration of Appellant Gregory Stenstrom's September 29, 2026 "Application for Expedited Disposition Pursuant to Pa.R.A.P. 123" (Application to Expedite), to which no response has been filed, the Application to Expedite is DENIED.
This matter shall be submitted to a panel of Judges for disposition on the briefs filed, without oral argument, unless otherwise ordered.

## SESSION INFORMATION

Journal Number: 33-12-2026
Consideration Type: Argued - SOB
Listed/Submitted Date: December 14, 2026

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on the docket sheets.

# EXHIBIT P

## Manganaro records-access appeal status

PacDocketSheet Manganaro.pdf: GEX-P-002 through GEX-P-004

Complete supplied documents. The application states the relief requested; the entered order and docket identify the recorded disposition and status. Docket status is as of November 23, 2026.

**Commonwealth Docket Sheet** **Commonwealth Court of Pennsylvania**

**Docket Number: 1661 CD 2026**



**November 23, 2026**

## CAPTION

Nick Manganaro, Kathryn Buckley,
and Gregory Stenstrom,
Appellants
v.
Delaware County, Delaware County
Board of Elections, and James P.
Allen, in his official capacity

## CASE INFORMATION

| | | | |
|---|---|---|---|
| Initiating Document: | Notice of Appeal | | |
| Case Status: | Active | | |
| Case Processing Status: | October 27, 2026 | Awaiting Original Record | |
| Journal Number: | | | |
| Case Category: | Civil | Case Type(s): | Election |

## CONSOLIDATED CASES

## RELATED CASES

## COUNSEL INFORMATION

**Appellant** **Stenstrom, Gregory**
IFP/Waiver:
Pro Se: Yes
Pro Se: Gregory Stenstrom
Address: 1541 Farmers Lane
Glen Mills, PA 19342
Phone No: (856) 264-5495 Fax No:

---

**Appellant** **Manganaro, Nick**
IFP/Waiver:
Pro Se: Yes
Pro Se: Nick Manganaro
Address: 429 Montgomery Avenue
Apt. C403
Haverford, PA 19041

---

**Appellant** **Buckley, Kathryn**
IFP/Waiver:
Pro Se: Yes
Pro Se: Kathryn Buckley
Address: 1070 Antler Drive
Glen Mills, PA 19342
Phone No: (215) 669-2575 Fax No:

---

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability
for inaccurate or delayed data, errors or omissions on the docket sheets.

**Commonwealth Docket Sheet** **Commonwealth Court of Pennsylvania**

**Docket Number: 1661 CD 2026**



**November 23, 2026**

## COUNSEL INFORMATION

**Appellee** **Delaware County Board of Elections**
IFP/Waiver:
Pro Se: No
Attorney: Larkin, John Edwin Daniel
Law Firm: Delaware County Solicitor's Office
Address: 201 W Front St
Media, PA 19063
Phone No: (610) 800-5569 Fax No:

**Appellee** **Delaware County**
IFP/Waiver:
Pro Se: No
Attorney: Larkin, John Edwin Daniel
Law Firm: Delaware County Solicitor's Office
Address: 201 W Front St
Media, PA 19063
Phone No: (610) 800-5569 Fax No:

**Appellee** **Allen, James P.**
IFP/Waiver:
Pro Se: No
Attorney: Larkin, John Edwin Daniel
Law Firm: Delaware County Solicitor's Office
Address: 201 W Front St
Media, PA 19063
Phone No: (610) 800-5569 Fax No:

## FEE INFORMATION

| Fee Dt | Fee Name | Fee Amt | Receipt Dt | Receipt No | Receipt Amt |
|---|---|---|---|---|---|
| 11/03/2026 | Notice of Appeal | 91.25 | 11/03/2026 | 2026-CMW-H-001770 | 91.25 |

## AGENCY/TRIAL COURT INFORMATION

Order Appealed From: October 27, 2026 Notice of Appeal Filed: October 27, 2026
Order Type: Lower Court Order
Documents Received: October 28, 2026

Court Below: Delaware County Court of Common Pleas
County: Delaware Division: Delaware County Civil Division
Judge: Scanlon, Anthony D. OTN:
Docket Number: CV-2026-009462 Judicial District: 32

## ORIGINAL RECORD CONTENT

| Original Record Item | Filed Date | Content Description |
|---|---|---|

**Date of Remand of Record:**

## BRIEFING SCHEDULE

None None

## DOCKET ENTRY

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on the docket sheets.

**Commonwealth Docket Sheet** **Commonwealth Court of Pennsylvania**

**Docket Number: 1661 CD 2026**



**November 23, 2026**

| Filed Date | Docket Entry / Filer | Representing | Participant Type | Exit Date |
|---|---|---|---|---|
| **October 27, 2026** | Notice of Appeal Filed | | | |
| | Manganaro, Nick | | Appellant | |
| | Buckley, Kathryn | | Appellant | |
| | Stenstrom, Gregory | | Appellant | |
| **October 27, 2026** | Filed - Other | | | |
| | Manganaro, Nick | | Appellant | |
| Document Name: | Copy of Concise Statement Filed at Trial Court | | | |
| **October 30, 2026** | Notice of Docketing Appeal Exited | | | |
| | Commonwealth Court Filing Office | | | |

Neither the Appellate Courts nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data, errors or omissions on the docket sheets.

# EXHIBIT Q

## County post-hearing memorandum on startup and separate hash testing

Complete supplied document. Original source pagination is retained.

The County memorandum states a litigating position and quotes testimony; it is not itself sworn testimony. The directive states required audit procedures and reporting; it does not establish that a particular contest was selected or that an audit failed.

**Office of the Delaware County Solicitor**
By: Jack Larkin
Pa. Supreme Court No. 307270
201 West Front Street
Media, PA 19063
ph. 610.800.5569
em. LarkinJ@co.delaware.pa.us

*Attorney for Defendants*

| | |
|---|---|
| GREGORY STENSTROM<br>*Plaintiffs*<br>v.<br><br>DELAWARE COUNTY, *et al.*<br>*Defendants.* | IN THE COURT OF COMMON PLEAS<br>OF DELAWARE COUNTY, PA<br><br><br>Case No: CV-2025-009036 |

**POST HEARING MEMORANDUM OF LAW**

On or about October 6, 2025, Gregory Stenstrom (**"Stenstrom"**) filed a document he styled a "Verified Petition for Declaratory Judgment, Injunctive Relief, and Mandamus" (the **"Petition."**) In the Petition, Stenstrom contends that the Hart Verity 2.7 voting machines used by Delaware County do not comply with the requirements of 25 P.S. § 3031.5. Following the Hearing held on February 13, 2026, it is clear that the Petition fails on its merits and should be dismissed with prejudice.

Section 3031.5 sets forth Pennsylvania's process for the certification of voting machines. Simply stated, when a manufacturer submits a new voting machine for certification, the Secretary examines the machine and issues a report opining on whether the machine "can be safely used by voters at elections as provided in this act and meets all of the requirements" of the law. 25 P.S. § 3031.5(b). The Secretary of the Commonwealth issued a report on January 12, 2023 conditionally approving Hart Verity 2.7 systems. One of the conditions of approval requires that "Jurisdictions must also



GEX-Q-002

perform a trusted build validation as part of the election preparation activities and post-election canvass activities utilizing the vendor supplied methods of validation and verification of voting system integrity." (Exhibit C-1, p. 28, hereinafter **"Condition 'J'"**).

The Petition contends that Delaware County has not performed trusted build validations utilizing vendor supplied methods of validation and verification. In response, the County offered the testimony of James Allen (**"Allen"**). Allen is the Director of Elections for Delaware County. (Hearing, Feb. 13, 2026, at 25:12-13). Prior to serving in his present role, Allen was the Director of Communications and Strategic Planning for the Board of Election Commissioners for the City of Chicago. (*Id.* at 25:17-19). He has worked in elections since 2006. (*Id.* at 26:8). He was invited to speak by the Department of State at a summer conference on hash testing. (*Id.* at 60:12-13).

During the Hearing, Allen testified that Delaware County does, indeed, perform trusted build validations as required by Condition "J". Specifically, he testified as follows:

> On each and every piece of equipment, we go through a logic and accuracy testing. Well, first we go through, ahead of each election, a -- sorry, the word is escaping me for a moment, but it's the calibration test. And the calibration test is to make sure that the scanner and the Touch Writer, everything, that it's calibrated properly. And there are a series of steps you go through to make sure that it's set up so that it's going to be reading the ballot precisely and/or producing the ballot, in the case of the Touch Writer, precisely. And in the calibration process, you have to boot up the machine, and immediately you see whether it's operating on 2.7.
>
> The second step during logic and accuracy testing, when we actually have an election database that we're working with, is you're booting up the equipment and we have to go through logic and accuracy testing. And that's when we load the election through the V drive onto the equipment.

> And if you -- so the second step is you -- when you boot up, you're going to see 2.7. When you load that election that was built on the central servers, it's not going to function if you're operating on the wrong version on any kind of deviation, any kind of change at all. That V drive is not going to function.
>
> So that's the third check. It's not a formal check, but you know, it's not going to accept that election. A fourth possible -- well actually not even possible, but a possible rejection, but a fourth definite verification comes on election night.
>
> . . .
>
> So a fourth time that a trusted build validation occurs is on election night when we receive the V 24 drives, the memory devices, from the precincts in secured envelopes that were sealed by the poll workers and signed across that seal. We open them. We remove the memory devices. We feed them into -- we upload them into the central count servers, which were fully hash-tested in all cases. We -- if it's not -- if that V drive was not from a component that operated on 2.7 and only on 2.7, it will not be accepted at the central count either.

(Hearing, Feb. 13, 2026, at 45:10-46:14, 47:23-48:8). Allen went on to testify that the process he had previously testified to was, indeed, the vendor-supplied method. (*Id.* at 49:5-8). In sum, therefore, a trusted build validation carried out using the vendor-supplied methods of validation and verification occurs on Hart Verity 2.7 machines *upon boot up.*

Allen went on to testify that the County does not stop its election security efforts at the requirements of Condition "J" but, instead, also performs hash testing on five percent of its election machines all of its central count servers. (*Id.* at 56:3-7; 61:8-9, 62:21-22). And, in addition, the County convenes a bipartisan board of residents to verify the machine-counted results by hand. (*Id.* at 63:21-66:10).

Stenstrom plainly disagreed with Allen's testimony, but presented no witnesses to rebut it. He also offered no exhibit identifying the specific vendor-supplied system of validation and verification that he believes should have been used but was not. Stenstrom is the party with the burden of proof, and his failure to offer testimony in support of the Petition is fatal. *See, e.g., Miller v. Cnty. of Lancaster*, 338 A.3d 1044 (Pa. Cmwlth. 2025) (party seeking mandamus relief has burden of proof).

***WHEREFORE,*** based on the foregoing, Defendants respectfully request that this Court DISMISS Stenstrom's Petition WITH PREJUDICE.

Respectfully submitted:

Date: *March 11, 2026*

By: Jack Larkin
Pa. Supreme Court No. 307270
**Deputy Solicitor, Delaware County**
201 W. Front Street
Media, PA 19063
p. 610.800.5569
e. LarkinJ@co.delaware.pa.us

***CERTIFICATE OF SERVICE***

I, Jack Larkin, certify that I have this-day served a copy of the foregoing Response on the Plaintiffs via the Delaware County eFiling System.

Date: *March 11, 2026*

By: ______________________________
Jack Larkin
*Attorney for Defendants*



GEX-Q-006

# EXHIBIT R

## Secretary of the Commonwealth risk-limiting audit directive

Complete supplied document. Original source pagination is retained.

The directive concerns outcome audits and State reporting. It does not replace the separately pleaded vendor-method validation requirement or establish a failure in the November 2026 audit.

TLP: CLEAR

Pennsylvania
Department of State

# Risk Limiting Audit Directive

Directive 2 of 2025
Date: April 7, 2025
Version 1.1

TLP: CLEAR

# Directive 2 of 2025

The following Directive is issued April 7, 2025, by the Secretary of the Commonwealth pursuant to authority contained at Sections 201 and 1105-A(a) of the Pennsylvania Election Code, 25 P.S. §§ 2621, 3031.5.

## Background

The Secretary of the Commonwealth has duties under Article II of the Election Code, 25 P.S. § 2621, and Article XI-A of the Election Code, 25 P.S. §§ 3031.1 – 3031.22, to ensure that voting systems comply with federal and state laws regarding accuracy and reliability. In addition, 25 P.S. § 2621(e) authorizes the Secretary to direct county boards of elections to provide reports on matters specified by the Secretary.

One statutory mechanism for verifying the accuracy and reliability of voting systems in a particular election is through conducting a post-election, pre-certification recount of a random sampling of ballots equal to 2% of the total ballots cast or 2,000 ballots, whichever is less. Though this fixed statistical sample is effective at identifying some voting system and human errors within a specific county, it is not adaptable to the facts of a specific election and is not flexible enough to conduct a statewide post-election audit.

In January 2019, the Department of State convened a Pennsylvania post-election audit workgroup to study models of post-election audits. The workgroup consists of six county election directors, the Secretary of the Commonwealth and three of her staff members, and three experts on voting systems and post-election audits. In its final report, the workgroup recommended that the Commonwealth regularly conduct a specific type of ballot audit, known as a Risk Limiting Audit (RLA), at the post-election, pre-certification stage of the election process. Unlike the fixed statistical sample, an RLA provides a statistically sound method for confirming, with a high degree of confidence, that the outcome of the audited election(s) is correct.

These post-election risk limiting audits supplement, but do not replace, the fixed statistical sample required by the Election Code. Counties must continue to conduct the 2% statistical sample. Though the 2% statistical sample and the post-election risk limiting audit are two separate processes, the board of elections may utilize the same group of randomly selected ballots to support both the statistical sample and the post-election audit.

## Directive

After each regularly scheduled primary and November election, the county boards of elections shall participate in a statewide post-election ballot audit involving a review of a random sample of votes cast in one or more randomly selected races,[1] facilitated by the Pennsylvania Department of State. The post-election audit must be completed during the official canvass before a county board of elections finalizes the certification of official election returns and no later than the third Monday after the primary or November election.

## Summary of High-Level Post-Election Audit Steps

1. Identify auditors
2. Create a Ballot Manifest
3. Create a Contest Totals by Batch file
4. Retrieve and tally ballots
5. Report tallies

### Step 1 - Identify auditors

The county board of elections must identify bipartisan teams of auditors (canvassers) for the purpose of completing the post-election audit. These auditor teams can include members of the public, elections office staff and precinct election officials. All auditors must take the same oath of office taken by members of the canvassing board. The department recommends using three-person auditing teams, but in no event can a ballot be reviewed by fewer than two auditors.

### Step 2 - Create a Ballot Manifest

A Ballot Manifest is a detailed description or accounting of how the county's ballots are stored. It is a necessary step to ensure that a county can identify where specific batches of ballots are stored and how many ballots are in each batch. Creating a Ballot Manifest is simple. Open a spreadsheet program and create a simple spreadsheet with two columns. The first column, titled "Batch Name," is for your container/batch name, and the second column, titled "Number of Ballots," is where you indicate the number of

[1] Any race that is subject to the statewide recount procedures under 25 P.S. § 3154(g), and where the defeated candidate has not waived the recount under 25 P.S. § 3154(h), shall not be included in the list of races which may be randomly chosen.

ballots in each container. Enter the data for your county or jurisdiction. When you're finished, ensure the total number of ballots matches your number of ballots cast. Then, save the file as a .csv file. The county board of elections will submit the Ballot Manifest to the Department of State in the manner prescribed by the Secretary of the Commonwealth. An example of a ballot manifest is provided in Figure 1, below.

| | A | B |
|---|---|---|
| 1 | Batch Name | Number of Ballots |
| 2 | Precinct 1 | 243 |
| 3 | AV Batch 202 | 471 |
| 4 | Box 38 | 154 |
| 5 | Container 4 | 577 |
| 6 | Provisional 2 | 17 |
| 7 | Early Voting Site 5, 101420 | 654 |

*Figure 1: Ballot Manifest*

## Step 3 - Create a Contest Totals by Batch file

A batch comparison audit is a type of RLA in which the auditing board manually examines every ballot in the randomly selected batches of ballots and compares the vote totals to the machine count. To conduct a batch comparison RLA, a Contest Totals by Batch file is necessary. The Contest Totals by Batch file (also known as Candidate Totals by Batch) outlines each batch of ballots and how many votes were cast for each contest (or candidate) in a particular batch. Using a spreadsheet program, a county official will create a simple spreadsheet. Column A shall be labeled as ‘Batch Name’ which is the name of the batch, which must coincide with the batch name in the Ballot Manifest. Additional columns, beginning with ‘B’ and continuing through the alphabet as necessary, will resemble the target contest candidates or ballot measures in the event of a referenda. The file will then be saved as a .csv file. The county board of elections will submit the Contest Totals by Batch file in the manner prescribed by the Secretary of the Commonwealth. An example of a Contest Totals by Batch file is provided in Figure 2, below.

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Batch Name | Jane Doe | Bob Jones | Write-in |
| 2 | 1 | 45 | 125 | 0 |
| 3 | 2 | 3 | 3 | 0 |
| 4 | 3 | 778 | 1944 | 0 |
| 5 | 4 | 395 | 435 | 0 |
| 6 | 5 | 321 | 889 | 1 |
| 7 | 6 | 45 | 133 | 4 |
| 8 | 7 | 650 | 232 | 1 |
| 9 | 8 | 127 | 228 | 2 |
| 10 | 9 | 543 | 432 | 0 |
| 11 | 10 | 129 | 87 | 2 |

*Figure 2: Contest Totals by Batch*

## Step 4 – Retrieve and tally ballots

The county board of elections will retrieve the randomly selected batches and convene the meeting of the auditing board for the purpose of manually examining the ballots, tallying the votes and recording the vote totals on tally sheets. The board of elections must ensure all members of the audit board are duly sworn.

## Step 5 - Report tallies

The county board of elections will report the results of the post-election audit in the manner prescribed by the Secretary of the Commonwealth.[i] The audit results must be transmitted to the Department of State concurrent with the county's certification of official election returns. In addition to reporting the results of the audit, the county must note any anomalies or errors found during the audit process.

# # #

| Version | Date | Description |
|---|---|---|
| 1.0 | 9.30.2022 | Initial document release |
| 1.1 | 4.7.2025 | Clarification of races eligible for RLA |

[i] The Department of State will provide counties with access to a post-election audit software tool or database for the purpose of uploading ballot manifests and reporting audit results.

**EXHIBIT S**

Machine application proceeding

Manganaro et al. v. Delaware County Board of Elections et al.

Delaware County Court of Common Pleas No. CV-2026-009865

GEX-S-002–003: complete supplied November 23 trial-court case view.

GEX-S-004: October 29, 2026 order sustaining preliminary objections and dismissing the complaint with prejudice. The order states no grounds.

GEX-S-005–010: complete six-page notice of appeal and service packet filed October 30, 2026, including the attached order, Rule 236 notice and case-view page. The signed notice names all six plaintiffs, including Nick Manganaro, as appellants.

The docket's Filed By field lists four individuals; the complete signed notice names all six plaintiffs. This identification is drawn from that notice.

The supplied papers do not identify the Commonwealth Court number for this machine appeal. No. 1661 C.D. 2026 concerns the separate records-access case, CV-2026-009462.

Original source content, signatures and pagination are preserved. Added GEX labels identify pages for citation.

THOMSON REUTERS
C-Track E-Filing

DELAWARE COUNTY, PENNSYLVANIA E-FILING

Stenstrom Gregory

Case search | Create Filing | Filing Management

**Case Information**

**Court** Delaware County Court of Common Pleas
**Case** CV-2026-009865
**Class** Civil - Miscellaneous - Other
**Short Title** Manganaro et al v. DELAWARE COUNTY BOARD OF ELECTIONS et al
**Status** AOPC Closed

CREATE E-FILING

## Case View - CV-2026-009865

CASE INFORMATION

| | | | |
|---|---|---|---|
| **Court Level** | Court of Common Pleas | **Court** | Delaware County Court of Common Pleas |
| **Case Title** | Manganaro et al v. DELAWARE COUNTY BOARD OF ELECTIONS et al | **Case Type** | Civil - Miscellaneous - Other |
| **Filed Date** | 10-27-2026 | **Status** | AOPC Closed |
| **Next Hearing** | | **Judge** | |
| **Next Hearing Type** | | | |

PARTIES / PARTICIPANTS

| # | Role | Name | Attorney | Serv |
|---|---|---|---|---|
| 1 | Plaintiff | Manganaro, Nick | | Con |
| 1 | Defendant | DELAWARE COUNTY BOARD OF ELECTIONS | Mungioli, Alessandra Jean | eSer |
| 2 | Plaintiff | Stenstrom, Gregory | | Con |
| 2 | Defendant | County of Delaware | Mungioli, Alessandra Jean | eSer |
| 3 | Plaintiff | Mancini, Robert | | Con |
| 3 | Defendant | Allen, James | Mungioli, Alessandra Jean | eSer |
| 4 | Plaintiff | Lewis, Laura | | Con |
| 5 | Plaintiff | Childs, John Proctor | | Con |
| 6 | Plaintiff | Thomas, Scott | | Con |

1 to 9 of 9 records

FILTER

DOCKET SHEET

| Filed Date | Document Description | Filed By |
|---|---|---|
| 10-30-2026 | Financials - Receipt | |
| 10-30-2026 | Notice - Notice of Appeal and Certification of Service | Gregory Stenstrom, John Proctor Childs, Laura Lewis, Robert Mancini |
| 10-29-2026 | Order - Order for Preliminary Objections Sustained | |
| 10-29-2026 | Answer - Answer to Preliminary Objections | Gregory Stenstrom |
| 10-29-2026 | Order - Order | |
| 10-29-2026 | Preliminary Objection - Preliminary Objections | County of Delaware, DELAWARE COUNTY BOARD OF ELECTIONS, James Allen |
| 10-29-2026 | Miscellaneous - Entry of Appearance for Defendant | County of Delaware, DELAWARE COUNTY BOARD OF ELECTIONS, James Allen |
| 10-28-2026 | Order - Scheduling Order | |
| 10-27-2026 | Miscellaneous - Exhibits | Gregory Stenstrom |
| 10-27-2026 | Miscellaneous - Entry of Appearance Self Represented Party | Gregory Stenstrom |
| 10-27-2026 | Financials - Receipt | |
| 10-27-2026 | Preliminary Injunction - Preliminary Injunction | Gregory Stenstrom, Nick Manganaro, Robert Mancini |
| 10-27-2026 | Complaint - Complaint | Gregory Stenstrom, Nick Manganaro, Robert Mancini |
| 10-27-2026 | Commenced by - Miscellaneous OJS | |

1 to 14 of 14 records

C-Track™ E-Filing, developed by Thomson Reuters Court Management Solutions
Version 6.4.2

| | |
|---|---|
| **NICK MANGANARO, GREGORY STENSTROM, ROBERT MANCINI, SCOTT THOMAS, LAURA LEWIS, and JOHN PROCTOR CHILD**<br><br>*Plaintiffs,*<br><br>**v.**<br><br>**DELAWARE COUNTY, DELAWARE COUNTY BOARD OF ELECTIONS, and JAMES ALLEN, in his official capacity,**<br><br>*Defendants.* | **COURT OF COMMON PLEAS, DELAWARE COUNTY**<br><br>**NO: CV-2026-009865** |

**ORDER**

*AND NOW*, this 29 day of OCTOBER, 2026, upon consideration of the Preliminary Objections filed by the Defendants Delaware County, Delaware County Board of Elections, and Mr. James Allen dated October 29, 2026, and any response thereto, it is hereby ORDERED and DECREED that Defendants' Preliminary Objections are SUSTAINED. Plaintiffs' Complaint is DISMISSED WITH PREJUDICE.

By the Court:

_______________ J.

FILED
10-29-2026 03:36 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**

**CIVIL DIVISION – ELECTIONS**

**No. CV-2026-009865**

FILED OJS DELAWARE CO.
2026 OCT 30 PM 4:10:49

NICK MANGANARO, GREGORY STENSTROM, ROBERT MANCINI, SCOTT THOMAS, LAURA LEWIS, and JOHN PROCTOR CHILD, *Plaintiffs,*

v.

DELAWARE COUNTY, DELAWARE COUNTY BOARD OF ELECTIONS, and JAMES ALLEN, in his official capacity, *Defendants.*

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs Nick Manganaro, Gregory Stenstrom, Robert Mancini, Scott Thomas, Laura Lewis, and John Proctor Child, plaintiffs above named, hereby appeal to the Commonwealth Court of Pennsylvania from the Order entered in this matter on the 29th day of October, 2026, sustaining Defendants' Preliminary Objections and dismissing Plaintiffs' Complaint with prejudice.

This Order has been entered in the docket as evidenced by the attached copy of the docket entry.

**Statement regarding transcript (Pa.R.A.P. 904(d)):** Appellants will promptly order the transcript of the proceedings held on October 29, 2026

Respectfully submitted,

Nick Manganaro, Plaintiff pro se
429 Montgomery Ave
Apt C403
Haverford, PA 19041
Telephone: 610-662-9291
Email: n.manganaro@comcast.net

Gregory Stenstrom, Plaintiff pro se
1541 Farmers Lane

Glen Mills, PA 19342
Telephone: 856-264-5495
Email: gregorystenstrom@gmail.com

Robert Mancini, Plaintiff pro se
4 Guernsey Lane
Media, PA 19063
Telephone: 610-506-9827
Email: Robcmancini@gmail.com

Scott Thomas, Plaintiff pro se
703 Barclay Lane
Broomall, PA 19008
Telephone: 610-717-8857
Email: scthomas61@hotmail.com

Laura Lewis, Plaintiff pro se
473 St. Davids Ave
Wayne, PA 19087
Telephone: 610-733-1023
Email: scanarchpc@aol.com

John Proctor Child, Plaintiff pro se
308 Rockingham Road
Bryn Mawr, PA 19010
Telephone: 610-203-6458
Email: JohnBuysProperty@gmail.com

Date: October 30, 2026

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Gregory Stenstrom, Plaintiff pro se
Date: October 30, 2026

---

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2026, I served a true and correct copy of the foregoing Notice of Appeal, in accordance with Pa.R.A.P. 121 and 906, upon the following:

- **Counsel for Defendants Delaware County, Delaware County Board of Elections, and James Allen:** by email and efile.
- **The Honorable Judge Anthony Scanlon, Court of Common Pleas of Delaware County,** by personal service to Court Administration office.
- **Court Reporter Administrator**— by personal service to Court Administration office.

Gregory Stenstrom, Plaintiff pro se
Date: October 30, 2026

| | |
|---|---|
| NICK MANGANARO, GREGORY STENSTROM, ROBERT MANCINI, SCOTT THOMAS, LAURA LEWIS, and JOHN PROCTOR CHILD<br><br>*Plaintiffs,*<br><br>v.<br><br>DELAWARE COUNTY, DELAWARE COUNTY BOARD OF ELECTIONS, and JAMES ALLEN, in his official capacity,<br><br>*Defendants.* | COURT OF COMMON PLEAS, DELAWARE COUNTY<br><br>NO: CV-2026-009865 |

## ORDER

*AND NOW*, this 29 day of October, 2026, upon consideration of the Preliminary Objections filed by the Defendants Delaware County, Delaware County Board of Elections, and Mr. James Allen dated October 29, 2026, and any response thereto, it is hereby ORDERED and DECREED that Defendants' Preliminary Objections are SUSTAINED. Plaintiffs' Complaint is DISMISSED WITH PREJUDICE.

By the Court:

_______________________ J.

FILED
10-29-2026 03:36 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA OFFICE OF JUDICIAL SUPPORT

## RULE OF CIVIL PROCEDURE NO. 236

Nick Manganaro et al,
Plaintiff
v.

No. CV-2026-009865

DELAWARE COUNTY BOARD OF ELECTIONS et al,
Defendant.

NOTICE IS GIVEN UNDER PENNSYLVANIA RULE OF CIVIL PROCEDURE NO. 236 THAT AN ORDER IN THE ABOVE CASE HAS BEEN ENTERED ON 10-29-2026.

SIGNED 2026-10-29

PER Judge Anthony Scanlon

**TIME AND LEGAL LIABILITY DO NOT PERMIT THE OFFICE OF JUDICIAL SUPPORT TO GIVE DOCKET INFORMATION BY TELEPHONE.**

**NO EXCEPTIONS!**

PUBLIC ACCESS INFORMATION: www.co.delaware.pa.us

CC: Nick Manganaro, Gregory Stenstrom, Robert Mancini, Laura Lewis, John Proctor Childs, Scott Thomas, Alessandra Jean Mungioli

«DisplayName» CV-2026-009865
«Address»

THOMSON REUTERS C-Track E-Filing DELAWARE COUNTY, PENNSYLVANIA E-FILING Stenstrom Gregory

Case Search Create Filing Filing Manager

**Case Information**

Court: Delaware County Court of Common Pleas
Case: CV-2026-009865
Class: Civil - Miscellaneous - Other
Short Title: Manganaro et al v. DELAWARE COUNTY BOARD OF ELECTIONS et al
Status: Active

CREATE FILING

# Case View - CV-2026-009865

## CASE INFORMATION

| | | | |
|---|---|---|---|
| Court Level | Court of Common Pleas | Court | Delaware County Court of Common Pleas |
| Case Title | Manganaro et al v. DELAWARE COUNTY BOARD OF ELECTIONS et al | Case Type | Civil - Miscellaneous - Other |
| Filed Date | 10-27-2026 | Status | Active |
| Next Hearing | | Judge | |
| Next Hearing Type | | | |

## PARTIES / PARTICIPANTS

| # | Role | Name | Attorney | Serv |
|---|---|---|---|---|
| 1 | Plaintiff | Manganaro, Nick | | Com |
| 1 | Defendant | DELAWARE COUNTY BOARD OF ELECTIONS | Mungioli, Alessandra Jean | eSer |
| 2 | Plaintiff | Stenstrom, Gregory | | Com |
| 2 | Defendant | County of Delaware | Mungioli, Alessandra Jean | eSer |
| 3 | Plaintiff | Mancini, Robert | | Com |
| 3 | Defendant | Allen, James | Mungioli, Alessandra Jean | eSer |
| 4 | Plaintiff | Lewis, Laura | | Com |
| 5 | Plaintiff | Childs, John Proctor | | Com |
| 6 | Plaintiff | Thomas, Scott | | Com |

1 to 9 of 9 records

FILTER ▸

## DOCKET SHEET

| Filed Date | Document Description | Filed By |
|---|---|---|
| 10-29-2026 | Order - Order for Preliminary Objections Sustained | |
| 10-29-2026 | Answer - Answer to Preliminary Objections | Gregory Stenstrom |
| 10-29-2026 | Order - Order | |
| 10-29-2026 | Preliminary Objection - Preliminary Objections | County of Delaware, DELAWARE COUNTY BOARD OF ELECTIONS, James Allen |
| 10-29-2026 | Miscellaneous - Entry of Appearance for Defendant | County of Delaware, DELAWARE COUNTY BOARD OF ELECTIONS, James Allen |
| 10-28-2026 | Order - Scheduling Order | |
| 10-27-2026 | Miscellaneous - Exhibits | Gregory Stenstrom |
| 10-27-2026 | Miscellaneous - Entry of Appearance Self Represented Party | Gregory Stenstrom |
| 10-27-2026 | Financials - Receipt | |
| 10-27-2026 | Preliminary Injunction - Preliminary Injunction | Gregory Stenstrom, Nick Manganaro, Robert Mancini |
| 10-27-2026 | Complaint - Complaint | Gregory Stenstrom, Nick Manganaro, Robert Mancini |
| 10-27-2026 | Commenced by - Miscellaneous OJS | |

1 to 12 of 12 records

C-Track™ E-Filing, developed by Thomson Reuters Court Management Solutions
Version 6.4.1



FILED
10-30-2026 04:10 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

Gregory Stenstrom; Nick Manganaro; and Harry R. Haury, individually pro se

v.

Al Schmidt, in his official capacity as Secretary of the Commonwealth

Civil Action No. ___________________

EXHIBIT T

November 23, 2026 joint compliance request and mailing records

Original signed letter: GEX-T-002-003

Six original enclosure pages: GEX-T-004-009

USPS receipt photograph: GEX-T-010

Addressed Priority Mail envelope photograph: GEX-T-011

Manganaro expressly joined the original request individually concerning PA-5. The letter and enclosures are reproduced without alteration. The postal photographs are supplied as records of mailing, not confirmation of delivery.

November 23, 2026

**Via email and overnight delivery**

Al Schmidt, Secretary of the Commonwealth
Pennsylvania Department of State
401 North Street, Room 302, North Office Building
Harrisburg, PA 17120

Office of Chief Counsel
Pennsylvania Department of State
401 North Street, Room 306, North Office Building
Harrisburg, PA 17120-0102

Copy: Michelle Rupp, Assistant Counsel — mirupp@pa.gov

**Re: Request for preservation of software validation records and advance certification notice**

Secretary Schmidt and Department Counsel:

I represent Stacy Garrity concerning the November 3, 2026 gubernatorial election. Nick Manganaro joins this request individually concerning his election for United States Representative in Pennsylvania's Fifth Congressional District. Delaware County's Hart Verity 2.7 equipment counted votes in both contests. We request immediate preservation, prompt access to the compliance records and written notice before the statewide gubernatorial certification and filing.

The enclosed documents identify the issue. Condition J requires validation using vendor-supplied methods. The County's verified Answer treats startup as validation on every machine and describes an additional comparison on a precinct sample. Its written procedure identifies the Department as the source of reference hashes. Allen's sworn testimony distinguishes startup from the software comparison and confirms that the latter was not performed on every machine. Starting a machine does not establish that its installed software matches the approved reference.

**We request the following:**

1. State the Department's position. Does the Department accept startup alone as satisfying Condition J on Hart Verity 2.7 equipment for which the vendor's Validate-and-compare procedure was not performed? Identify the instructions, guidance and communications supporting that position and the operation the Department requires on each covered device.

2. Preserve and produce the records. Preserve November 2026 Delaware County L&A completion certifications; any executed Condition J Attachment C implementation attestation or equivalent; accompanying communications; approved reference manifests; device-validation outputs; comparison results; inventory and completion records; and Department instructions concerning the accepted validation method. Provide existing responsive records held by the Department and identify the custodian of any requested category not held. Retain original electronic files, dates, attachments and relevant communications.

3. Obtain a focused county report. Exercise the Secretary's authority under 25 P.S. § 2621(e) to obtain the November Hart device and workstation inventory by serial number or inventory identifier; the operation treated as validation; its dates and coverage; whether Validate-and-compare was performed on each listed device; and custodians of supporting records.

4. Confirm certification status and provide advance notice. Identify any completed or remaining gubernatorial certification and filing acts under 25 P.S. § 3159 and the planned date and time of any remaining act. Provide at least 48 hours' written notice to the undersigned before completing that act. We request a one-business-day response and production within two business days.

These records permit a direct answer to a concrete compliance question before certification. Please send the Department's written response and responsive records to counsel at the email address below, with a copy to Manganaro. The separate August 18 and September 18 NVRA demands by Haury and Stenstrom remain outstanding; this letter does not replace them.

Respectfully,

Renee Ellen Mazer, Esquire
Attorney ID No. 57666
Counsel for Stacy Garrity
191 Presidential Boulevard, Apt. 419
Bala Cynwyd, PA 19004
(484) 716-9619; reneemazer@gmail.com

Joined individually by:

Nick Manganaro
429 Montgomery Avenue, Apt. C403
Haverford, PA 19041
610-662-9291; n.manganaro@comcast.net

Enclosures: GEX-A-005; GEX-C-002, C-008–009; GEX-D-005–006 (six pages).

H. All jurisdictions implementing the Verity Voting 2.7 must ensure that no default passwords are used on any devices including COTS components and that all passwords are complex and secured. Counties must implement an audit process to review and ensure that no default passwords are used upon equipment install/reinstall and routinely change passwords (at least once prior to preparing for each primary and election) to avoid any password compromise. The passwords and permissions management must at a minimum comply to the password requirements outlined in NIST 800-63. This publication can be accessed at https://pages.nist.gov/800-63-3/sp800-63-3.html

I. All jurisdictions implementing Verity Voting 2.7 must configure the polling place components of the voting system to notify voters when they attempt to cast overvotes. This is to ensure that the system implementation adheres to the requirement of notifying the voter of overvotes as mandated by 25 P.S. § 3031.7(16).

J. All jurisdictions implementing Verity Voting 2.7 must work with Hart to ensure that only the certified system configuration is installed upon purchase and acceptance or any time a system component is replaced or upgraded. Jurisdictions must as part of their user acceptance test verify the implementation to ensure that the components, software and firmware belong to the certified system. Jurisdictions must also perform a trusted build validation as part of the election preparation activities and post-election canvass activities utilizing the vendor supplied methods of validation and verification of voting system integrity. A sample format that can be used for the attestation is added as Attachment C to this document.

K. The direct recording components of Verity Voting 2.7 voting system, Verity Touch and Verity Touch with access identified as system components per the EAC certification scope, are not certified for use in Pennsylvania with Verity Voting 2.7. This software was not presented to the Secretary for certification by Hart.

L. Jurisdictions implementing Verity Voting 2.7 must work with Hart to ensure that the implemented configuration can operate for a period of at least two hours on backup power as required by the VVSG. If the system components do not include internal battery packs for reliable power, the Uninterruptible Power Supply (UPS) specified in the EAC

# Voting Machine Hash Testing Procedures

## OVERVIEW

The Delaware County Election Department performs optional hash testing on the Hart Intercivic Verity voting machines before and after each election. Hash testing is a way of testing the software being used by the voting equipment to make certain that the software is an exact match with the software that was tested and approved by an independent laboratory during the process of equipment certification by both federal and state election jurisdictions. Hash testing is a best practice. Hash testing is separate from and beyond the current Department of State requirements for performing processes that include "logic and accuracy testing" and "trusted build validation."

The pre-election hash testing typically takes place about four to eight weeks before Election Day but can be done even sooner. The post-election hash testing occurs as soon as time allows after the certification of the Election.

See attached Hart Verity knowledge base article #15 for an explanation of what hash testing is and step-by-step instructions provided by Hart Intercivic.

One hundred percent (100%) of the Hart workstations at the Delaware County central counting center are tested. This includes the servers and clients that consist of the Hart components 1) Data/Build, 2) Central, and 3) Count. By testing all of the central-count equipment, any precinct memory devices, by extension, must be compatible with the hash-tested equipment in the central count. The importance of testing 100% of the workstations at the central counting center is that these workstations will process the results from all voting methods: all ballots cast in-precinct, all mail/absentee ballots and all provisional ballots.

Meantime, a random selection of two percent (2%) of the components used in the precincts are tested. These components include the Hart Scan and Touch Writer devices. (This percentage is based on the standard set under the Pennsylvania Election Code for performing a random audit of the paper ballots from 2% of the precincts.) Ten-sided dice are used to randomly select the precincts for the hash test. (Similarly, ten-sided dice are used to randomly select the precincts for the 2% random audit of paper ballots.) The selection process takes place at the Voting Machine Warehouse (VMW) and is made accessible to the public for transparency. The same 2% of the precincts in the pre-election hash tests are re-tested after the election to verify that the software has not changed.

The source hashes from the Election Assistance Commission (EAC) for the Hart Verity system are provided to the Delaware County Elections Department by the PA Department of State Bureau of Elections.

trusted build validation as part of the election preparation activities and post-election canvass activities utilizing the vendor supplied methods of validation and verification of voting system integrity.

27. The Hart Verity 2.7 voting system automatically performs a trusted build validation each time it is booted up and, upon being booted up, prints a tape confirming the validity of its build and that the system is operating on Hart Verity 2.7.

28. Thus, each and every Hart Verity machine used by the County has performed a trusted build validation in advance of the election using vendor supplied methods of validation and verification.

29. Each and every Hart Verity machine will perform at least one additional trusted build validation on the day of the election when it is booted up at the polls prior to the commencement of voting.

30. On or about September 23, 2025, Delaware County had staff follow the process prescribed by the manufacturer and approved by the United States Election Assistance Commission on a randomly selected five percent of its Hart Verity 2.7 precinct equipment as an added layer of security, and also performed same hash testing on all central-count servers.

31. The hash testing performed by the County is thus in addition to, and not instead of, the trusted build validation required by the Secretary's approval.

***AFFIRMATIVE DEFENSES***

32. This issue was the subject of extensive testimony in an earlier case, *Mancini, et al. v. Delaware County, et al.*, CV-2024-008838 at which Stenstrom testified.

Therein, Defendant James Allen testified to the distinctions between a trusted build validation and hash testing:

> A hash test is where you pull down the thumbprint or a fingerprint or the software facsimile if you will, of from the Election Assistance Commission. And then you pull the same fingerprint of the software from the certified equipment and you do a comparison of the two and you are determining whether or not there's anything whether they're an exact match, which is exactly what we did. And it came back an exact match. A trusted build validation is simply making sure that when you have a V-Drive that's built on hart 2.7 and you feed it into a scanner to begin setting up that scanner or that touch writer a, it accepts it. And then when you print out the tickets as we have in all these envelopes, when it prints out the when you boot it up, tickets are the wrong word, I apologize, but it, when it prints out that it's starting up or prints out a zero tape, it indicates that it's operating on Hart 2.7. They're two entirely different things.

The trial court dismissed Mr. Mancini's petition. Because of his participation in the *Mancini* matter, Stenstrom's claims are or may be barred by the doctrines of collateral estoppel, res judicata, and stare decisis.

***WHEREFORE,*** based on the foregoing, Defendants respectfully request that this Court DISMISS Stenstrom's Petition WITH PREJUDICE.

Respectfully submitted:

Date: *October 30, 2025*

By: Jack Larkin
Pa. Supreme Court No. 307270
**Deputy Solicitor, Delaware County**
201 W. Front Street
Media, PA 19063
p. 610.800.5569
e. LarkinJ@co.delaware.pa.us

immediately press and hold the blue validation button inside the V drive compartment. Hold the button down until the device displays the additional functions screen. So this is not a standard process. This is not a standard process. It's outside of -- select validate. Lastly, when you see the message hash values have been calculated and stored, you may remove the USB drive. The exported files are saved to a folder named with the device serial number and date, time of export. You may repeat the process with additional devices.
From there, we take the hash that we downloaded from that piece of equipment and we compare it to the hash that the Department of State gave us for that same piece of equipment. Again, they have a different hash for the server. They have a different hash for build. They have a different hash for the scanner. They have a different hash for the Touch Writer.
Q. Is that test run on every machine?
A. This? No. I just described the hash testing. What's run on every machine ---
Q. No. Is that hash test that you just described ---
A. --- is we power it on and we verify that it's 2. 7.

***

THE COURT: All right, all right, all right.

MR. STENSTROM: I'm only asking a quick question.

THE COURT: You're going in circles.

MR. STENSTROM: Your Honor ---

THE COURT: You're going in circles, sir.

MR. STENSTROM: I'm not going in circles, Your Honor.

THE COURT: Yes, you are.

MR. STENSTROM: Is that hash test run on every machine, which you just described?

MR. ALLEN: Absolutely not.

MR. STENSTROM: Okay.

THE COURT: He's already told you. He told you that a half hour ago.

MR. ALLEN: It's not run on any machine elsewhere in Pennsylvania, as far as I know.

***

BY MR. STENSTROM:

Q. Who developed that procedure?

A. Hart InterCivic.

Q. Is that on the Hart InterCivic -- which document is that? I'm not aware that Hart InterCivic developed that.

***

THE COURT: All right. We're taking a 10-minute

**USPS receipt - November 23, 2026, 3:52 p.m.**



**Priority Mail envelope - Office of Chief Counsel**



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Gregory Stenstrom; Nick Manganaro; Harry R. Haury, individually pro se

v. Al Schmidt, in his official capacity

**EXHIBIT U**

Official PA-5 public returns display and capture record

Capture time: 11/23/2026, 11:09:56 PM EST (2026-11-24T04:09:56.605Z).

Source: Pennsylvania Department of State election returns website.

Page: Pennsylvania Elections - County Breakdown Results

URL: https://www.electionreturns.pa.gov/General/CountyBreakDownResults?officeId=11&districtId=6&ElectionID=117&ElectionType=G&IsActive=1&isRetention=0

The page is headed “2026 General Election (Unofficial Returns)” and identifies “Representative in Congress - 5th Congressional District.” It states that official results will be clearly marked after county certification.

This capture documents the public display at the recorded time. It is not a Department statement identifying the completion status of each act under 25 P.S. §§ 3159 and 3163.

Contents: declaration, GEX-U-002; unchanged full-page screenshot, GEX-U-003.

**DECLARATION OF GREGORY STENSTROM**

1. I am a plaintiff in this action and make this declaration from my personal review described below.

2. On November 23, 2026, at 11:35 p.m. EST, I viewed the Department of State webpage at the URL stated on GEX-U-001.

3. I compared that webpage with the attached reproduction. The reproduction fairly and accurately shows the public page's designation of the November 3, 2026 PA-5 returns as unofficial when I viewed it. The supplied capture record identifies a capture on November 23, 2026, at 11:09:56 p.m. EST. I do not represent that I personally made that earlier capture.

4. I offer the reproduction to document the public status displayed. I do not claim personal knowledge of whether the Secretary completed a particular statutory act that the webpage does not identify.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 23, 2026

Signature: ___________________________________

Gregory Stenstrom

# Official PA-5 webpage - unchanged full-page capture

Captured November 23, 2026, 11:09:56 p.m. EST

Results displayed are unofficial and for informational purposes only. Counties provide these unofficial results as they tally votes cast via in-person, mail-in, and provisional ballots.

Official results will be clearly marked as such on the site after counties complete the certification process.

PA Commonwealth of Pennsylvania Election Results

Home Reports Elections Counties Offices Other Links

Tuesday, November 3, 2026

**2026 General Election (Unofficial Returns)**

Representative in Congress - Statewide

Back to all election results

**Representative in Congress - 5th Congressional District**

**Filter by county**



Search counties

**Results displayed are unofficial and for informational purposes only. Counties provide these unofficial results as they tally votes cast via in-person, mail-in, and provisional ballots.**

**Official results will be clearly marked as such on the site after counties complete the certification process.**

**CHESTER** By Vote Method

| Candidate | Result |
|---|---|
| MARY GAY SCANLON (DEM) | 0.00% (Votes: 0) |
| NICK MANGANARO (REP) | 0.00% (Votes: 0) |

**DELAWARE** By Vote Method

| Candidate | Result |
|---|---|
| MARY GAY SCANLON (DEM) | 69.80% (Votes: 164,438) |
| NICK MANGANARO (REP) | 30.20% (Votes: 71,136) |

**MONTGOMERY** By Vote Method

| Candidate | Result |
|---|---|
| MARY GAY SCANLON (DEM) | 81.12% (Votes: 35,567) |
| NICK MANGANARO (REP) | 18.88% (Votes: 8,279) |

**PHILADELPHIA** By Vote Method

| Candidate | Result |
|---|---|
| MARY GAY SCANLON (DEM) | 81.36% (Votes: 15,980) |
| NICK MANGANARO (REP) | 18.64% (Votes: 3,660) |

**PRIVACY POLICY SECURITY POLICY AGENCIES**

COPYRIGHT © 2026 COMMONWEALTH OF PENNSYLVANIA. ALL RIGHTS RESERVED

Disclaimer: Results displayed are ***unofficial*** and for informational purposes only. Counties provide these ***unofficial*** results as they tally votes cast via in-person, mail, and provisional ballots. Official results will be clearly marked as such on the site after counties complete the certification process.